# BARRY S. GLASS AND SHIRLEY P. GLASS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos:                                           Filed November 17, 1986.

| | | | | | |
|---|---|---|---|---|---|
| 13278-78, | 4054-79, | 5544-79, | 5649-79, | 7605-79, | 7692-79, |
| 8146-79, | 8147-79, | 8148-79, | 8150-79, | 8151-79, | 8152-79, |
| 8153-79, | 8156-79, | 8157-79, | 8158-79, | 8160-79, | 8161-79, |
| 8163-79, | 8668-79, | 8720-79, | 9118-79, | 9453-79, | 9454-79, |
| 9455-79, | 9456-79, | 9457-79, | 9458-79, | 9459-79, | 9460-79, |
| 9461-79, | 9580-79, | 9587-79, | 9588-79, | 9589-79, | 9590-79, |
| 9591-79, | 9698-79, | 9699-79, | 9700-79, | 9830-79, | 9908-79, |
| 9993-79, | 10466-79, | 11819-79, | 11822-79, | 12157-79, | 12427-79, |
| 12803-79, | 13009-79, | 13580-79, | 13586-79, | 13835-79, | 14469-79, |
| 14502-79, | 14656-79, | 14944-79, | 14947-79, | 15119-79, | 15144-79, |
| 15145-79, | 15232-79, | 15238-79, | 15259-79, | 15260-79, | 15286-79, |
| 15340-79, | 15591-79, | 16151-79, | 16319-79, | 16358-79, | 16823-79, |
| 17421-79, | 17539-79, | 321-80, | 673-80, | 798-80, | 868-80, |
| 956-80, | 957-80, | 958-80, | 959-80, | 960-80, | 961-80, |
| 962-80, | 963-80, | 964-80, | 965-80, | 966-80, | 967-80, |
| 1130-80, | 1131-80, | 1132-80, | 1133-80, | 1134-80, | 1135-80, |
| 1136-80, | 1137-80, | 1138-80, | 1139-80, | 1140-80, | 1141-80, |
| 1142-80, | 1243-80, | 1339-80, | 1627-80, | 2502-80, | 2569-80, |
| 2872-80, | 2875-80, | 3205-80, | 3279-80, | 3332-80, | 3333-80, |
| 3334-80, | 3335-80, | 3336-80, | 3565-80, | 3566-80, | 3568-80, |
| 3705-80, | 3999-80, | 4000-80, | 4036-80, | 4174-80, | 4363-80, |
| 4457-80, | 4567-80, | 4665-80, | 5055-80, | 5333-80, | 5334-80, |
| 5395-80, | 5396-80, | 5397-80, | 5398-80, | 5399-80, | 5400-80, |
| 5401-80, | 5465-80, | 5466-80, | 5467-80, | 5468-80, | 5469-80, |
| 5470-80, | 6315-80, | 6589-80, | 6590-80, | 6591-80, | 6840-80, |
| 6906-80, | 7204-80, | 7829-80, | 7836-80, | 8151-80, | 8536-80, |
| 8583-80, | 8584-80, | 8585-80, | 8586-80, | 8587-80, | 8588-80, |
| 8589-80, | 8711-80, | 8905-80, | 9060-80, | 9076-80, | 9084-80, |
| 9325-80, | 9329-80, | 9330-80, | 9331-80, | 9332-80, | 9333-80, |
| 9418-80, | 9423-80, | 9443-80, | 9590-80, | 9746-80, | 9747-80, |
| 9748-80, | 9763-80, | 10226-80, | 10252-80, | 10269-80, | 10270-80, |
| 10525-80, | 10597-80, | 10604-80, | 10605-80, | 10642-80, | 10643-80, |
| 10660-80, | 10721-80, | 10722-80, | 10723-80, | 10724-80, | 10725-80, |
| 10902-80, | 10922-80, | 10929-80, | 10986-80, | 11017-80, | 11067-80, |
| 11068-80, | 11096-80, | 11097-80, | 11140-80, | 11173-80, | 11174-80, |
| 11175-80, | 11176-80, | 11177-80, | 11195-80, | 11205-80, | 11206-80, |
| 11207-80, | 11208-80, | 11212-80, | 11216-80, | 11282-80, | 11402-80, |
| 11495-80, | 11496-80, | 11574-80, | 11605-80, | 11640-80, | 11689-80, |
| 11737-80, | 11739-80, | 11745-80, | 11748-80 | 11755-80, | 11756-80, |
| 11757-80, | 11780-80, | 11781-80, | 11782-80, | 11783-80, | 11811-80, |

[1]Cases of petitioners listed in Appendix A are consolidated herewith.

| | | | | | |
|---|---|---|---|---|---|
| 11823-80, | 11894-80, | 11952-80, | 12006-80, | 12009-80, | 12027-80, |
| 12028-80, | 12029-80, | 12030-80, | 12067-80, | 12122-80, | 12144-80, |
| 12164-80, | 12197-80, | 12198-80, | 12199-80, | 12203-80, | 12204-80, |
| 12207-80, | 12213-80, | 12214-80, | 12216-80, | 12218-80, | 12219-80, |
| 12221-80, | 12224-80, | 12225-80, | 12226-80, | 12229-80, | 12232-80, |
| 12233-80, | 12236-80, | 12237-80, | 12238-80, | 12241-80, | 12246-80, |
| 12247-80, | 12249-80, | 12250-80, | 12252-80, | 12253-80, | 12254-80, |
| 12255-80, | 12261-80, | 12262-80, | 12263-80, | 12264-80, | 12265-80, |
| 12266-80, | 12267-80, | 12268-80, | 12269-80, | 12270-80, | 12273-80, |
| 12274-80, | 12343-80, | 12344-80, | 12345-80, | 12410-80, | 12417-80, |
| 12491-80, | 12608-80, | 12609-80, | 12610-80, | 12611-80, | 12612-80, |
| 12613-80, | 12614-80, | 12615-80, | 12616-80, | 12617-80, | 12618-80, |
| 12619-80, | 12620-80, | 12621-80, | 12622-80, | 12623-80, | 12624-80, |
| 12625-80, | 12721-80, | 12767-80, | 12774-80, | 12793-80, | 12834-80, |
| 12864-80, | 12884-80, | 12901-80, | 12928-80, | 12970-80, | 12976-80, |
| 12987-80, | 13049-80, | 13066-80, | 13067-80, | 13068-80, | 13069-80, |
| 13125-80, | 13126-80, | 13142-80, | 13155-80, | 13162-80, | 13192-80, |
| 13199-80, | 13223-80, | 13383-80, | 13452-80, | 13540-80, | 13604-80, |
| 13616-80, | 13765-80, | 14448-80, | 14757-80, | 15144-80, | 15592-80, |
| 15770-80, | 15771-80, | 15811-80, | 15899-80, | 16204-80, | 16319-80, |
| 16483-80, | 16556-80, | 16557-80, | 16558-80, | 16559-80, | 16560-80, |
| 16561-80, | 16562-80, | 16563-80, | 16656-80, | 16680-80, | 16681-80, |
| 16856-80, | 16857-80, | 16858-80, | 17069-80, | 17117-80, | 17147-80, |
| 17148-80, | 17336-80, | 17351-80, | 17457-80, | 17644-80, | 18137-80, |
| 18654-80, | 18692-80, | 19091-80, | 19247-80, | 19248-80, | 19382-80, |
| 19395-80, | 19396-80, | 19419-80, | 19492-80, | 19664-80, | 19665-80, |
| 19666-80, | 19669-80, | 19670-80, | 19750-80, | 19751-80, | 19752-80, |
| 19753-80, | 19754-80, | 19897-80, | 19898-80, | 20078-80, | 20079-80, |
| 20138-80, | 20292-80, | 20293-80, | 20295-80, | 20296-80, | 20297-80, |
| 20298-90, | 20299-80, | 20362-80, | 20436-80, | 20521-80, | 20522-80, |
| 20531-80, | 20543-80, | 20574-80, | 20697-80, | 20699-80, | 20700-80, |
| 20701-80, | 20703-80, | 20768-80, | 20770-80, | 20771-80, | 20847-80, |
| 21035-80, | 21036-80, | 21037-80, | 21039-80, | 21126-80, | 21127-80, |
| 21128-80, | 21129-80, | 21130-80, | 21179-80, | 21180-80, | 21188-80, |
| 21282-80, | 21817-80, | 22035-80, | 22085-80, | 22195-80, | 22511-80, |
| 22512-80, | 22867-80, | 22981-80, | 277-81, | 278-81, | 279-81, |
| 387-81, | 388-81, | 389-81, | 390-81, | 391-81, | 392-81, |
| 463-81, | 537-81, | 538-81, | 666-81, | 667-81, | 668-81, |
| 669-81, | 670-81, | 705-81, | 910-81, | 911-81, | 927-81, |
| 940-81, | 998-81, | 1000-81, | 1009-81, | 1051-81, | 1109-81, |
| 1110-81, | 1232-81, | 1233-81, | 1240-81, | 1241-81, | 1242-81, |
| 1403-81, | 1404-81, | 1405-81, | 1501-81, | 1539-81, | 1563-81, |
| 1802-81, | 1871-81, | 2029-81, | 2030-81, | 2078-81, | 2373-81, |
| 2398-81, | 2459-81, | 2579-81, | 2658-81, | 3001-81, | 3002-81, |
| 3003-81, | 3004-81, | 3066-81, | 3185-81, | 3269-81, | 3286-81, |
| 3337-81, | 3544-81, | 3545-81, | 3546-81, | 3547-81, | 3561-81, |
| 3583-81, | 3618-81, | 3802-81, | 4135-81, | 4270-81, | 4348-81, |
| 4419-81, | 4467-81, | 4468-81, | 4496-81, | 4785-81, | 4786-81, |
| 4827-81, | 4841-81, | 4894-81, | 4909-81, | 4910-81, | 4911-81, |

4987-81, 5083-81, 5123-81, 5194-81, 5237-81, 5458-81,
5539-81, 5540-81, 5541-81, 5618-81, 5621-81, 5669-81,
5787-81, 5812-81, 5813-81, 6114-81, 6115-81, 6145-81,
6146-81, 6147-81, 6377-81, 6500-81, 6556-81, 6583-81,
6762-81, 6763-81, 6764-81, 6929-81, 7113-81, 7213-81,
7214-81, 7372-81. 7389-81, 7698-81, 7851-81, 7852-81,
8020-81, 8431-81, 8432-81, 8434-81, 8545-81, 8573-81,
8586-81, 8589-81, 9395-81, 9501-81, 9705-81, 9716-81,
9845-81, 9917-81, 9926-81, 9940-81, 10003-81, 10196-81,
10939-81, 11621-81, 11717-81, 11718-81, 11797-81, 11820-81,
11846-81, 11892-81, 11929-81, 12219-81, 12324-81, 12352-81,
12525-81, 12742-81, 12806-81, 12827-81, 12828-81, 12829-81,
12830-81, 12831-81, 12832-81, 12833-81, 12834-81, 12835-81,
12836-81, 12837-81, 12838-81, 12839-81, 12840-81, 12841-81,
12842-81, 12843-81, 12844-81, 12845-81, 12846-81, 12847-81,
12848-81, 12849-81, 12850-81, 12863-81, 12878-81, 13026-81,
13064-81, 13132-81, 13133-81, 13276-81, 13664-81, 13707-81,
13809-81, 13810-81, 13898-81, 13913-81, 13938-81, 14058-81,
14134-81, 14353-81, 14441-81, 14446-81, 14608-81, 14776-81,
15327-81, 15328-81, 15329-81, 15332-81, 15333-81, 15334-81,
15335-81, 15336-81, 15389-81, 15507-81, 15536-81, 15537-81,
15538-81, 15540-81, 15541-81, 15675-81, 15875-81, 15930-81,
15934-81, 15967-81, 15987-81, 16015-81, 16288-81, 16388-81,
16398-81, 16469-81, 16481-81, 16517-81, 16702-81, 16770-81,
16890-81, 16963-81, 17033-81, 17108-81, 17187-81, 17394-81,
17452-81, 17453-81, 17524-81, 17525-81, 17528-81, 17529-81,
17532-81, 17603-81, 17665-81, 17682-81, 17762-81, 17810-81,
17828-81, 17829-81, 17838-81, 17924-81, 17932-81, 17933-81,
17935-81, 17996-81, 18041-81, 18217-81, 18264-81, 18337-81,
18416-81, 18428-81, 18573-81, 18671-81, 18747-81, 18929-81,
18939-81, 19013-81, 19080-81, 19103-81, 19108-81, 19173-81,
19181-81, 19331-81, 19336-81, 19758-81, 19912-81, 20338-81,
20492-81, 20514-81, 20627-81, 20641-81, 20689-81, 20933-81,
21155-81, 21170-81, 21641-81, 21896-81, 21906-81, 22192-81,
22244-81, 22359-81, 22409-81, 22412-81, 22413-81, 22414-81,
22415-81, 22417-81, 22418-81, 22419-81, 22420-81, 22436-81,
22450-81, 22498-81, 22522-81, 22548-81, 22644-81, 22904-81,
22966-81, 23122-81, 23123-81, 23124-81, 23321-81, 23322-81,
23323-81, 23324-81, 23376-81, 23445-81, 23475-81, 23544-81,
23591-81, 24091-81, 24207-81, 24208-81, 24272-81, 24461-81,
24519-81, 24604-81, 24755-81, 25047-81, 25089-81, 25090-81,
25091-81, 25257-81, 25348-81, 25349-81, 25538-81, 25639-81,
25877-81, 25879-81, 25880-81, 25994-81, 26011-81, 26122-81,
26203-81, 26271-81, 26290-81, 26700-81, 26768-81, 26925-81,
26999-81, 27176-81, 27177-81, 27223-81, 27224-81, 27225-81,
27237-81, 27400-81, 27633-81, 27634-81, 27719-81, 27932-81,
28076-81, 28431-81, 28492-81, 28493-81, 28495-81, 28496-81,
28730-81, 28731-81, 29252-81, 29331-81, 29417-81, 29423-81,
29646-81, 30042-81, 30045-81, 30434-81, 30435-81, 30546-81,

30618-81, 30640-81, 30641-81, 30708-81, 30709-81, 30920-81,
30974-81, 31139-81, 31178-81, 31186-81, 31188-81, 31190-81,
31191-81, 31192-81, 31262-81, 31278-81, 31288-81, 31299-81,
31327-81, 31348-81, 31349-81, 31350-81, 31536-81, 31589-81,
31614-81, 183-82, 678-82, 706-82, 776-82, 784-82,
849-82, 890-82, 993-82, 1199-82, 1235-82, 1295-82,
1347-82, 1353-82, 1496-82, 1536-82, 1568-82, 1775-82,
1790-82, 1813-82, 1834-82, 1841-82, 1982-82, 2018-82,
2080-82, 2283-82, 2284-82, 2285-82, 2286-82, 2287-82,
2293-82, 2299-82, 2300-82, 2308-82, 2334-82, 2475-82
2648-82, 2776-82, 2782-82, 2844-82, 2881-82, 2906-82,
3122-82, 3280-82, 3406-82, 3408-82, 3432-82, 3519-82,
3534-82, 3535-82, 3537-82, 3538-82, 3627-82, 3685-82,
3770-82, 3794-82, 3864-82, 3874-82, 3968-82, 3999-82,
4000-82, 4001-82, 4002-82, 4003-82, 4004-82, 4005-82,
4006-82, 4007-82, 4008-82, 4009-82, 4010-82, 4011-82,
4017-82, 4160-82, 4509-82, 4518-82, 4629-82, 4630-82,
4631-82, 4763-82, 4764-82, 4821-82, 4907-82, 4993-82,
5070-82, 5072-82, 5074-82, 5228-82, 5229-82, 5337-82,
5442-82, 5529-82, 5661-82, 5868-82, 5869-82, 5870-82,
5871-82, 5872-82, 5873-82, 5907-82, 5908-82, 5915-82,
5924-82, 5936-82, 5957-82, 6063-82, 6116-82, 6139-82,
6200-82, 6365-82, 6382-82, 6395-82, 6557-82, 6828-82,
6837-82, 6838-82, 6839-82, 6841-82, 6850-82, 6857-82,
6870-82, 7045-82, 7121-82, 7128-82, 7310-82, 7786-82,
7808-82, 7977-82, 8074-82, 8413-82, 8415-82, 8580-82,
8739-82, 10129-82, 10287-82, 10444-82, 10622-82, 10623-82,
11087-82, 11810-82, 11811-82, 12000-82, 12809-82, 12926-82,
13062-82, 13241-82, 13242-82, 13285-82, 13320-82, 13415-82,
13617-82, 13667-82, 13689-82, 13998-82, 14197-82, 14309-82,
14310-82, 14311-82, 14312-82, 14313-82, 14314-82, 14315-82,
14470-82, 14712-82, 14731-82, 14732-82, 14733-82, 14803-82,
14856-82, 14949-82, 14959-82, 14960-82, 14961-82, 14968-82,
14969-82, 15002-82, 15007-82, 15018-82, 15058-82, 15073-82,
15094-82, 15097-82, 15260-82, 15646-82, 15704-82, 15788-82,
15844-82, 15914-82, 16284-82, 16285-82, 16350-82, 16419-82,
16629-82, 16630-82, 16631-82, 16632-82, 16753-82, 17308-82,
17311-82, 17452-82, 17453-82, 17460-82, 17463-82, 17853-82,
17917-82, 18399-82, 18400-82, 18401-82, 19184-82, 19185-82,
19318-82, 19488-82, 20138-82, 20423-82, 20983-82, 21016-82,
21282-82, 22277-82, 22783-82, 24028-82, 24371-82, 25066-82,
25070-82, 25174-82, 25411-82, 25506-82, 26314-82.

*Martin M. Ruken*, *Robert E. Kolek*, *Kenneth C. Shepro*, *Herbert L. Zarov*, *John S. Pennish*, *R. LaMar Bishop*, and *Gary S. Vandeweghe*, for the petitioners.

*Stephen M. Miller* and *Carolyn A. Boyer*, for the respondent.

NIMS, *Judge*: In these consolidated cases, respondent determined aggregate deficiencies in excess of $61 million in petitioners' Federal income taxes for the years 1975 through 1980.[2]

Each of the petitioners in these cases entered into a series of transactions herein sometimes referred to for convenience as the London Options Transaction. The issues for decision are: (1) Whether the London Options Transactions are shams; and (2) if the transactions are not shams, whether they were entered into for profit under the standard set forth in section 108 of the Tax Reform Act of 1984.[3]

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in Massachusetts at the time their respective petitions were filed: 18692-80, 19753-80, 20768-80, and 14968-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either New York, Connecticut, or Vermont at the time their respective petitions were filed: 13835-79, 1627-80, 9423-80, 9746-80, 9747-80, 9748-80, 10902-80, 11811-80, 12144-80, 19750-80, 19897-80, 19898-80, 4841-81, 11717-81,

---

[2]The years stated merely represent the range of taxable years at issue; not all petitioners had deficiencies determined for each of these years.

[3]Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494. Except as otherwise stated, all section references (except to sec. 108 of the Tax Reform Act of 1984 are to sections of the Internal Revenue Code of 1954 in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

11718-81, 12324-81, 19181-81, 20627-81, 23591-81, 24091-81, 24604-81, 24755-81, 26700-81, 27400-81, 27719-81, 30709-81, 31186-81, 31188-81, 31190-81, 31191-81, 31192-81, 31262-81, 31278-81, 31299-81, 31327-81, 1347-82, 1982-82, 2018-82, 3280-82, 3770-82, 7128-82, 10129-82, 10287-82, and 13415-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either New Jersey or Pennsylvania at the time their respective petitions were filed: 13142-80, 15770-80, 15771-80, 16558-80, 17351-80, 21188-80, 2459-81, 7214-81, 13809-81, 13810-81, 28496-81, 25066-82, 25070-82, and 25174-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either North Carolina or Maryland at the time their respective petitions were filed: 321-80, 6906-80, 12976-80, 17069-80, 22085-80, 22195-80, 5194-81, 6377-81, 6500-81, 6929-81, 7113-81, 7698-81, 8020-81, 8573-81, 8586-81, 9395-81, 10196-81, 11621-81, 11846-81, 11892-81, 11929-81, 12742-81, 13026-81, 13664-81, 14058-81, 14776-81, 20338-81, 22418-81, and 776-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either Texas or Louisiana at the time their respective petitions were filed: 5544-79, 5395-80, 5396-80, 5397-80, 5398-80, 5399-80, 5400-80, 5401-80, 6315-80, 10721-80, 12901-80, 15592-80, 16656-80, 17117-80, 17457-80, 19492-80, 21817-80, 5540-81, 9926-81, 12841-81, 23475-81, 23544-81, 25348-81, 25349-81, 25877-81, 25879-81, 27633-81, 27634-81, 993-82, 3794-82, 5907-82, 5908-82, 11087-82, and 16285-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either Michigan or Kentucky at the time their respective petitions were filed: 3565-80, 3566-80, 3568-80, 538-81, 7213-81, 2475-82, and 20983-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either Illinois or Indiana at the time their respective petitions were filed: 15145-79, 16358-79, 9060-80,

10642-80, 10643-80, 11067-80, 11068-80, 11173-80, 11174-80,
11175-80, 11176-80, 11177-80, 11195-80, 11205-80, 11206-80,
11207-80, 11216-80, 11605-80, 11755-80, 11756-80, 11757-80,
12609-80, 13223-80, 17336-80, 19419-80, 20531-80, 3561-81,
4987-81, 6762-81, 6763-81, 6764-81, 7851-81, 7852-81,
8431-81, 8432-81, 8434-81, 8545-81, 9501-81, 12878-81,
13276-81, 13898-81, 13913-81, 15875-81, 18428-81, 20514-81,
23324-81, 25639-81, 29423-81, 706-82, 3408-82, 3432-82,
5442-82, 5957-82, 6839-82, 10622-82, 13667-82, 14309-82,
14310-82, 14311-82, 14312-82, 14313-82, 14314-82, 14315-82,
14731-82, 14732-82, 14733-82, 14959-82, 14961-82, 15058-82,
15073-82, 15094-82 15844-82, 15914-82, 16629-82, 16630-82,
16631-82,[4] 16632-82, 17452-82, 17453-82, 17460-82, 20423-82,
and 22783-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either Missouri, Nebraska, Minnesota, or Iowa at the time their respective petitions were filed: 12417-80, 17810-81, 17838-81, 19173-81, 25880-81, 2299-82, 8074-82, and 10623-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either Utah, Wyoming, Colorado, Kansas, or Oklahoma at the time their respective petitions were filed: 8146-79, 8147-79, 8148-79, 8150-79, 8151-79, 8152-79, 8153-79, 8156-79, 8157-79, 8158-79, 8160-79, 8161-79, 8163-79, 8720-79, 9118-79, 9457-79, 9580-79, 9590-79, 9698-79, 9699-79, 9700-79, 12157-79, 15591-79, 1142-80, 1243-80, 1339-80, 2872-80, 2875-80, 3279-80, 3705-80, 4000-80, 4036-80, 4174-80, 4567-80, 8587-80, 8905-80, 9084-80, 9443-80, 10660-80, 10929-80, 11017-80, 11737-80, 11739-80, 11745-80, 11748-80, 11781-80, 11782-80, 11952-80, 12029-80, 12030-80, 12197-80, 12198-80, 12199-80, 12203-80, 12204-80, 12207-80, 12213-80, 12214-80, 12216-80, 12218-80, 12219-80, 12221-80, 12224-80, 12225-80, 12226-80, 12229-80, 12232-80, 12233-80, 12236-80, 12237-80, 12238-80, 12241-80, 12246-80, 12247-80, 12249-80, 12250-80, 12252-80, 12253-80, 12254-80, 12255-80, 12261-80, 12262-80, 12263-80, 12264-80, 12265-80, 12266-80, 12267-80, 12268-80, 12269-80, 12270-80, 12273-80, 12274-80, 12610-80, 12619-80, 13125-80, 13162-80,

---

[4]Petitioner Joseph Interlandi in docket No. 16631-82 resided in California.

13199-80, 13540-80, 16204-80, 16319-80, 16556-80, 16557-80, 16560-80, 16563-80, 16681-80, 17148-80, 18137-80, 19395-80,[5] 19396-80,[6] 19664-80, 19665-80, 19666-80, 19669-80, 19670-80, 20078-80, 20079-80, 20292-80, 20293-80, 20295-80, 20296-80, 20297-80, 20298-80, 20299-80, 20362-80, 20522-80, 20697-80, 20699-80, 20700-80, 20701-80, 20703-80, 20770-80, 20771-80, 20847-80, 21035-80, 21036-80, 21037-80, 21039-80, 21126-80, 21127-80, 21128-80, 21129-80, 21130-80, 22511-80, 22512-80, 391-81, 537-81, 666-81, 667-81, 669-81, 670-81, 1233-81, 1563-81, 2029-81, 3001-81, 3003-81, 3004-81, 5123-81, 5237-81, 9845-81, 9940-81, 12219-81,[7] 12806-81, 12827-81, 12828-81, 12838-81, 12847-81, 12850-81, 13132-81, 13938-81, 14134-81, 16702-81, 17452-81, 22409-81, 22412-81, 22904-81, 23123-81, 23124-81, 23322-81, 24207-81, 24208-81, 25047-81, 27176-81, 27177-81, 27223-81, 27224-81, 27225-81, 28431-81, 29252-81, 29646-81, 30640-81, 30641-81, 31348-81, 31349-81, 31350-81, 890-82, 3627-82, 7808-82, 14470-82, 14949-82, 14969-82, 15007-82, and 15788-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either Alabama, Florida, or Georgia at the time their respective petitions were filed: 4054-79, 10252-80, 11640-80, 11894-80, 12122-80, 14757-80, 15899-80, 19248-80, 20521-80, 22981-80, 2398-81, 12840-81, 15538-81, 24461-81, 1235-82, 2293-82, 3874-82, 13689-82, and 17463-82.

Petitioners in the following docket numbers resided (or, if corporations, had their principal places of business or offices) in either West Germany, Great Britain, Canada, or France at the time their respective petitions were filed: 12987-80, 16483-80, 16963-81, 17532-81, 18747-81, 19013-81, 23321-81, 28492-81, and 5074-82.

The remaining petitioners resided (or, if corporations, had their principal places of business or offices) in either California, Arizona, Idaho, Montana, Nevada, Washington, Oregon, Alaska, or Hawaii at the time their respective petitions were filed.[8]

---

[5] Petitioners Werner Haack and Helen E. Haack in docket No. 19395-80 resided in California.

[6] Eighty-four separate petitioners were listed on the joint petition in docket No. 19396-80. Two unspecified petitioners resided in New York and Oregon, respectively.

[7] Petitioners Donald W. Hurta and Marian Hurta in docket No. 12219-81 resided in Texas.

[8] Petitioners Wilson Darell Murphy and Linda S. Murphy in docket No. 10939-81 resided in Texas.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

## I. *Introduction*

A typical London options transaction entered into by a petitioner involved a 2-year series of commodity trades and employed either an option-straddle or option-hedge trading strategy. Under the more prevalent option-straddle trading strategy, a petitioner purchased and sold options for future delivery of a specified metal in the first year of the transaction. Shortly thereafter, identical offsetting positions were executed resulting in an expected ordinary loss and short-term capital gain in approximately the same amount for the first year. The short-term capital gain was then "rolled over" into either a short-term or long-term capital gain in the second year through the execution of a futures straddle.

All London options transactions entered into by petitioners were conducted through one or more of 17 foreign broker/dealers operating on the London Metal Exchange (LME). Substantially all of the transactions were conducted with the following six so-called "major" broker/dealers: Rudolf Wolff & Co., Ltd. (Rudolf Wolff), Competex, S.A. (Competex), Gardner Lohmann Ltd. (Gardner Lohmann), Amalgamated Metal Trading Ltd. (Amalgamated), Rothmetal Trading Ltd. (Rothmetal), and Commodity Analysis Ltd. (Commodity Analysis).

In the following section, a general description of the LME, the types of contracts traded, and the option-straddle and option-hedge trading strategies are presented. Then, each of the major broker/dealers and a representative London options transaction conducted by each of them are discussed in detail.

## II. *Background*

### A. *The London Metal Exchange (the LME)*

The LME, a commodity exchange located in London, England, was established in 1877. Cash, future, and option

contracts in silver, copper, zinc, tin, and lead are all traded on the LME.

The LME maintains three categories of membership—individual, representative, and associate subscribers. Individual subscribers are primarily persons prominent in metal trading but temporarily unaffiliated with a member company. Representative subscribers, the most important group, trade on behalf of their companies or organizations directly in the "ring," the part of the exchange where formal trading occurs. The third category of members, the associate subscribers, are entitled to participate in the market but may not trade directly in the ring. All members are subject to annual election.

Before a company can be represented by a ring-dealing subscriber, it must meet stringent financial requirements. A margin of solvency test which includes both a proof of net asset worth and an independent bank or parent company guarantee is required. In addition, a ring-dealing company must be incorporated in the United Kingdom and be subject to British company law. During the years 1975 through 1980, there were approximately 30 ring-dealing members of the LME.

Unlike its American counterparts (e.g., the New York Stock Exchange and the Chicago Board Options Exchange), the LME does not operate as a clearing house for trades. Rather, all transactions on or subject to the rules of the LME are executed on a principal-to-principal basis. Thus, in each of these consolidated cases, a petitioner who purchased an option or futures contract through a broker/dealer was, in effect, actually purchasing that contract from the broker/dealer. Conversely, the broker/dealers were the purchasers of contracts whenever petitioners sold contracts in executing a London options transaction.

Because the LME operates as a principal's market, broker/dealers are legally obligated to fulfill their part of any contract entered into with either another broker/dealer or a customer. A broker/dealer normally thus will lay off[9] his trades; i.e., enter into an offsetting contract with another party. A broker/dealer who fails to lay off a trade is

---

[9]The term "trading back-to-back" as used herein is synonymous with the term "laying off" as used herein.

said to be running a position (taking a risk) in the market. The LME does not require broker/dealers to lay off trades.

Trading on the LME occurs in three different ways: *Formalized ring trading* takes place twice a day during morning and afternoon sessions. Each metal is traded twice during each session in 5 minute "rings." After the close of the final ring of the morning session, the LME quotations committee announces the official buyers' and sellers' prices for the metals traded. The official prices are merely the last bid and offer prices prevailing at the close of the ring. The so-called "settlement price" is the official price for cash sellers of a particular metal.

The afternoon session is similarly conducted with each metal again being traded in two separate rings. The London Financial Times reports the closing price of silver for the afternoon session as the "LME close." The closing prices of all other LME traded metals are reported as the "PM Unofficial."

*Kerb trading* entails formalized trading by ring members (representative subscribers) for a period of 15 minutes following the close of both the morning and afternoon ring sessions. All metals are simultaneously traded on the kerb.

*Inter-dealer market* trading consists of all trading which is not done either on the ring or on the kerb. Approximately 80 percent of all LME trading occurs in the inter-dealer market. All inter-dealer trades are subject to LME rules.

Because the LME operates as a principal's market, no accurate financial data summarizing the transactions entered into by the various broker/dealers exists. Trading volume can thus only be estimated. Although such estimates are reported in the London Financial Times, they do not reflect the substantial amount of trading activity which takes place on the inter-dealer market.

Another significant difference between the LME and U.S. commodity exchanges is the LME's lack of limits on price changes for metals which are traded. Prices are free to fluctuate on the LME as market conditions dictate.

B. *Types of Contracts Traded*

1. *Option Contracts*

The three most common forms of options traded on the LME are call, put, and double options. A call option gives

the holder (the buyer) the right to buy from the grantor (the seller or writer) a specified quantity of a commodity at an agreed upon price at any time before the option's expiration date. The holder of a put option has the right to sell a specified quantity of a commodity at an agreed upon price to the grantor at any time before the option's expiration date. A third type of option is known as a double option. The holder of a double option has the right to either sell or buy the underlying commodity at ,the agreed upon price by the option's expiration date. A double option is in effect the combination of both a put and a call option.

An option contract is unique in that the holder has the right but not the obligation to purchase or sell the stated commodity at the agreed price. Thus, while the grantor of an option might appear to be subject to unlimited risk, the holder is never at risk for more than the cost of the option.

The price paid by the holder to the grantor to purchase an option is known as the premium. Each option contract contains a strike (basis) price, the agreed upon price at which the holder may exercise his right to either buy or sell the underlying commodity (depending on whether a call or put option has been granted). An option holder must declare his intention to exercise the option before the option's declaration date. An option holder's failure to declare by the declaration date represents an abandonment of the option. Finally, the delivery date (or prompt date) is the date on which the underlying commodity has to be delivered if the option is exercised.

The minimum contract size or unit for each metal traded on the LME is referred to as a "lot." Copper, lead, and zinc are traded in 25-ton lots. Tin is traded in 5-ton lots while silver is traded in 10,000 troy-ounce lots. Option premiums are expressed in pounds sterling (£) per ton except for silver, for which premiums are expressed in pences per ounce.

The declaration date of an LME option is normally 1 trading day prior to the delivery date for each month of the option's existence. Thus, a 3-month call option granted on January 10 for delivery on April 10 (the delivery date), would have a declaration date of\ April 7. The holder would have to declare his intention to exercise the call option by

April 7 or the option would be treated as having been abandoned.

The so-called traditional LME option is known as a market option. The strike price of a market option is normally set at the current future trading price of the underlying metal. In addition, traditional LME options are usually traded for a specific delivery date—1, 3, 6, 9, or 12 months forward from the day the option contract is made.

A second type of option traded on the LME is known as a traded or dealer option. Unlike traditional LME options, delivery dates of traded options are not tied to specific future dates. Moreover, the strike price of a traded option may be set at, above, or below the current future trading price of the underlying metal. As explained *infra*, the relationship between the strike price of a traded option and the market price of the underlying commodity will be reflected in the premium received for the option.

The primary difference between a traded option and a market option is flexibility, the former being far more flexible than the latter. Frequently, the holder or grantor of an option will want to "close out" his position prior to the option's declaration date. To close out a position, an option holder or grantor simply enters into an offsetting contract, thereby extinguishing all of his rights or obligations.

The inflexibility of closing out a market option arises from the difficulty of entering into an offsetting contract with identical terms. Because the strike price of a market option is customarily set at the *current* market price of the underlying commodity existing at the time the option is granted, the holder or grantor will normally be unable to enter into an offsetting position if the price of the underlying commodity has changed at the time of the desired closeout. In addition, the relatively rigid setting of declaration dates for market options makes it difficult to later contract for an offsetting position.

A traded option, however, offers much greater flexibility. The holder or grantor of a traded option can easily enter into an offsetting position having the same strike price and delivery date. Of course, the premium paid or received by the holder or grantor for entering into an offsetting contract will reflect changes in underlying market conditions. Be-

cause the options involved in executing a London options transaction were intended to be closed out prior to their declaration date, petitioners in these consolidated cases predominately entered into traded option contracts.

As previously noted, the strike price of a traded option can be set above, below, or equal to the current forward price of the underlying commodity. If the strike price of an option, as compared to the current market price of the underlying commodity, is in favor of the holder of the option (e.g., a silver call option with a strike price of 300 pence per ounce when the current market price for silver is 350 pence per ounce), the option is said to be "in the money." Conversely, an option is "out of the money" if the strike price of the option as compared to the current market price of the underlying commodity is in favor of the grantor (e.g., a silver put option with a strike price of 300 pence per ounce when the current price of silver is 350 pence per ounce).

In general, the amount of premium paid for an option is determined through negotiation and bargaining between willing buyers and sellers. Nevertheless, the premium paid for an option normally reflects two factors—an intrinsic value and a time value. An option's intrinsic value measures the relationship between the strike price and the current price of the underlying commodity (i.e., if and to what extent the option is in or out of the money). The time value of an option relates to the amount of time remaining until the option expires (the declaration date).

Broker/dealers charge fees in the form of commissions for executing options transactions. The amount of and manner in which commissions are charged can vary significantly. For example, ring members normally trade "net" with each other. When ring members trade net, profits are made not from commissions but rather from the difference between the bid and offer price of the contracts being traded.

Between a broker/dealer and a customer (e.g., a petitioner in these cases), however, commissions are normally charged based on a percentage of the strike price of the option. In addition, broker/dealers generally levy commissions only on the opening contract; thus no commissions are charged on the later closing transaction. Furthermore, at various times

broker/dealers sometimes trade net with individual customers.

As previously noted, trading on the LME occurs either on the ring, kerb, or inter-dealer market. Options, however, are generally not traded in the fast-paced environment of either the ring or the kerb because in addition to premiums there must also be negotiated the delivery dates and strike prices. Thus, the vast majority of options are traded on the inter-dealer market where buyers and sellers are afforded the time to reach agreement on the various components of an option contract.

## 2. *Futures Contracts*

A futures (or forward) contract requires the buyer to receive and seller to deliver a specified quantity of a given commodity at some future date. As with options, the delivery (or prompt) date is the agreed upon future date on which delivery of the commodity is due. Selling short (or taking a short position) refers to the sale of a futures contract while buying long (or taking a long position) denotes the purchase of a futures contract.

Although a future's contract is, of course, legally binding between the principals involved, actual delivery of the underlying commodity rarely occurs. Rather, like traded options, a futures contract is normally closed out before actual delivery occurs by entering into an offsetting contract with identical terms.

On the LME, futures contracts for metals are traded for delivery from the current date through 3 months forward, except for silver, which is traded from the current date through up to 7 months forward.

The future price of a commodity will, of course, either exceed, equal, or be less than the cash (or "nearby") price of that commodity. In a normal market, the future price of a commodity is greater than its cash price. The difference between the two prices is known as the "contango." The contango represents the cost of holding a commodity and thus is primarily related to prevailing interest rates. Warehouse and insurance costs are also reflected in a commodity's contango.

Occasionally, a shortage in a commodity occurs, resulting in the cash price being greater than the future price. In such a situation, a "backwardation" is said to exist.

## C. *Straddles*

A straddle consists of the simultaneous holding of a long position (a purchased contract) of a commodity for delivery in a future month and a short position (a sold contract) for the identical amount of the same commodity for delivery in a different future month. The long and short positions are commonly referred to as the legs of the straddle. Both option and futures contracts (or combinations of both) may be used in establishing (putting on) a straddle.

The legs of a straddle may be entered into simultaneously, i.e., each leg may be purchased and sold at the same time on the same day. In addition, a straddle may be established by separately executing the legs at different times. Similarly, the legs of a straddle may be closed out (i.e., offsetting contracts purchased and sold) either simultaneously or separately.

A switch transaction occurs when the holder of a straddle liquidates (i.e., closes out) one leg of the straddle and replaces the liquidated leg by either purchasing or selling (depending on whether a long or short position was liquidated) an identical quantity of the same commodity for delivery in a different month.

The potential for profit from a straddle arises from changes in the price differential (hereinafter sometimes referred to as the spread) between the legs of the straddle. A straddle in which the long position is held in a month farther out than the short position will increase in value if the price differential between the legs widens and will decrease in value if the price differential narrows. Conversely, a straddle in which the short position is held in a month farther out than the long position will increase in value if the price differential narrows and will decrease in value if the price differential widens.

As previously noted, the legs of a straddle are not always either put on or closed out simultaneously. When a short or long position is not held in a straddle configuration (i.e., the position is unhedged), the potential for profit arises solely

from the risk that the value of the position held will increase or decrease.

Initial margin (or initial deposit) is the amount of money which a broker/dealer may require from a customer in order to initiate trading. Margin payments provide insurance to broker/dealers that losses incurred in a customer's account will be met. Except for certain long-term silver futures contracts, there was no LME requirement during the years at issue as to payment of initial margin. A broker/dealer thus might begin trading for a customer without having received any initial margin if the broker/dealer believed that any future funds due from the customer would be forthcoming.

Although the amount of initial margin is subject to negotiation, it is normally based upon a percentage of the value of the outstanding futures contracts. Initial margins for a straddle are generally lower than for unhedged trading (i.e., open positions) because of the substantial reduction in a customer's exposure in a straddle investment.

Maintenance margin (or margin where the term "initial deposit" is used) is the amount of funds, if any, that a broker/dealer might require a customer to pay into his account after trading commences. The payment of maintenance margin, like initial margin, is negotiable.

Broker/dealers periodically value the open positions in a customer's account in order to determine whether the payment of maintenance margin is required. This valuation procedure, undertaken daily by most broker/dealers, is known as marking to market. The most recent market prices and spreads are generally used in marking to market a customer's account.

After a customer's account has been marked to market, and all relevant debits (e.g., losses on closed positions) and credits (e.g., previous margin deposits) have been taken into account, the net equity in a customer's account can be determined. A customer's net equity thus approximates the amount of funds a customer would receive (or pay, if the net equity were negative) if all open positions in the account were immediately closed out. If a broker/dealer believes insufficient net equity exists in a customer's account the customer may be required to pay a maintenance margin.

The LME does not require or regulate the charging of commissions on futures contracts. Typically, though, commissions are charged based on a percentage of the contract price.[10] Commission percentages generally range from one-sixteenth of 1 percent to one-fourth of 1 percent per leg of each transaction. Commissions might be charged on the opening or closing transactions, or partly on both. As previously noted, ring members frequently trade net with each other without charging commissions.

Frequently customers provide broker/dealers with the discretionary authority to trade on their behalf. Broker/dealers generally attempt to lay off their trades (see discussion, *supra*) when they conduct discretionary trading since the laying off of trades is essential in order to avoid a possible conflict of interest with a customer. When discretionary trades are laid off, broker/dealers cannot, by definition, profit on the market movement of the contracts entered into with customers. Thus, the commissions charged for executing the trades are the broker/dealers' sole source of profit.

### III. *The London Options Transactions*

#### A. *In General*

In the above section we have set forth a broad description of the LME and the types of contracts traded thereon. We turn now to a description of the actual transactions at issue in these consolidated cases. As previously noted, a typical London options transaction took place over a 2-year period in the form of either an option straddle or an option hedge. An option-straddle transaction,[11] the more prevalent trading strategy, was initiated by the following combination of trades in the first year of the transaction:

(1) An option straddle was put on, consisting of the simultaneous purchase and sale (grant) of either a call or put option (or both), for identical quantities of the same commodity with different delivery dates; and

---

[10]The contract price, or underlying contract value, is computed by multiplying the price per ounce or ton by the total number of ounces or tons.

[11]The term "option-straddle transaction" as used herein denotes a type of *trading strategy* based upon the use of both options and futures contracts. The term is to be distinguished from the term "option straddle" which is simply a straddle consisting of option contracts.

(2) A futures straddle was also put on, consisting of the simultaneous purchase and sale of futures contracts for identical quantities of the same commodity with different delivery dates.

Shortly after the option straddle was put on, the legs would be closed out through the purchase and sale of identical offsetting positions. The premium (purchase price) paid to buy an offsetting option which closed out the sold (granted) option would exceed the premium that had been received on the granted option, resulting in an overall net loss on the sold option leg of the straddle. Conversely, the premium received on the sale of an offsetting option which closed out the purchased option would exceed the premium that had been paid for the purchased option, resulting in an overall net gain on the purchased option leg of the straddle. The net loss and gain, which were approximately equal, would be reported as an ordinary loss and short-term capital gain for the first year of the transaction. Since the expected tax result in the first year was generally an ordinary loss, such loss could be used to offset ordinary income from unrelated sources.

Next, in a switch transaction, the so-called loss leg of the futures straddle would be closed out through the purchase (or sale) of an identical offsetting position and replaced by a new position with a different delivery date. (Because an inverse relationship normally exists between the legs of a futures straddle, one leg will have an unrealized loss while the other will have an unrealized gain.) The net loss on the closed leg of the futures straddle would be reported as a short-term capital loss in the first year of the transaction and would approximately equal the short-term capital gain incurred on closing out the purchased option position.

The final step of a typical option-straddle transaction occurred in the subsequent year, although not earlier than 6 months after the switch. Both legs of the futures straddle would be closed out by offsetting trades, resulting in a gain approximately equal to the loss incurred on the switch transaction in the previous year. The gain incurred would be reported as either a short-term or long-term capital gain in the second year of the transaction.

The second trading strategy employed by broker/dealers was the option-hedge transaction. In an option-hedge transaction, the sale of a call and/or put option was hedged by the purchase of a futures contract (to hedge the call) and/or the sale of a futures contract (to hedge the put). Shortly thereafter, the option positions would be closed out at a net loss through the purchase of an identical offsetting call and/or put option. Simultaneously with the purchase of the closing option positions, futures contracts would be executed to hedge the previously purchased and/or sold futures, thus forming one or more futures straddles. Finally, in the following year, thé futures straddles would be closed out at a gain approximately equal in amount to the loss incurred on the sold options.

Because both the option-straddle transaction and the option-hedge transaction strategies resulted in a capital gain in the second year of the transaction, many petitioners attempted to defer the gain (and possibly convert it into long-term gain) to the subsequent year by engaging in a rollover transaction. A rollover transaction simply entailed putting on another futures straddle in the second year of the transaction, subsequently closing out the loss leg in a switch, and then closing out the straddle at a gain in the following year.

B. *Representative Transactions*

1. *Background*

Each of the petitioners in these consolidated cases entered into one or more London options transactions. All of the trades comprising a London options transaction were executed for petitioners by broker/dealers on a discretionary account basis. Consequently, all decisions regarding aspects of a transaction (e.g., types of commodities and contracts traded) rested with the broker/dealers. In accordance with general LME rules, all London options transactions were executed on a principal-to-principal basis between petitioners and their respective broker/dealers.

The marketing and promotion of the London options transactions in the United States were conducted by persons known as finders. A finder would explain the London options transaction to a potential customer and

then transmit money and documents to a broker/dealer if the person wished to engage in a transaction.

Broker/dealers did not require petitioners to submit financial statements either prior or subsequent to opening a trading account. In addition, the amount of funds remitted to the broker/dealers by petitioners was agreed upon at the time of or prior to entering into a London options transaction. Finally, petitioners in every case received nominal or no funds back from the broker/dealers with whom they dealt.

### 2. *Actual Transactions*

#### a. *Introduction*

All but a handful of the London options transactions at issue in these consolidated cases were conducted through the following six so-called major broker/dealers: Competex, Rudolf Wolff, Gardner Lohmann, Amalgamated, Commodity Analysis, and Rothmetal. As previously discussed, each of the broker/dealers employed either an option-straddle or option-hedge trading strategy. Rudolf Wolff, however, traded both option straddles and option hedges for its customers. In addition, Gardner Lohmann and Amalgamated London options transactions occurred in tandem with Gardner Lohmann's executing the option trades and Amalgamated's executing the futures trades for petitioners. Thus, hereinafter the Gardner Lohmann and Amalgamated London options transactions are sometimes collectively referred to as the Gardner/Amalgamated transactions.

Below, each of the broker/dealers, their particular trading strategies, and representative transactions of petitioners who traded with them are discussed.

#### b. *Broker/Dealers Employing the Option-Straddle Trading Strategy*

##### i. *Competex*

###### (A) *In General*

Competex, a Swiss corporation (and thus not a member of the LME), was incorporated on April 14, 1976. All of Competex's trading records were maintained at its head-

quarters in Geneva, Switzerland. At the time of trial, Competex was in voluntary liquidation.

Sometime in 1976, James Gourlay (Gourlay) became employed as a manager of Competex under a verbal contract. Gourlay had extensive experience in commodity trading, including options. Prior to 1971, Gourlay was a partner in and representative subscriber for Rudolf Wolff. In 1971, Gourlay became an individual subscribing member of the LME after leaving Rudolf Wolff to form Ingleram Investments, Ltd. (Ingleram). Gourlay continued to operate Ingleram while he was employed as a manager at Competex.

As manager for Competex, Gourlay employed an option-straddle trading strategy for the approximately 265 petitioners who had discretionary accounts with Competex. Between January and September 1976, option straddles were executed for a substantial majority of petitioners who traded with Competex. Initially, simultaneous put and call options were bought and sold by petitioners for identical quantities of the same commodity for different delivery dates. Subsequently, all of the option positions were closed out through the purchase of offsetting positions. All of the granted options were closed out for a net loss, while the purchased options were closed out for a net gain.

Although Gourlay intended to earn a net economic profit for petitioners dealing with Competex through changes in the spread, he was aware that certain favorable tax consequences resulted under existing American tax law for losses incurred on granted options. Thus, after learning that legislation ending such favorable tax treatment had been enacted (see discussion *infra*), Gourlay ceased using the option-straddle trading strategy.

Gourlay's trading strategy also utilized futures straddles. For a substantial majority of petitioners who traded with Competex, a futures straddle with a 1-month spread was put on in early November 1976. The sold leg of the futures straddle had a delivery (prompt) date during the last week of August 1977, while the bought leg had a delivery date during the last week of September 1977.

Competex subsequently executed a total or partial switch in early December 1976 for each straddle. In a total switch,

the entire bought leg was closed and replaced by a new long position for the same quantity with a delivery date in the last week of October 1977. In a partial switch, only a portion of the bought leg was closed and replaced. Thus, all straddles after a total switch had a 2-month spread between legs, while the straddles undergoing a partial switch had combined 1- and 2-month spreads.

All of the 1-month spreads were closed out during the last week of April 1977. Then, on August 9, 1977, Competex closed out the long positions which had been put on during either the total or partial switch. The short positions were thus left open. On August 11, 1977, the short positions were closed, thus concluding the London options transactions executed by Competex.

Each of those petitioners' London options transactions which were handled by Competex were executed by Competex at prevailing market prices. Neither Gourlay nor anyone acting under his direction or control artificially assigned prices.

Gourlay never personally placed any of petitioners' trades. John Pitcher, who was employed by Gourlay, was responsible for the actual execution of trades and related paperwork. As noted above, Competex did not always simultaneously execute the legs of straddle transactions.

For the majority of petitioners who traded with Competex, Gourlay agreed to limit their losses to the amount of initial margin deposited. Competex charged commissions for executing transactions in a variety of ways, including charging the entire commission on the opening or closing transaction, charging half the commission on both the opening and closing transaction, or trading net.[12] All trades executed by Competex for petitioners were laid off by placing orders through ring-dealing members of the LME, including Rudolf Wolff, Gourlay's former employer.

Verbal authorization to trade discretionary accounts on behalf of petitioners was frequently given to Gourlay by finders. In return, the finders were compensated with a percentage of the commissions earned by Competex. The

---

[12]When trading net, the commission was included in the option premium or added to or subtracted from the price of the metal.

following promotional material describing the option-straddle trading strategy employed by Competex was sent by finders to prospective customers:

You may have some interest in a tax shelter which we are recommending to some of our clients which has extremely high potential benefits. It has the following attributes:

1. It is highly leveraged. For a $3,000 investment, a $25,000 1976 ordinary deduction can be acquired. That is the smallest amount which is available. However, greater write-offs are available with corresponding larger investments on an 8.3 to 1 ratio.

2. The economic risk is limited. It is a hedging transaction in silver where parity between monthly contracts is an historical fact and which when accomplished by a knowledgeable member of such exchange, the chance of overall loss is slight. However, the premiums and commissions for handling the transaction approximately equal the original investment.

3. Eighty-eight percent (88%) of the ordinary deduction taken in 1976 (the deduction less the original investment) will be recovered for tax purposes in 1977 *but at capital gains rates.* It is also possible to shelter the recovery by an additional transaction to take place in 1977. To someone who has capital loss carry forwards, the benefits are even greater.

Assuming a taxpayer in the 50% bracket, the tax consequences in 1976 are as follows; also assuming a $12,000 original investment and no shelter of the recovery in 1977:

*1976*

| | | | |
|---|---|---|---|
| Amount invested | = | $12,000 | |
| Ordinary deduction | = | 100,000 | |
| Tax savings (50%) | | | $50,000 |

*1977*

| | | |
|---|---|---|
| Capital gain | 88,000 | |
| Tax (25%) | | 22,000 |
| Tax savings from overall transaction | | 28,000 |
| Less premiums and commissions | | 12,000 |
| Economic gain | | 16,000 |

The same taxpayer could shelter the capital gain recovery in 1977 as follows:

*1976*

| | | |
|---|---|---|
| Amount invested now for 1976 | 12,000 | |
| Amount invested now for 1977 | 9,600 | |
| Ordinary deduction | 100,000 | |
| Tax savings | | 50,000 |

*1977*

| | |
|---|---|
| Ordinary deduction from $9,600 investment | 80,000 |

| | | |
|---|---|---|
| Tax savings | | $40,000 |
| Capital gain (1976 recovery) | $88,000 | |
| Tax | | (22,000) |
| Capital gain (1977 recovery) | 70,400 | (17,600) |
| Tax savings from overall transaction | | 50,400 |
| Less premiums and commissions | | 21,600 |
| Economic gain | | 28,800 |

The economic gain for a 70% taxpayer with the same investment of $21,600 would be $48,960.

This type of shelter has been available for some time but over the last several months we have hesitated to recommend it to clients because of pending legislation before Congress to eliminate it and the possibility that said legislation might be applied retroactively. The House Ways & Means Committee has now acted by passing HR 12224 to remove the shelter but said legislation will be effective July 1, 1976. Thus, there are about ten days within which to act.

The transactions involve the purchase and sale of options. It is possible to deal in securities or commodities on varying exchanges but the shelter which we are suggesting you consider is handled on the London Metals Exchange through one of its members, Rudolf Wolff & Company of London and its affiliate company, Competex S.A. of Geneva, Switzerland.[13]

We are acquainted with reputable people in the States who are involved in perfecting the transactions contemplated and who have spent a considerable amount of time in London establishing the contacts for handling the transactions. They will handle the transmition[sic] of the investment to Competex, the communication of the desired timing of tax effect to London, and will supply the investor with a schedule setting forth the tax consequences for tax reporting purposes.

The reasons for using the London Metal Exchange are three-fold:

1. A highly leveraged investment is available; in this case 8.3 to 1.

2. The premiums and commissions are negotiable; in this case 12%; an amount equal to the original investment.

3. Silver options and contracts are written on a daily basis, thus avoiding wash sale treatment.

Of course, all tax shelters are subject to attack by the IRS but there are private IRS rulings in existence approving the basic ordinary loss treatment. The transaction might be attacked by the IRS as a wash sale but that is unlikely because of the daily contracts on the London Exchange. It appears likely that the IRS will have less incentive to attack this shelter as a sham transaction since, if the proposed legislation is passed, as of July 1, it will no longer be available.

---

[13]Although Competex traded with Rudolf Wolff, the record reveals no evidence that Competex and Rudolf Wolff were affiliated in terms of ownership.

(B) *Representative Competex Petitioner*

The parties agreed that the options and futures trades of Dr. Judson Davison (Davison), docket No. 1132-80, were representative of the London options transactions entered into by petitioners who traded with Competex.

Competex initiated Davison's London options transaction with a call option straddle on June 28, 1976.[14] On that date, Davison purchased a call option for 34 lots of silver (340,000 troy ounces) at a strike price of 299 pence per ounce for delivery on November 5, 1976.[15] Competex charged Davison a premium of 3.4 pence per ounce and a commission (based on the strike price) of .1875 percent for the option. Competex thus debited Davison's account £13,466.13.[16]

Davison put on the other leg of the straddle on the same date by selling (granting) a call option for 34 lots of silver at a strike price of 305.1 pence per ounce for delivery on December 9, 1976.[17] The option sold for a premium of 3.8 pence per ounce, less a commission of .1875 percent. Competex thus credited £10,974.99 to Davison's account.[18]

The next day, June 29, 1976, Davison entered into a put option straddle. He purchased a put option for 14 lots of silver at a strike price of 255.1 pence per ounce for delivery on November 11, 1976.[19] The option was purchased at a premium of 2.8 pence per ounce plus a commission of .1875 percent. Competex debited £4,589.64 to his account for the cost of the option.[20] Davison then sold a put option for 14

---

[14]Confirmations of contract issued by Competex to Davison detail each purchase and sale.

[15]The option's declaration date was Oct. 29, 1976

[16]The amount debited is calculated as follows:

Premium—340,000 ounces × 3.4 pence per ounce premium ................. £11,560.00
Commission—340,000 ounces × 299 pence per ounce strike price × .1875%
   commission rate.................................................... 1,906.13
Amount debited.................................................... 13,466.13

[17]The option's declaration date was Dec. 1, 1976.

[18]The amount credited is calculated as follows:

Premium—340,000 ounces × 3.8 pence per ounce premium ................. £12,920.00
Commission—340,000 ounces × 305.1 pence per ounce strike price × .1875%
   commission rate.................................................... 1,945.01
Amount credited .................................................... 10,974.99

[19]The option's declaration date was Nov. 4, 1976.

[20]The amount debited is calculated as follows:

Premium—140,000 ounces × 2.8 pence per ounce premium ................. £3,920.00
Commission—140,000 ounces × 255.1 pence per ounce strike price × .1875%
   commission rate.................................................... 669.64
Amount debited.................................................... 4,589.64

lots of silver at a strike price of 255.2 pence per ounce for delivery on December 15, 1976.[21] The option sold for a premium of 3.1 pence per ounce, less a commission of .1875 percent. Competex credited the net price of £3,670.10 for the sold option to Davison's account.[22]

On July 9, 1976, Davison's June 28 call option straddle was closed out by the purchase and sale of offsetting positions. The bought leg was offset by the sale of an identical option (34 lots of silver at a strike price of 299 pence per ounce for delivery on November 5, 1976) for a premium of 18.5 pence per ounce. No commission was charged and Competex credited £62,900 to Davison's account.[23] The sold leg was offset by the purchase of an identical option (34 lots of silver at a strike price of 305.1 pence per ounce for delivery on December 9, 1976) at a premium of 18.9 pence per ounce. Competex charged no commission and debited £64,260 to Davison's account.[24]

On July 19, 1976, Davison's June 29 put option straddle was similarly closed out. The bought leg was offset by the sale of an identical option (14 lots of silver at a strike price of 255.1 pence per ounce for delivery on November 11, 1976) at a premium of 6.3 pence per ounce. Davison's account was credited with the net price of the sold option of £8,820.[25] The sold leg was offset by the purchase of an identical option (14 lots of silver at a strike price of 255.2 pence per ounce for delivery on December 15, 1976) at a premium of 6.6 pence per ounce. Competex debited Davison's account £9,240 for the transaction.[26] Competex charged no commissions on the closing transactions.

---

[21] The option's declaration date was Dec. 7, 1976.

[22] The amount credited is calculated as follows:

| | |
|---|---|
| Premium—140,000 ounces × 3.1 pence per ounce premium ................ | £4,340.00 |
| Commission—140,000 ounces × 255.2 pence per ounce strike price × .1875% commission rate ..................................................... | 669.90 |
| Amount credited ..................................................... | 3,670.10 |

[23] The amount credited is calculated as follows:

340,000 ounces × 18.5 pence per ounce premium = £62,900

[24] The amount debited is calculated as follows:

340,000 ounces × 18.9 pence per ounce premium = £64,260

[25] The amount credited is calculated as follows:

140,000 ounces × 6.3 pence per ounce premium = £8,820

[26] The amount debited is calculated as follows:

140,000 ounces × 6.6 pence per ounce premium = £9,240

As a result of the option-straddle transactions, Davison incurred a combined loss on the granted options in the amount of £58,854.91 and a combined gain on the purchased options in the amount of £53,664.23, after commissions.[27] Davison reported an ordinary loss of $104,976 on the granted options for 1976. The gain on the purchased options was reported as short-term capital gain.

After closing out the option straddles, Competex put on a futures straddle for Davison's account. On November 2, 1976, Davison sold 60 lots of silver for delivery on August 22, 1977, at a price of 307.6 pence per ounce.[28] Competex charged Davison a commission of .1875 percent on 14 of the lots sold, resulting in a net credit to Davison's account of £1,844,792.60.[29] On the same day, the other leg of the straddle was put on with Davison purchasing 60 lots of silver (again in two separate purchases of 14 and 46 lots) at a price of 311.6 pence per ounce for delivery on September 23, 1977. Competex again charged a .1875 percent commission on only 14 of the lots purchased, resulting in a net debit to Davison's account of £1,870,417.95.[30]

On December 7, 1976, Davison closed out a portion of the loss leg of the straddle in a partial switch transaction. On that date, he offset a portion of the long position by selling

[27]The amount of gain or loss is calculated as follows:

| Granted options | June 28 call option | June 29 put option | Total net gain (loss) |
|---|---|---|---|
| Amount credited- sold options | £10,974.99 | £3,670.10 | £14,645.09 |
| Amount debited- offsetting purchased options | 64,260.00 | 9,240.00 | 73,500.00 |
| Net gain (loss) | (53,285.01) | (5,569.90) | (58,854.91) |

| Purchased options | June 28 call option | June 29 put option | Total net gain (loss) |
|---|---|---|---|
| Amount debited- purchased options | £13,466.13 | £4,589.64 | £18,055.77 |
| Amount credited- offsetting sold options | 62,900.00 | 8,820.00 | 71,720.00 |
| Net gain (loss) | 49,433.87 | 4,230.36 | 53,664.23 |

[28]Competex purchased the silver futures from Davison in two separate transactions of 14 and 46 lots.

[29]The amount credited is calculated as follows:

(600,000 ounces × 307.6 pence per ounce price) − (140,000 ounces × 307.6 pence per ounce price × .1875% commission rate) = £1,844,792.60

[30]The amount debited is calculated as follows:

(600,000 ounces × 311.6 pence per ounce price) + (140,000 ounces × 311.6 pence per ounce price × .1875% commission rate) = £1,870,417.95

33 lots of silver for delivery on September 23, 1977, at a price of 293.7 pence per ounce. No commission was charged, and Competex credited £969,210 to his account.[31] Davison completed the switch by purchasing 33 lots of silver at a price of 296.7 pence per ounce for delivery on October 24, 1977. Competex charged no commission and debited £979,110 to Davison's account.[32]

As a result of the partial switch, Davison incurred a loss, including commissions, of £59,887.95 on futures trades in 1976.[33] Davison reported the loss as a short-term capital loss, thus offsetting the entire short-term capital gain of £53,664.23 on the purchased options.

Davison's 1976 London options transaction was completed in 1977 with the following trades. On April 29, 1977, the balance of the November 2, 1977, purchased silver futures (27 lots) that had not been offset in the December 7, 1976, partial switch transaction were closed out. On that date, Davison sold 27 lots of silver for delivery on September 23, 1977, at a price of 285.2 pence per ounce price. Competex credited £770,040 to Davison's account (no commission was charged).[34] The sold lots offset the lots purchased by Davison on November 2, 1976, resulting in an overall loss of £71,280,[35] which Davison reported as a short-term capital loss in 1977.

Davison then purchased 27 lots of silver for delivery on August 22, 1977, at a price of 281.6 pence per ounce. Competex charged no commission on the purchase and thus

---

[31]The amount credited is calculated as follows:
330,000 ounces × 293.7 pence per ounce price = £969,210
[32]The amount debited is calculated as follows:
330,000 ounces × 296.7 pence per ounce price = £979,110
[33]The loss incurred on the offsetting futures trades is calculated as follows:

| | |
|---|---|
| 11/2/76 Purchase—33 lots at 311.60 pence per ounce | £1,028,280.00 |
| 12/7/76 Offsetting sale—33 lots at 293.70 pence per ounce price | 969,210.00 |
| Gain (loss) | (59,070.00) |
| Commissions | 817.95 |
| Net gain (loss) | (59,887.95) |

[34]The amount credited is calculated as follows:
270,000 ounces × 285.2 pence per ounce price = £770,040
[35]The net loss is calculated as follows:

| | |
|---|---|
| 11/2/76 Purchase—27 lots at 311.60 pence per ounce | £841,320 |
| 4/29/77 Offsetting sale—27 lots at 285.2 pence per ounce | 770,040 |
| Net gain (loss) | (71,280) |

debited £760,320 to Davison's account.[36] The 27 lots purchased partially offset the silver futures sold on November 2, 1976, resulting in a net gain of £69,392.55, after commissions.[37] Davison reported the gain as a short-term capital gain.

On August 9, 1977, the bought leg of the straddle put on by the December 7, 1976, partial switch transaction was closed out. In two separate transactions, Davison sold 20 lots of silver at a price of 267.3 pence per ounce and 13 lots of silver at a price of 267.4 pence per ounce, both for delivery on October 24, 1977. Competex credited £882,220 to Davison's account (no commissions were charged).[38] The sold silver futures offset those purchased by Davison in putting on the partial switch transaction and resulted in an overall net loss of £96,890.[39] Davison reported the loss as a long-term capital loss.

Because the entire bought leg of the straddle was liquidated, the short position was left open. Two days later, on August 11, 1977, the sold futures were liquidated by Davison purchasing 33 lots of silver futures at a price of 260 pence per ounce for delivery on August 22, 1977. Competex charged no commission on the transaction, and thus debited £858,000 to Davison's account for the cost of the purchase.[40] Davison reported the net gain of £157,080

---

[36]The amount debited is calculated as follows:

270,000 ounces × 281.6 pence per ounce price = £760,320

[37]The net gain is calculated as follows:

| | |
|---|---:|
| 11/2/76 Sale—27 lots at 307.6 pence per ounce | £830,520.00 |
| 4/29/77 Offsetting purchase—27 lots at 281.6 pence per ounce | 760,320.00 |
| Gain (loss) | 70,200.00 |
| Commissions (on 11/2/76 sale) | 807.45 |
| Net gain (loss) | 69,392.55 |

[38]The amount credited is calculated as follows:

| | |
|---|---:|
| 200,000 ounces × 267.3 pence per ounce price | £534,600 |
| 130,000 ounces × 267.4 pence per ounce price | 347,620 |
| Total amount credited | 882,220 |

Note: Competex paid Davison an average price of 267.339 pence per ounce for the 33 lots of silver futures.

[39]The net loss is calculated as follows:

| | |
|---|---:|
| 12/7/76 Purchase—33 lots at 296.70 pence per ounce price | £979,110 |
| 8/9/77 Offsetting sale—33 lots at 267.339 pence per ounce | 882,220 |
| Net loss | 96,890 |

[40]The amount debited is calculated as follows:

330,000 ounces × 260 pence per ounce price = £858,000

from the offsetting purchase as a short-term capital gain.[41]

Davison's 1976 London options transaction thus resulted in the following gains and losses:

| Year | Description | Gain (loss) | Commission | Net gain (loss) |
|------|-------------|-------------|------------|-----------------|
| 1976 | Ordinary loss—<br>granted options | (£56,240) | £2,614.91 | (£58,854.91) |
| 1976 | Short-term capital gain—<br>purchased options | 56,240 | 2,575.77 | 53,664.23 |
| 1976 | Short-term capital loss—<br>futures trades | (59,070) | 817.95 | (59,887.95) |
| 1977 | Short-term capital gain—<br>futures trades | 59,110 | 807.45 | [42]58,302.55 |
| | Total | 40 | 6,816.08 | (6,776.08) |

On June 10, 1976, 18 days before Competex put on Davison's initial call option straddle, Davison paid $12,000 (£6,779.66) to Competex as initial margin on his account. No further maintenance margin was subsequently paid. As shown above, Davison incurred a net loss after commissions of £6,776.08 from entering into the London Options Transaction. Thus, the net equity in his account at the completion of the transaction was £3.58 (£6,779.66 initial margin less £6,776.08 trading loss). Competex did not return these funds to Davison.

### ii. *Rudolf Wolff*

As previously noted, Rudolf Wolff traded both option straddles and option hedges for petitioners in these consolidated cases. Approximately 80 of the 96 petitioners who executed London options transactions with Rudolf Wolff engaged in option-straddle transactions, while the remaining petitioners employed the option-hedge strategy. All of the London options transactions put on by Rudolf Wolff, whether option straddles or option hedges, were initiated in 1975. The option-straddle transactions are discussed above, while the option-hedge transactions are presented *infra*.

---

[41]The net gain is calculated as follows:

| | |
|---|---:|
| 11/2/76 Sale—33 lots at 307.6 pence per ounce | £1,015,080 |
| 8/11/77 Offsetting purchase—33 lots at 260 pence per ounce | 858,000 |
| Net gain | 157,080 |

[42]The short-term capital gain on futures trades in 1977 is calculated as follows:

£69,392.55 (see note 39 *supra*) +£157,080 (see note 43 *supra*) −
£71,280 (see note 37 *supra*) − £96,890 (see note 41 *supra*) = £58,302.55

Virtually all of the petitioners who engaged in an option-straddle transaction with Rudolf Wolff were introduced by and clients of Gourlay.[43] As noted above, Gourlay formed Ingleram in 1971 after the termination of his partnership interest in Rudolf Wolff. Before becoming employed as a manager at Competex, where he executed the option-straddle transactions described *supra*, Gourlay acted as a half-commission agent for Rudolf Wolff. In his capacity as a half-commission agent, Gourlay introduced clients to Rudolf Wolff who wished to engage in a London options transaction. Rudolf Wolff would execute the necessary trades (on a principal-to-principal basis), issue the related paperwork, and charge petitioners commissions for the option-straddle transactions. A portion of the commissions received by Rudolf Wolff subsequently would be paid to Gourlay.

Although Rudolf Wolff executed the trades of petitioners who engaged in option-straddle transactions, Gourlay ordered the trades and was responsible for the overall trading strategy. Gourlay employed an option-straddle trading strategy identical to that which he would later use at Competex. All relevant aspects of the two trading strategies (e.g., pricing and commissions) were similar. Thus, the representative option-straddle transaction of Competex petitioner Davison, described above, accurately reflects not only the Competex trading strategy but in addition the Rudolf Wolff option-straddle trading strategy. Consequently, an option-straddle transaction of a petitioner who traded through Rudolf Wolff is not presented.[44]

### iii. *Gardner/Amalgamated*

#### (A) *In General*

#### (1) *Introduction*

Approximately 175 petitioners in these consolidated cases entered into London options transactions with Gardner/Amalgamated. With few exceptions, all option trades were executed by Gardner Lohmann while Amalgam-

---

[43]The few petitioners who were not clients of Gourlay, nonetheless, apparently engaged in similar option-straddle transactions.

[44]A detailed description of Rudolf Wolff is set forth *infra* in conjunction with the option-hedge transactions executed by Rudolf Wolff.

ated performed all futures transactions. Initially, a petitioner would pay Gardner Lohmann to execute an option-straddle transaction. After putting on (and closing out) one or more option straddles, Gardner Lohmann would transmit the balance of any funds remaining in the account to Amalgamated for execution of a futures straddle. A more detailed discussion of the London options transactions put on by Gardner/Amalgamated is presented below.

### (2) *Gardner Lohmann*

John Schrader (Schrader) incorporated Gardner Lohmann in October 1970. Schrader subsequently became the managing director of Gardner Lohmann and was primarily responsible for directing Gardner Lohmann's trading. During the years at issue, Gardner Lohmann was not a ring-dealing member of the LME.

Richard P. Pearson (Pearson), a chartered accountant, began performing part-time accounting functions for Gardner Lohmann in 1973. In 1974, Pearson was appointed financial director of Gardner Lohmann. Pearson was responsible for financial and administrative matters at Gardner Lohmann until August 1976, when he left the company.

Schrader supervised the discretionary accounts of petitioners who entered into London options transactions with Gardner Lohmann. In that capacity, he employed the following option-straddle trading strategy which was similar to that used by Rudolf Wolff. Sometime in 1976, Gardner Lohmann would execute either a put or call option straddle (or both) for a petitioner. Shortly thereafter, the option straddle would be closed out through the execution of identical offsetting positions. As a result, a petitioner would incur an ordinary loss on the granted option and a short-term capital gain (of approximately the same amount) on the purchased option.

All option straddles put on by Gardner Lohmann were executed at prevailing market prices. Generally, Gardner Lohmann only charged commissions on the opening leg of an option straddle. Although commission rates were negotiable, Gardner Lohmann typically charged a rate of one-sixteenth per leg on the opening trade. Gardner Lohmann

also agreed to limit petitioners' losses to the amount of their initial margin.

Gardner Lohmann's general practice was to lay off its trades; however, not all trades executed by them were laid off. Schrader was responsible for deciding whether a trade would be laid off.

Bell-Lewis was Gardner Lohmann's principal finder in the United States for potential customers who wished to engage in a London options transaction. The following promotional material[45] was received by a petitioner who entered into a London options transaction with Gardner/Amalgamated:

INCOME CONVERSION AND DEFERRAL PROGRAM

This program is APPLICABLE TO BOTH INDIVIDUALS AND CORPORATIONS. It is designed for those with high incomes and/or capital losses. The vehicle used for the program is the buying and selling of silver commodities - (puts, Calls and/or Contracts).

THE PROGRAM IS COMPRISED OF TWO STEPS

STEP I CONVERTS ORDINARY INCOME INTO CAPITAL GAIN.

STEP II DEFERS CAPITAL GAIN TAXABLE IN THE PRESENT YEAR TO POTENTIAL LONG TERM CAPITAL GAIN TAXED IN FUTURE YEARS.

STEP I

INCOME CONVERSION PROGRAM

This program is designed particularly for those with high incomes and capital losses. However, it can be effective even if a client does not have capital losses.

The vehicle employed is an Option Hedge[46] with an optional tie-in to a Commodity Tax Straddle.

The Internal Revenue Service has recently rendered a series of rulings which if professionally applied can result in truly remarkable tax savings opportunities.

In part, one ruling states:

"If a writer of a call engages in a closing transaction by payment of an amount equivalent to the value of the call at the time of such payment, the difference between the amount so paid and the premium received by him is ordinary income or loss."

---

[45]Although the promotional material was not sent by Bell-Lewis, it is representative of the material received by Gardner/Amalgamated petitioners.

[46]Although the promotional material describes the program as an option hedge, Gardner/Amalgamated petitioners in fact entered into option-straddle transactions.

Thus, in the case of the *writer* (or seller) of an option that is closed out prior to the expiration date *ordinary income or loss results*. In the hands of the *holder* (or buyer) an option is a capital asset and gives rise to *capital gain or loss*.

ILLUSTRATION:

WRITER:

| | | |
|---|---|---|
| Writes Call | $10,000 | premium received |
| Closes Call | 10,500 | premium paid |
| Ordinary Loss | (500) | |

HOLDER:

| | | |
|---|---|---|
| Buys Call | $10,000 | premium paid |
| Sells Call | 10,500 | premium received |
| Capital Gain | 500 | |

QUESTION: WHAT IS THE RATIONALE FOR CONSIDERING AN OPTION WRITER'S CLOSING TRANSACTION AN ORDINARY TRANSACTION AND NOT A CAPITAL TRANSACTION?

According to the IRS ruling the closing writer is not transferring a "capital asset" within section [1221] of the Code and the closing transaction does not result in capital gain or loss because it does not involve a "sale or exchange". What is involved is the receiving of a premium or the incurring of an expense to release the writer from a contractual obligation.

QUESTION: HOW DO I UTILIZE THE NEW RULINGS TO SERVE MY TAX PLANNING REQUIREMENTS?

You establish hedges in options whereby you purchase and write options for equal amounts of silver. Options would be set up with different expiration dates and possibly different striking prices.

For hedges employing CALLS, *a rise* in the price of the underlying silver would create a capital gain on the long side and an approximate offsetting ordinary loss on the short side.

For hedges employing PUTS, *a drop* in the price of the underlying silver would create a capital gain on the long side and an ordinary loss on the short side.

THE OBJECTIVE OF THE PROGRAM, ASIDE FROM THE PROFIT MOTIVE, IS TO ACHIEVE AN ORDINARY LOSS APPROXIMATELY OFFSET BY A CAPITAL GAIN.

QUESTION: WILL THE CONVERSION BE DONE IN ONE TRANSACTION?

In most cases a series of diversified Option Hedge transactions selected to benefit from short-term price spreads and fluctuations would be used.

QUESTION: WHAT HAPPENS SHOULD THE LOSS APPEAR ON THE LONG SIDE?

You would be generating ordinary income and capital loss. However, we anticipate the adverse tax effect will be absorbed in the total series of transactions and the *net result* should be ordinary loss and capital gains.

QUESTION: HOW MUCH TIME IS REQUIRED TO ACHIEVE THE DESIRED CONVERSION?

Actual time required depends upon the volatility of the market. A $100,000 conversion could be generated in a week or in a month. As a rule of thumb it is anticipated that the transaction would take from 15 to 45 days.

QUESTION: WHAT IS THE ESTIMATED COST AND RISK?

The total pre-tax cost discounting any profit potential for accomplishing the desired conversion would be dependant on amount of write-off desired and at what time of year you initate the program. This would include commissions, fees, and documentation.

Since at all times you are in a completely hedged position, long and short options for the same amount of silver, you are not subject to the ordinary risk of market fluctuations. You may, however, be subject to the risk of adverse spread variations. This would result when in the silver price movement the long and short option prices do not move uniformly up or down. This risk is far less than that incurred should you be either long or short an option and not be in a hedged position.

QUESTION: WHY IS [SIC] SILVER FUTURES USED RATHER THAN OTHER COMMODITIES?

Silver futures are used since historically the price fluctuation between various delivery months remains reasonably constant.

QUESTION: WHY IS THE TRANSACTION PERFORMED IN LONDON?

There are two primary reasons:

1. *Exchange Guarantees* - Commodity contracts traded in London are guaranteed by the Exchange on which the commodity is traded. Contracts traded in the United States are only guaranteed by the full faith and credit of the broker or dealer selling the contract.

2. *Centralized Market Place* - In London commodity contracts are traded on a central commodity exchange (e.g., silver is traded on the London Metal Exchange). This afford [sic] price stability, as well as fluidity and liquidity in transacting trades. In the United States commodity contracts are traded directly between hundreds of brokerage houses which restricts liquidity and increases price differentials.

QUESTION: IS THERE A LIMIT TO THE ORDINARY LOSS THAT AN INDIVIDUAL OR A CORPORATION CAN TAKE USING THIS PROGRAM?

No. While the amount of tax deduction based upon interest expense may be limited for an individual or corporation, there are no such limitations on ordinary losses realized from Option Hedges.

QUESTION: WHAT IS THE PROFIT POTENTIAL IN OPTION HEDGES?

The price relationship between two options in the same commodity with different expiration dates and/or different striking prices can fluctuate based on changes in the price of the underlying commodity. This change in the relative values between the options can give rise to a profit or a loss.

QUESTION: HOW CAN THE CAPITAL GAIN BE SHELTERED?

The gain generated by the Option Hedge will almost certainly be short-term and can be handled as follows:

1. For those with realized capital loss carry-forwards, long or short term, the gain can be offset *dollar* for *dollar*.

2. For those with unrealized capital losses the gain offers an excellent reason for realizing the loss, thereby releasing capital while recouping a large portion of the loss through tax savings.

3. For those without capital losses the Option Hedge would be used in conjunction with the Income Deferral Program, in which Tax Straddles are used to defer the short term capital gain and are structured to convert it into long term capital gain.

STEP II

INCOME DEFERRAL PROGRAM USING COMMODITY TAX STRADDLE

A Commodity Tax Straddle is the simultaneous purchase and sale of a like number of commodity future contracts for delivery in different months in the next taxable year. A rise in price would thus create a capital gain on the long side and an approximate offsetting capital loss on the short side. The reverse would occur on a drop in price.

The loss is realized in one tax period and the gain in the next. In this way the tax on the gain is deferred. For conversion from short-term to long-term gain the long position must be held for over six months and the gain must appear on the long side, which would occur only in a rising market.

QUESTION: HOW DO I PROTECT MY GAIN AFTER REALIZING THE LOSS?

By replacing the contracts covered to realize the loss with contracts for equal amounts of silver for delivery in the next taxable year but at the current market price.

QUESTION: HOW IS A COMMODITY TAX STRADDLE USED IN CONJUNCTION WITH AN OPTION HEDGE?

This becomes vital for the Taxpayer who does not have realized or unrealized losses available to offset the short-term gain generated by the Option Hedge.

For example, if in 1975 the Option Hedge creates an ordinary loss of $10,500 and a short-term gain of $10,000, the Commodity Tax Straddle would be used to create a $10,000 short-term loss in 1975 and a $10,000 short or long-term gain in 1976.

QUESTION: WILL CURRENT TAX REFORM PROPOSALS AND PRESENT TAX LEGISLATION ADVERSELY AFFECT THIS PROGRAM?

Main La Frentz & Co. and Eli Warach have researched this question in detail and it is their opinion that neither current tax reform proposals nor present tax legislation would affect the Program.

QUESTION: WHEN SHOULD I ENTER THE PROGRAM?

As early in the tax year as is possible for you to approximate your taxable income.

### SUMMARY

QUESTION: COULD YOU SUMMARIZE THE PROGRAM FOR ME?

1. Dollars you would have paid in taxes can now be used for an additional year.

2. Capital losses can now be used to reduce ordinary income.

3. Income taxed at ordinary rates may now be taxed at the more favorable long term capital gain rates.

    i.e. For individuals a maximum of 35%

       For corporations a maximum of 30%

THIS IS JUST A SUMMARY OF THIS PROGRAM LIKE ANY INVESTMENT, YOU SHOULD CONSULT YOUR TAX, LEGAL AND FINANCIAL ADVISORS

WE ENCOURAGE YOU TO DO SO

(3) *Amalgamated.*

Amalgamated, located in London, England, was formed in 1975 as a wholly owned subsidiary of Amalgamated Metal Corp. Amalgamated trades only in metals and during the years at issue was a full ring-dealing member of the LME.

Between December 9, 1977, and May 30, 1980, Amalgamated owned a 40-percent investment interest in Gardner Lohmann. Amalgamated has never had a management interest in Gardner Lohmann.

Terrance McGuinness (McGuinness), a commodities trader at Amalgamated, supervised the Amalgamated team which

traded futures straddles for petitioners engaging in London options transactions. As previously noted, Gardner Lohmann would transfer petitioners' account balances to Amalgamated after executing option-straddle transactions. Amalgamated, under McGuinness' supervision, would then execute futures straddles for petitioners to defer (and convert, if possible) the short-term capital gain realized on the option-straddle transactions. Although Amalgamated attempted to conduct all straddle trading simultaneously, it was not always able to put on (or close out) the legs of a straddle at the same time.

All legs of the futures straddles were executed at prevailing market prices. Amalgamated generally charged commissions of .1 pence per troy ounce on the opening leg (i.e., the leg with the nearer delivery date) of a straddle transaction. During the years in question, it was Amalgamated's general practice to lay off all futures trades.

Bell-Lewis acted as a finder for Amalgamated. The following letter soliciting a futures straddle was sent by Bell-Lewis to an Amalgamated petitioner:

Dear [name]

Bell-Lewis has been requested by the trading firms in London to contact their clients concerning the possible deferral of capital gain taxes that the client might be liable for in the present tax year.

As you probably know, one of the auxiliary advantages resulting from the commodity option trading that your clients have been involved in has been the reduction of their ordinary income tax liability for 1976. However, the trading firms in London have found that many of their clients also have substantial *capital gain liabilities* that they should consider *deferring into 1977 or after*. Especially in light of the new changes on tax preferences in the 1976 Tax Reform Act. Such a deferral can be accomplished by a competent trading firm with minimal costs and risks by using certain trading techniques involving *commodity future contracts*.

You should contact your clients if you feel that they do have a capital gain problem at the present time.

If either you or your clients wish to discuss the possibility of deferring this tax liability to some future date, please feel free to contact our office for further discussion. Of course, as in the past, these clients will be dealing directly with London firms with all trading decisions made by them. The normal range of trading commissions involved in such a program is very minimal. Bell-Lewis will be acting merely in an administrative capacity.

Any program of this nature must be started as quickly as possible since there are only about 60 days left in the year. Please direct your inquiries to Mr. Wallace Willard, Assistant Vice-President, Bell-Lewis.

Enclosed you will find some illustrations which show the impact in the form of actual tax savings by using a capital gain deferral program.

Sincerely,

Bell-Lewis Associates, Inc.
(S)ROBERT W. BELL
*President*

P.S. Of course, do not limit contacting your client to only those that participated in the options trading programs. All clients with any type of capital gain problem would qualify.

## (B) *Representative Gardner/Amalgamated Petitioner*

The parties agreed that the London options transaction entered into by Eddie H. Anderson (Anderson), docket No. 20543-80, was representative of the London options transactions executed by Gardner/Amalgamated.

Gardner Lohmann initiated Anderson's London options transaction on August 26, 1976, with a put option straddle.[47] On that date, Anderson sold a put option for 24 lots of silver (240,000 troy ounces) at a strike price of 243.3 pence per ounce for delivery on November 25, 1976.[48] Gardner Lohmann purchased the put option from Anderson at a premium of 16.2 pence per ounce, less a commission of .0625 percent. Gardner Lohmann thus credited £38,515.05 to Anderson's account.[49]

The other leg of the straddle was executed (on the same date) by Anderson's purchasing from Gardner Lohmann a put option at a premium of 6.4 pence per ounce for 24 lots of silver at a strike price of 238.4 pence per ounce for delivery on September 27, 1976.[50] Gardner Lohmann again

---

[47]Confirmations of contract issued by Gardner Lohmann and Amalgamated to Anderson detail each purchase and sale.

[48]The option's declaration date was Nov. 22, 1976.

[49]The amount credited is calculated as follows:

| | |
|---|---:|
| Premium—240,000 ounces × 16.2 pence per ounce premium | £38,880.00 |
| Commission—240,000 ounces × 243.3 pence per ounce strike price × .0625% commission rate | 364.95 |
| Amount credited | 38,515.05 |

[50]The option's declaration date was Sept. 24, 1976.

charged a commission of .0625 percent, which resulted in a net debit of £15,717.60 to Anderson's account.[51]

The put option straddle was subsequently closed out 5 days later. On August 31, 1976, the sold leg of the straddle was offset by the purchase of an identical option (24 lots of silver at a strike price of 243.3 pence per ounce for delivery on November 25, 1976) at a premium of 21.8 pence per ounce. The bought leg was similarly offset by the sale of an identical put option (24 lots of silver at a strike price of 238.4 pence per ounce for delivery on September 27, 1976) at a premium of 12.4 pence per ounce. No commissions were charged on either closing transaction. Gardner Lohmann debited £52,320 (24 lots × 21.8 pence per ounce premium) to Anderson's account for the offsetting purchased option and credited £29,760 (24 lots × 12.4 pence per ounce premium) to his account for the offsetting sold option. The net result to Anderson from closing the put option silver straddle was a £13,804.95 loss[52] on the sold (granted) leg and a £14,042.40 gain[53] on the purchased leg.

On August 31, 1976, the day Anderson's put option silver straddle was closed, Gardner Lohmann executed a call option straddle in copper wirebars for Anderson. The copper wirebars straddle was put on in the same manner as the silver straddle, with Gardner Lohmann only charging commissions on the opening legs of the straddle. The straddle was closed out the following day (September 1, 1976) through the purchase and sale of identical offsetting positions. The net result to Anderson from entering into the copper wirebars call option straddle was a £14,376.52 loss

---

[51]The amount debited is calculated as follows:

| | |
|---|---|
| Premium—240,000 ounces × 6.4 pence per ounce premium | £15,360.00 |
| Commission: 240,000 ounces × 238.4 pence per ounce strike price × .0625% commission rate | 357.60 |
| Amount debited | 15,717.60 |

[52]The loss on the sold (granted) option is calculated as follows:

| | |
|---|---|
| Amount credited – sold option | £38,515.05 |
| Amount debited – offsetting purchased option | 52,320.00 |
| Net gain (loss) | (13,804.95) |

[53]The gain on the purchased option is calculated as follows:

| | |
|---|---|
| Amount debited – purchased option | £15,717.60 |
| Amount credited – offsetting sold option | 29,760.00 |
| Net gain (loss) | 14,042.40 |

on the sold (granted) option and a £11,183.31 gain on the purchased option.[54]

Taking into account both the silver and copper straddles, Anderson incurred a £28,181.47 loss on the sold (granted) options and a £25,225.71 gain on the purchased options in 1976.[55] The gain and loss were converted into dollars at a rate of 1.7745 dollars/pound. Anderson consequently reported an ordinary loss of $50,008 on the sold options and short-term capital gain of $44,763 on the purchased options on his 1976 Federal income tax return.

Sometime prior to September 1976, Anderson made an initial margin deposit to Gardner Lohmann in the amount of $6,000. At the conclusion of his option trades, Anderson had $755 remaining in his account at Gardner Lohmann.[56] Gardner Lohmann forwarded these funds to Amalgamated for the futures straddle portion of Anderson's London options transaction.

Amalgamated commenced the rollover transaction by putting on a futures straddle for Anderson on October 18, 1976. On that date, Anderson sold 45 lots of silver at a price of 288.7 pence per ounce for delivery on August 24, 1977. Amalgamated charged no commission on the sale. Thus £1,299,150 was credited to Anderson's account.[57] Anderson then purchased 45 lots of silver for delivery on October 5, 1977, at a price of 293.4 pence per ounce plus a commission of .10 pence per ounce. Amalgamated debited Anderson's account £1,320,750 for the purchase.[58]

---

[54]The details of the copper wirebars call option straddle have been omitted because they mirror the previous silver put option straddle, except for, of course, the prices and quantities involved.

[55]The gain and loss are respectively computed as follows:

|  | Sold options | Purchased options |
|---|---|---|
| Silver put option straddle | (£13,804.95) | £14,042.40 |
| Copper wirebar call option straddle: | (14,376.52) | 11,183.31 |
| Net gain (loss) | (28,181.47) | 25,225.71 |

[56]Anderson's final account balance at Gardner Lohmann is computed as follows:

| | |
|---|---|
| Loss on sold options | (£28,181.47) |
| Gain on purchased options | 25,225.71 |
| Net gain (loss) | (£2,955.76) |
| Loss in dollars at 1.7745 dollars/pound conversion rate | $5,245 |
| Amount of initial margin deposit | 6,000 |
| Account balance after Gardner Lohman option trades | $755 |

[57]The amount credited is calculated as follows:

450,000 ounces × 288.7 pence per ounce price = £1,299,150

[58]The amount debited is calculated as follows:

450,000 ounces × (293.4 pence per ounce price plus .10 pence per ounce commission) = £1,320,750

Seven days later, on October 25, 1976, Amalgamated closed out the loss leg of the futures straddle (which was on the sold side) by executing a switch transaction. Anderson offset the short position by purchasing 45 lots of silver for delivery on August 24, 1977, at a price of 295 pence per ounce. Competex charged no commission on the purchase, and thus debited £1,327,500 to Anderson's account.[59] The switch was completed by Anderson's sale of 45 lots of silver for delivery on September 21, 1977, at a price of 298.4 pence per ounce, less a .10 pence per ounce commission charge. Amalgamated made a net credit of £1,342,350 to Anderson's account.[60]

Anderson thus incurred a loss of £28,350 from closing out the short position.[61] After converting the loss into dollars (at a conversion rate of 1.5782 dollars/pound), Anderson reported a short-term capital loss in the amount of $44,742 on his 1976 income tax return. The short-term capital loss of $44,742 offset the $44,763 short-term capital gain that had been previously incurred on closing out the purchased options.

The following year, on September 12, 1977, Amalgamated completed the rollover transaction and closed out Anderson's futures straddle. On that date, Anderson offset the entire bought leg of the futures straddle by selling 45 lots of silver for delivery on October 5, 1977. Anderson sold the 45 lots to Amalgamated in two separate transactions of 23 and 22 lots at a price of 259.2 and 259.3 pence per ounce, respectively, less commissions of .10 pence per ounce. Amalgamated credited the net sales proceeds of £1,166,170 to Anderson's account.[62]

---

[59]The amount debited is calculated as follows:

450,000 ounces × 295 pence per ounce price = £1,327,500

[60]The amount credited is calculated as follows:

450,000 ounces × (298.4 pence per ounce price less .10 pence per ounce commission) = £1,342,350

[61]The loss incurred is calculated as follows:

| | |
|---|---|
| 10/18/76 Sale—45 lots at 288.7 pence/ounce | £1,299,150 |
| 10/25/76 Offsetting purchase—45 lots at 295 pence/ounce | 1,327,500 |
| Net gain (loss) | (28,350) |

[62]The amount credited is calculated as follows:

230,000 ounces × (259.2 pence per ounce price less .10 pence per ounce commission) = £595,930

220,000 ounces × (259.3 pence per ounce price less

Anderson then closed out the sold leg of the straddle by purchasing 45 lots of silver for delivery on September 21, 1977. The offsetting purchase again took place in two separate transactions of 23 and 22 lots, both at a price of 258.7 pence per ounce (no commissions were charged). Amalgamated thus debited £1,164,150 to Anderson's account.[63]

As a result of the offsetting purchases and sales, Anderson incurred a loss of £154,580[64] on the bought leg of the straddle and a gain of £178,200[65] on the sold leg in 1977. Anderson also entered into three separate straddles on January 25, April 5, and August 19 during 1977. Each of these straddles was closed out shortly thereafter on January 26, April 6, and August 24, respectively.[66] Anderson incurred a total net gain and loss (after commissions) of £57,560 and £53,310, respectively, from the three straddle transactions.[67]

All of the gains and losses incurred by Anderson from completing the rollover transaction and executing the above three straddles were reported as short-term capital gains and losses, respectively, except for the £154,580 loss

---

| .10 pence per ounce commission) | = | £570,240 |
| Amount credited: | | 1,166,170 |

[63]The amount debited is calculated as follows:

(230,000 ounces plus 220,000 ounces) × 258.7 pence per ounce price = £1,164,150

[64]The loss on the bought leg is calculated as follows:

Oct. 18, 1976 Purchase—45 lots at 293.4 (less commission) ................£1,320,750
Sept. 12, 1977 Offsetting sale—45 lots at average price of 259.25
   (less commission) ..................................................... 1,166,170
   Net gain (loss).................................................... (154,580)

[65]The gain on the sold leg is calculated as follows:

Oct. 25, 1976 Sale—45 lots at 298.4 (less commission) ..................... £1,342,350
Sept. 12, 1977 Offsetting purchase— 45 lots at 258.7...................... 1,164,150
   Net gain (loss).................................................... 178,200

[66]Neither petitioner nor respondent argues, nor do we find, that the straddles should be excluded from Anderson's London options transaction. For convenience, we have omitted the details of the transactions.

[67]The total net gain and loss are computed as follows:

*Net gains—*

Jan. 25 Sold leg ..............................................................£13,860
Apr. 5 Sold leg ............................................................... 23,220
Aug. 19 Sold leg............................................................... 20,480
   Total net gains .......................................................... 57,560

*Net losses—*

Jan. 25 Bought leg .......................................................... 12,540
Apr. 5 Bought leg ........................................................... 21,870
Aug. 19 Bought leg........................................................... 18,900
   Total net losses.......................................................... 53,310

incurred on the long leg of the rollover straddle which was reported as a long-term capital loss. Thus, overall, Anderson incurred a gain from futures trades in the amount of £27,870 for 1977.[68]

After completion of the futures straddle portion of his London options transaction, Anderson's account balance at Amalgamated showed a balance of $2.54 owed to Amalgamated.[69] Amalgamated did not require Anderson to remit the funds due and thus closed his account on October 12, 1977.

A summary of Anderson's 1976-77 London options transaction is as follows:

| Year | Description | Gain (loss) | Commission | Net gain (loss) |
|------|-------------|-------------|------------|-----------------|
| 1976 | Ordinary loss— granted options | (£27,315) | £866.47 | (£28,181.47) |
| 1976 | Short-term capital gain— purchased options | 26,075 | 849.29 | 25,225.71 |
| 1976 | Short-term capital loss— futures trades | (28,350) | - - - | (28,350.00) |
| 1977 | Short-term capital gain— futures trades | 32,880 | 5,010.00 | 27,870.00 |
|      | Totals | 3,290 | 6,725.76 | (3,435.76) |

### iv. *Commodity Analysis*

### (A) *In General*

Commodity Analysis was chartered as a commodity commission brokerage house in London, England. During

---

[68]The net gain is computed as follows:

*Gains*

| | |
|---|---|
| Sold leg of rollover straddle | £178,200 |
| Sold legs of three additional straddles | 57,560 |
| Total gains | 235,760 |

*Losses*

| | |
|---|---|
| Bought leg of rollover straddle | 154,580 |
| Bought legs of three additional straddles | 53,310 |
| Total losses | 207,890 |
| Net gain (loss) | 27,870 |

Note: Anderson apparently rolled over the net gain from 1977 to 1978 by initiating another rollover transaction in 1977. The second rollover transaction, however, is not at issue.

[69]The amount owed Amalgamated by Anderson is computed as follows:

| | |
|---|---|
| 1976 Loss on futures trades | £28,350.00 |
| 1977 Gain on futures trades | 27,870.00 |
| Net gain (loss) | (£480.00) |
| Loss in U.S. dollars (1.5782 conversion rate) | ($757.54) |
| Initial margin deposit forwarded to Amalgamated by Gardner Lohmann | 755.00 |
| Amount owed | $2.54 |

the years at issue, Commodity Analysis had two subsidiaries, Commodity Analysis Trading and Chart Analysis. Commodity Analysis Trading traded and exported physical goods while Chart Analysis performed technical market analysis and acted as an investment advisory company.

David Monroe Anderson (Anderson) was the managing director[70] of Commodity Analysis from its inception until 1981, the year in which Commodity Analysis was sold to a British banking group. Anderson became an individual subscribing member of the LME in 1975 and has been an active commodity broker and trader since 1964.

During the years at issue, Commodity Analysis was not a ring-dealing member of the LME. Ten employees of Commodity Analysis were engaged in its trading and brokering operations, including option trading. Another three to four people were employed in the margin department. Commodity Analysis received annual commissions in excess of 1.5 million pounds sterling during 1975, 1976, and 1977.

Approximately 131 petitioners in these consolidated cases executed London options transactions with Commodity Analysis. Commodity Analysis put on two separate series of London options transactions during 1975-76 (hereinafter the 1975 series) and 1976-77 (hereinafter the 1976 series). Approximately 25 petitioners participated in the 1975 series while the remaining petitioners traded the 1976 series.

Although a general option-straddle trading strategy involving option and futures straddles was employed by Commodity Analysis, the identical trading strategy was not used in both the 1975 and 1976 series. For the vast majority of petitioners who entered into London options transactions with Commodity Analysis during 1975-76 (the 1975 series), Commodity Analysis executed an option straddle using double options.[71] Shortly thereafter, the option straddle was closed out resulting in an ordinary loss on the granted option and a short-term capital gain (in approximately the same amount) on the purchased option.

Concurrently with the execution of the option straddle, Commodity Analysis would put on a futures straddle.

---

[70]A managing director in England is analogous to a chief executive officer in the United States.

[71]The purchaser of a double option has the option to either put or call the underlying commodity at a specified price before the option's expiration date.

Sometime prior to 1976, Commodity Analysis would close out the loss leg of the futures straddle in a switch transaction, thus generating a short-term capital loss. Six months later, in 1976, the futures straddle would be closed out at a capital gain approximately equal to the capital loss incurred in the switch transaction.

For the 1976 series of London options transactions, Commodity Analysis used "ordinary" rather than double options in executing petitioners' option straddles. In addition, while only silver was traded in the 1975 series, other metals, such as copper wirebars, were traded during the 1976 series. The final significant difference between the 1975 and 1976 series was the creation of a butterfly straddle in the 1976 series after the loss leg of the futures straddle was closed out in a switch transaction.[72]

Anderson was aware that under American tax law, favorable treatment was accorded to losses on sold (granted) options and thus in both the 1975 and 1976 series he would incur losses on the sold options if possible. Anderson's decision as to whether to employ double or ordinary options in executing the option straddles was based on whether he thought the market was in a vacillating stage (whereby double options were employed) or in a directional (upward or downward) phase (whereby ordinary options were used).

Commodity Analysis would sometimes begin trading a petitioner's London options transaction before the receipt of initial margin if the client was well known to Commodity Analysis. In addition, because all trading was discretionary, Commodity Analysis would frequently agree with petitioners to limit their losses to the amount of initial margin deposited. Virtually all of petitioners' trades were laid off by Commodity Analysis.

The majority of petitioners who dealt with Commodity Analysis were represented by an American company named London Commodity Options, Ltd. (LCOL). LCOL negotiated commission rates with Commodity Analysis on behalf of petitioners. For trades executed in the 1975 series, commissions were generally charged on the opening legs of the option and futures straddles. In the 1976 series, commis-

---

[72]A detailed discussion of butterfly straddles is presented in *Smith v. Commissioner*, 78 T.C. 350, 360-361 (1982).

sions were not charged on any of the individual trades but rather debit notes representing commission charges were issued to petitioners after the option and futures straddles were closed. The second debit note (issued after the futures straddle was closed) was always in the amount which brought the account balance to zero.

All Commodity Analysis transactions were executed at market prices and prevailing spread differentials. Commodity Analysis, however, did not always simultaneously put on or close out the legs of straddles for petitioners.

The following promotional material was received from a finder by a petitioner who entered into a London options transaction with Commodity Analysis:

### AN INTRODUCTION TO LONDON COMMODITY OPTIONS

Over the years, many systems have been devised to take advantage of the high leverage, the volatility and the unlimited profit potential of the commodity futures market. Yet, with each of these systems the investor is left vulnerable to losses well beyond his original investment should the market go against him.

*The only known method* capable of setting an *absolute limit on losses* while still providing the potential for extraordinary capital gains is thru use of commodity Puts and Calls.

Many U.S. investors are familiar with Put and Call options in securities but are unaware that a large international market exists in similar options in commodities.

These options are traded in London and Paris in such world commodities as Cocoa, Sugar, Silver, Wooltops, Coffee, Copper, Lead, Zinc and Rubber. Like the futures contract they pertain to, options are traded by open outcry on their respective exchanges, thus providing *high market liquidity*.

Purchase of an option gives the buyer the right to control a futures contract for a specified period of time of up to 18 months. The cost of the option is the *full extent* of the investor's financial commitment. *He is never subject to a margin call.* When the market moves in his favor, he has the right to exercise the option for a profit *at any time* prior to expiration date.

### HOW PUTS AND CALLS WORK FOR ME

This market works in a very simple fashion and the brief explanation which follows will provide good understanding of its workings.

A CALL OPTION is the *right to buy* a futures contract at the current market price (Striking Price) in order to profit from an *expected rise* in the price of the commodity within the specified option time period. A profit is made when the commodity rises sufficiently to give your option a value which exceeds the cost (Premium) paid for it.

A PUT OPTION is the *right* to *sell short* a futures contract at the current market price in order to profit from an *expected fall* in the price of the commodity. Here a profit is made when the *downward move* is sufficient to give your option a value which exceeds the premium cost.

A DOUBLE OPTION is simply a back to back Put and Call in the same commodity in order to profit from market moves *in both directions*. It is used when large see-saw moves are anticipated.

If, during the life of the option, the market does not move sufficiently to give your option a value which exceeds its cost, a proportionate loss will occur. However, this loss *cannot exceed* the original premium cost. By contrast, those who trade the futures market directly can be hit with losses *far in excess* of their original investment.

## TRADING AGAINST PUTS AND CALLS

The owner of an option also has the right to use it as collateral for taking a direct futures position against the option. This is called "HEDGING" and may be used to lock in an option profit if a market reversal appears imminent, or to capitalize on the many short term market moves which occur during the life of the option.

Here again there are *no margin calls* to contend with and only a nominal hedge fee is charged.

Profits and losses on closed out hedge positions must be settled immediately, whether thru account adjustment or cash payment.

Before entering a hedge position, you should review this carefully with your Account Executive.

## HOW IS MY ACCOUNT MANAGED?

Since we deal in only 10 world commodities, we have a significant advantage in specialization.

Your Account Executive will recommend a portfolio based on intelligence from our highly respected London correspondents, knowledgeable independent advisory sources and our own review of market conditions. You will then be advised regularly on the status of your positions and given recommendations regarding exercising or hedging your options.

## SUMMARY

### Advantages of Investing In Commodity Puts & Calls

1. Unlimited profit potential in either upside or downside market.
2. Limited, pre-determined risk. (LIKE ANY INVESTMENTS IN COMMODITIES ONLY RISK CAPITAL SHOULD BE USED.)
3. No margin calls or forced liquidations.
*4. No reserve deposit required. The premium cost is your only outlay.
5. Tremendous money leverage on invested capital.
6. Double options eliminate outguessing market direction.
7. Large market moves provide ample opportunities to make money.
8. Time periods of up to 18 months are available to achieve profit objective.
9. Options permit direct futures trading without margin.

* Trading against an option can enhance potential. Additional funds may be required in certain situations as your Account Executive can explain.

### CONTRACT FULFILLMENT

The contractual fulfillment of London Commodity Options, as represented and offered by Options Trading Corporation is protected by the Rules and Bylaws of the appropriate London Exchange. Soft commodities, e.g.: sugar, coffee, cocoa, are registered by the International Commodity Clearing House, Ltd. Metals, e.g.: silver, copper and zinc are registered by the London Metal Exchange.

If you have any questions or need additional information please call us collect.

### (B) *Representative Commodity Analysis Petitioner*

The parties agreed that the 1975-76 London options transaction entered into by Gary Garff (Garff), docket No. 21130-80, was representative of the London options transactions executed by Commodity Analysis.[73]

Commodity Analysis initiated Garff's London options transaction on December 15, 1975, by executing a double option straddle. On that date, Garff purchased a double option for 186 lots of silver (in two separate purchases of 93 lots) for delivery on March 16, 1976,[74] at a premium of 30.2 pence per ounce. The strike prices of the respective options were 202.57 and 200.57 pence per ounce, respectively. A commission of .2 pence per ounce was included in the option premium,[75] thus Garff's account balance at Commodity Analysis was debited £561,720.[76]

Garff sold a double option on the same day for 186 lots of silver for delivery on March 15, 1976,[77] at a strike price of 201.5 pence per ounce. The option was sold at a premium of 30 pence per ounce. No commission was charged, thus Commodity Analysis credited £558,000 to Garff's account.[78]

---

[73]As previously noted, Commodity Analysis also executed a second series of London options transactions during 1976-77. Because only minor differences exist between the 1975 and 1976 series, a Commodity Analysis London options transaction put on during 1976-77 is not presented.

[74]The option's declaration date was Mar. 11, 1976.

[75]Commodity Analysis charged the commission by a debit note.

[76]The amount debited is calculated as follows:

1,860,000 ounces × 30.2 pence per ounce premium = £561,720

[77]The option's declaration date was Mar. 10, 1976.

[78]The amount credited is calculated as follows:

1,860,000 ounces × 30 pence per ounce premium = £558,000

The double option straddle was subsequently closed out 2 days later. On December 17, 1975, Garff offset the bought options by selling identical options for 186 lots of silver (again, in two separate transactions of 93 lots) at a premium of 31.65 and 32.35 pence per ounce, respectively. Commodity Analysis credited £595,200 to Garff's account for the offsetting sale.[79]

Garff then offset the sold double option by purchasing an identical double option at a premium of 32 pence per ounce. Commodity Analysis debited Garff's account in the amount of £595,200[80] for the offsetting purchase. No commissions were charged on either closing transaction. The net result to Garff from closing out the double option straddle was a loss on the sold (granted) option in the amount of £37,200[81] and a gain on the purchased options in the amount of £33,480.[82]

Garff converted the £37,200 loss on the sold double option to dollars at a conversion rate of 2.03 dollars/pound and reported an ordinary loss of $75,516 on his 1975 Federal income tax return. The gain on the purchased options was converted to dollars at the same rate, resulting in a short-term capital gain of $67,965.

Concurrently with the execution of the option straddle, Commodity Analysis executed a futures straddle for Garff. On December 15, 1975, Garff purchased 75 lots of silver for delivery on August 16, 1976, at a price of 211.24 pence per ounce. On the same date, he sold 75 lots of silver for delivery on September 6, 1976, at a price of 212.7 pence per ounce. No commissions were charged, and Commodity Analysis thus debited Garff's account £1,584,300[83] for the

---

[79]The amount credited is calculated as follows:

(93,000 ounces × 31.65 pence per ounce premium) + (93,000 ounces × 32.35 pence per ounce premium) = £595,200

[80]The amount debited is calculated as follows:

1,860,000 ounces × 32 pence per ounce premium = £595,200

[81]The loss on the sold (granted) option is calculated as follows:

| | |
|---|---|
| Amount credited - sold option | £558,000 |
| Amount debited - offsetting purchased option | 595,200 |
| Net loss | 37,200 |

[82]The gain on the purchased options is calculated as follows:

| | |
|---|---|
| Amount debited - purchased options | £561,720 |
| Amount credited - offsetting sold options | 595,200 |
| Net gain | 33,480 |

[83]The amount debited is calculated as follows:

750,000 ounces × 211.24 pence per ounce price = £1,584,300

purchase, and credited £1,595,250[84] to his account for the sale.

On December 17, 1975, Garth closed out the loss leg (the short position) of the futures straddle by entering into a switch transaction. On that date, Garff purchased 75 lots of silver for delivery on September 6, 1976, at a price of 217.7 pence per ounce (no commission was charged). The total purchase price of £1,632,750[85] was debited to Garff's account. The sold leg of the straddle put on 2 days earlier was thus entirely offset.

Garff completed the switch by selling 75 lots of silver at a price of 218.6 pence per ounce for delivery on September 20, 1976. Commodity Analysis credited £1,639,500[86] to Garff's account for the sale.

The closing out of the short side of the straddle resulted in a loss of £37,500.[87] Garff converted the loss to dollars (at an exchange rate of 2.03 dollars/pound), and reported a short-term capital loss of $76,125 on his 1975 Federal income tax return. The short-term capital loss on the switch transaction offset the entire $67,965 short-term capital gain incurred by Garff on the purchased options. Thus, for 1975, Garff incurred a net short-term loss of $8,160.

Garff's futures straddle was closed out the next year on July 2, 1976. On that date, Garff sold 75 lots of silver for delivery on August 16, 1976, at a price of 284 pence per ounce and purchased 75 lots of silver for delivery on September 20, 1976, at a price of 286.36 pence per ounce. No commissions were charged on either transaction, and Commodity Analysis credited £2,130,000[88] to Garff's ac-

---

[84]The amount credited is calculated as follows:

750,000 ounces × 212.7 pence per ounce price = £1,595,250

[85]The amount debited is calculated as follows:

750,000 ounces × 217.7 pence per ounce price = £1,632,750

[86]The amount credited is calculated as follows:

750,000 ounces × 218.6 pence per ounce price = £1,639,500

[87]The loss is calculated as follows:

| | |
|---|---:|
| 12/15/75 Sale—75 lots at 212.7 | £1,595,250 |
| 12/07/75 Offsetting purchase—75 lots at 217.7 | 1,632,750 |
| Net gain (loss) | (37,500) |

[88]The amount credited is calculated as follows:

750,000 ounces × 284 pence per ounce price = £2,130,000

count for the sale, and debited £2,147,700[89] to his account for the purchase.

Garff thus incurred a gain of £37,500[90] on closing out the futures straddle. Garff converted the gain to dollars at a rate of 1.8 dollars/pound, and reported a net long-term gain of $67,500 for 1976.

Sometime in 1975, Garff paid Commodity Analysis an initial margin deposit of $7,500 for putting on his London options transaction.

Garff's 1975-76 London options transaction is summarized as follows:

| Year | Description | Gain (loss) | Commission | Net gain (loss) |
|------|-------------|-------------|------------|-----------------|
| 1975 | Ordinary loss—granted option | (£37,200) | - - - | (£37,200) |
| 1975 | Short-term capital gain—purchased options | 37,200 | $3,720 | 33,480 |
| 1975 | Short-term capital loss—futures trades | (37,500) | - - - | (37,500) |
| 1976 | Long-term capital gain—futures trades | 37,500 | - - - | 37,500 |
|      | Totals | - - - | 3,720 | (3,720) |

c. *Broker/Dealers Employing the Option-Hedge Trading Strategy*

i. *Rudolf Wolff*

(A) *In General*

Rudolf Wolff was originally formed as a partnership in 1866 in London, England. In 1971, the partners dissolved the partnership and formed Rudolf Wolff as the main operating company. Rudolf Wolff also acts as a holding company for various worldwide subsidiaries. Since its incep-

---

[89]The amount debited is calculated as follows:

750,000 ounces × 286.36 pence per ounce price = £2,147,700

[90]The gain is calculated as follows:

| | |
|---|---:|
| 12/15/75 Purchase | £1,584,300 |
| 7/02/76 Offsetting sale | 2,130,000 |
| Net gain (loss) | 545,700 |
| 12/17/75 Sale | 1,639,500 |
| 7/02/76 Offsetting purchase | 2,147,700 |
| Net gain (loss) | (508,200) |
| Overall net gain (loss) | 37,500 |

tion, Rudolf Wolff has operated as a broker and merchant in metals and commodities.

During the years at issue, Rudolf Wolff employed approximately 25 people in trading activities and was a ring-dealing member of the LME. In addition, Rudolf Wolff was a member of the London cocoa, coffee, sugar, and rubber exchanges and the New York and Hong Kong commodity exchanges. Francis Holford (Holford) was appointed secretary of Rudolf Wolff in 1971 and subsequently became managing director of the company in 1976. Holford's duties, however, have never involved the day-to-day operations of Rudolf Wolff's trading and brokering businesses.

During the years at issue, G.C. Douglas Metals, Ltd. (Douglas), acted as a half-commission agent for Rudolf Wolff. Various Douglas personnel had desks within the offices of Rudolf Wolff, including Dermot Butler (Butler), who began working for Douglas in 1970. Butler was a commodity broker and dealer with extensive experience on the English commodity markets in both options and futures trading.

Although Butler was not employed by Rudolf Wolff, he effectively acted as Rudolf Wolff's option dealer until the late 1970's. Thus, Butler traded options not only for Douglas' clients which he introduced to Rudolf Wolff but also for some of Rudolf Wolff's own clients. In addition, Butler traded futures contracts as well. All option and futures contracts traded by Butler, whether for a Rudolf Wolff or Douglas client, were entered into on a principal-to-principal basis between the client and Rudolf Wolff.

Butler devised the option-hedge trading strategy for the approximately 16 petitioners who entered into option-hedge London options transactions with Rudolf Wolff during 1975-76. Based on his belief that the silver market would rise in the long run, sometime in 1975 Butler would purchase a long position in silver futures for a petitioner's account. Concurrently, the long position would be hedged by the sale of an out of the money call option for silver. Shortly thereafter, the granted (sold) option would be closed out at a loss in an offsetting trade, and a futures contract would be sold to form a futures straddle. Subsequently, in 1976, after a series of futures trades, the futures straddle

would be closed out at a gain approximately equal to the loss incurred on the sold option.

Because all petitioners engaging in option-hedge transactions with Rudolf Wolff maintained discretionary accounts, Butler was solely responsible for deciding which trades would be executed on their behalf. In implementing the option-hedge transactions, Butler was aware that under American tax law losses on sold (granted) options were treated as ordinary losses, while gains on long forward positions held for 6 months or more were reported as long-term capital gains. Butler thus sought to maximize the tax advantages to petitioners when making trading decisions.

Commission charges for executing trades were negotiated among Rudolf Wolff, Butler (for Douglas), and the client. For Douglas' clients trading through Rudolf Wolff, commissions were generally charged based on some percentage of the underlying contract value. As a half-commission agent, Douglas would receive a portion of the commissions charged by Rudolf Wolff.[91]

During the years at issue, Rudolf Wolff used a computer service to mark customers' accounts to market on a daily basis. All paperwork for petitioners' trades was generated by Rudolf Wolff. The paperwork would then be forwarded to the client's half-commission agent.

Butler sometimes would begin a petitioner's trades before receipt of that petitioner's initial margin if Butler believed that the funds would eventually be forwarded. For virtually all petitioners entering into option-hedge transactions, Butler agreed to limit their losses to the amount of initial margin deposited. Butler controlled the losses incurred by carefully monitoring the accounts and placing stop-loss orders.

All Rudolf Wolff trades ordered by Butler were executed at prevailing market prices. In addition, Rudolf Wolff laid off all of the trades executed.

Petitioners who entered into option-hedge transactions were introduced to Butler by finders. The record, however, contains no example of the promotional material sent by

---

[91]The record does not reveal whether or how Butler (or Douglas) was compensated for Butler's execution of option trades for non-Douglas clients at Rudolf Wolff.

finders to petitioners who entered into London options transactions with Rudolf Wolff.

(B) *Representative Rudolf Wolff Petitioner*

The parties agreed that the London options transaction entered into by Phil Hohnstein (Hohnstein), docket No. 1133-80, was representative of the option-hedge transactions executed by Rudolf Wolff.

Rudolf Wolff initiated Hohnstein's London options transaction on December 15, 1975, by putting on an option hedge. On that date, Hohnstein purchased a futures contract for 100 lots of silver (1 million troy ounces) for delivery on September 15, 1976, at a price of 212.2 pence per ounce. Rudolf Wolff charged Hohnstein a commission of £2,652.50 for the purchase (.125 percent of the underlying contract value), and thus debited £2,124,652.50 to Hohnstein's account.[92] On the same day, Hohnstein sold a call option for 100 lots of silver for delivery on January 15, 1976, at a strike price of 201.8 pence per ounce.[93] The option was sold for a premium of 2 pence per ounce, less a commission of £2,522.50 (.125 percent). Rudolf Wolff thus credited £17,477.50 to Hohnstein's account.[94]

Two days later, on December 17, 1975, Hohnstein closed out the sold option by purchasing an identical offsetting option (100 lots of silver for delivery on January 15, 1976, at a strike price of 201.8 pence per ounce) at a premium of 6.8 pence per ounce. Rudolf Wolff charged no commission on the transaction and thus debited £68,000 to Hohnstein's account.[95]

The following day, December 18, 1975, after having left the bought futures contract in an open position overnight, Hohnstein entered into a futures straddle by selling a futures contract for 100 lots of silver for delivery on March 18, 1976, at a price of 206.9 pence per ounce. Rudolf Wolff charged a commission of £2,586.25 on the transaction (.125

---

[92]The amount debited is calculated as follows:

1,000,000 ounces × 212.2 pence per ounce price plus £2,652.50 commission = £2,124,652.50

[93]The option's declaration date was Jan. 14, 1976.

[94]The amount credited is calculated as follows:

1,000,000 ounces × 2 pence per ounce premium less £2,522.50 commission = £17,477.50

[95]The amount debited is calculated as follows:

1,000,000 ounces × 6.8 pence per ounce premium = £68,000

percent) and thus credited £2,066,413.80 to Hohnstein's account.[96]

The closing out of the sold (granted) option resulted in a loss of £50,522.50, after commissions.[97] The loss was converted to dollars at an exchange rate of 2.0235 dollars/pound,[98] and Hohnstein consequently reported an ordinary loss from the granted option in the amount of $102,233 on his 1975 Federal income tax return.

On January 21, 1976, Rudolf Wolff resumed trading for Hohnstein and put on a second silver futures straddle (hereinafter sometimes referred to as the 1976 straddle).[99] On February 17, 1976, the short position of the original silver futures straddle (hereinafter sometimes referred to as the 1975 straddle) was closed out in a switch transaction and replaced with a new short position. Hohnstein incurred a gain of £45,413.75 on the switch transaction, which was reported as a short-term capital gain for 1976.

On March 2, 1976, Rudolf Wolff executed a third futures straddle for Hohnstein composed of a zinc short leg and a lead long leg. The straddle was closed out 3 days later on March 5, 1976, with Hohnstein incurring a £12,540 short-term capital gain on the long position and a £11,880 short-term capital loss on the short position.

On March 26, 1976, Hohnstein closed out the short position of the 1976 straddle in a switch transaction. Hohnstein incurred a short-term capital loss of £210,437.50 on the switch. The short leg was replaced by the sale of a new silver futures contract.

On May 14, 1976, Hohnstein again closed out the short position of the 1975 straddle by purchasing an identical offsetting futures contract. Hohnstein incurred a £378,585 short-term capital loss on the switch.

On July 15, 1976, Hohnstein closed out the long leg of the 1975 straddle and the short leg of the 1976 straddle,

---

[96]The amount credited is calculated as follows:

1,000,000 ounces × 206.9 pence per ounce price less 2,586.25 commission = £2,066,413.80

[97]The loss on the sold (granted) option is calculated as follows:

| | |
|---|---|
| Amount credited - sold option | £17,477.50 |
| Amount debited - offsetting purchased option | 68,000.00 |
| Net gain (loss) | (50,522.50) |

[98]The exchange rate used was that existing on Dec. 1, 1975.

[99]For convenience, we have omitted the details of the futures trades executed in 1976. All amounts noted include commissions, where charged.

leaving a new straddle composed of the short leg of the 1975 straddle and the long leg of the 1976 straddle. Hohnstein incurred a long-term capital gain of £701,347.50 on the long position and a short-term capital loss of £594,765 on the short position.

On September 2, 1976, Hohnstein closed out both legs of the remaining straddle. He incurred a long-term capital gain of £383,336.25 on the long position and a short-term capital gain of £105,757.50 on the short position.

Overall, Hohnstein incurred a net gain of £52,727.50 on futures trades for his 1975-76 London options transaction.[100] The gain was converted to dollars at an exchange rate of 1.7685 dollars/pound,[101] and Hohnstein consequently reported a long-term capital gain in the amount of $93,248.58 from the futures trades on his 1976 Federal income tax return.

On December 15, 1975, Hohnstein wired an initial margin deposit in the amount of $9,500 to Rudolf Wolff's bank account in New York. On February 23, 1976, Butler returned $500 of the initial margin to Hohnstein. At the conclusion of Hohnstein's 1975-76 London options transaction, $16 of net equity[102] remained in his account.[103]

Hohnstein's 1975-76 London options transaction is summarized as follows:

| Year | Description | Gain (loss) | Commissions | Net gain (loss) |
|------|-------------|-------------|-------------|-----------------|
| 1975 | Ordinary loss—granted option | (£48,000) | £2,522.50 | (£50,522.50) |
| 1976 | Long-term capital gain—futures trades | 72,900 | 20,172.50 | 52,727.50 |
| | Totals | 24,900 | 22,695.00 | 2,205.00 |

[100]The net gain is computed as follows:

£45,413.75 (2/17/76 gain) + £12,540.00 (3/5/76 gain) − £11,880.00 (3/5/76 loss) − £210,437.50 (3/26/76 loss) − £378,585.00 (5/14/76 loss) + £701,347.50 (7/15/76 gain) − £594,765.00 (7/15/76 loss) + £383,336.25 (9/2/76 gain) + £105,757.50 (9/2/76 gain) = £52,727.50

[101]The exchange rate used was that existing on Sept. 8, 1976.

[102]The net equity is calculated as follows:

| | |
|---|---:|
| 12/15/75 Initial margin deposit | $9,500 |
| 2/23/76 Margin returned | 500 |
| Net margin deposited | 9,000 |
| | |
| Loss - granted options | 102,233 |
| Gain - futures trades | 93,249 |
| Net equity | 16 |

[103]The record does not reveal whether Rudolf Wolff remitted the $16 of net equity to Hohnstein.

ii. *Rothmetal*

(A) *In General*

Rothmetal was incorporated under the laws of Bermuda on September 19, 1975, under the name of Thebes, Ltd. On October 14, 1975, the corporate name was changed to Rothmetal. During the years at issue, Rothmetal was not a ring-dealing member of the LME.

Sometime in the fall of 1975, Anderson, the managing director of Commodity Analysis, introduced Philip Greenberg (Greenberg) to Michael Collins (Collins), the managing director of Rothmetal. Greenberg had engaged in the trading of physical commodities, futures, and options during the prior 15 to 20 years. Although Greenberg primarily dealt in coffee and sugar, he also had traded silver, copper, lead, zinc, and copper wirebars on the LME.

Greenberg subsequently became an advisor to Rothmetal in late 1975. Greenberg's duties included supervising finders who introduced business to Rothmetal, reviewing various transactional documents, and ensuring that initial margin deposits were sent. For his services, Rothmetal paid Greenberg 15 percent of the gross commissions earned on business he introduced to Rothmetal.

Greenberg also actively participated in the creation of the option-hedge trading strategy employed by Rothmetal during 1975 through 1978. For the approximately 82 petitioners who entered an option-hedge London options transaction with Rothmetal, two straddles consisting of a long futures position hedged by the sale of a call option and a short futures position hedged by the sale of a put option would be executed in the first year of the transaction. Shortly thereafter, both options would be closed out in offsetting trades and replaced by futures contracts to form two futures straddles with the open futures positions. Overall, the closing of the option positions resulted in a net loss in the first year of the transaction. Subsequently, in the next year, the futures straddles would be closed out for a net gain approximately equal to the net loss incurred on the sold options.

All London options transactions were executed by Rothmetal on a discretionary basis. In addition, all trades

were executed between Rothmetal and petitioners on a principal-to-principal basis. Commissions for trades were negotiable and depended upon a variety of factors. Commissions were listed as clearing charges on petitioners' final statements of account. Rothmetal laid off all trades with Commodity Analysis.

The following promotional material was distributed by finders to petitioners who engaged in London options transactions with Rothmetal:

### COMMODITY TRADING STRATEGY

The Commodity Trading Strategy set forth on the attached flow chart ("Commodity Trading Strategy") is a complex financial transaction suitable only for persons having both substantial financial experience and substantial income subject to federal income taxes at a marginal rate of not less than 50%. In addition, the Commodity Trading Strategy involves substantial risk factors. The following statement of risk factors and the attached flow chart are not intended to be a substitute for a detailed individual review by competent financial, tax and legal advisors taking into account the individual circumstances of each prospective client. EACH PROSPECTIVE CLIENT MUST MAKE AN INDEPEN-DENT JUDGMENT AS TO THE POTENTIAL BENEFITS AND RISKS OF THE COMMODITY TRADING STRATEGY. NO PERSON HAS BEEN AUTHORIZED BY ROTHMETAL TRADING LTD. OR ITS ASSOCIATES TO MAKE ANY OTHER REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL BENEFITS AND RISKS OF THE COMMODITY TRADING STRATEGY.

\* \* \* \* \* \* \*

### IMPORTANT RISK FACTORS

1. *Tax Consequences*

The Commodity Trading Strategy is predicated upon certain interpretations of the existing provisions of the Internal Revenue Code and the regulations promulgated pursuant thereto. No ruling from the Internal Revenue Service has been obtained by Rothmetal as to the tax consequences of the Commodity Trading Strategy and Rothmetal does not presently intend to apply for such a ruling. CONGRESS IS PRESENTLY CONSIDERING CHANGES IN THE TAX LAWS WHICH, IF AND WHEN ENACTED, COULD EFFECTIVELY ELIMI-NATE THE TAX BENEFITS OF THE COMMODITY TRADING STRATEGY. The tax consequences of the Commodity Trading Strategy may not be the same for all taxpayers. Accordingly, prospective clients must consult with their tax advisors with specific reference to their own tax situation under Federal tax law and the provisions of applicable state tax laws.

## 2. *Margin Transactions*

All of the transactions contemplated by the Commodity Trading Strategy will be made as margin transactions. Because of the low margin deposits normally required in commodity futures trading an extremely high degree of leverage is typical of a commodity futures trading account. As a result, a relatively small movement in the prices of silver futures contracts and options will have a substantially greater effect on a client using the Commodity Trading Strategy. To the extent that the Commodity Trading Strategy involves "hedged" transactions, the risk of market fluctuation is reduced and lower margin deposits and fees are required. Generally, the fees charged as a result of transactions under the Commodity Trading Strategy will not exceed an amount equal to the initial margin deposit made at the time of commencing the Commodity Trading Strategy transactions.

## 3. *Market Fluctuations*

The Commodity Trading Strategy is intended to minimize the risks of fluctuations in the market price of silver futures contracts and options. However, the Commodity Trading Strategy is predicated upon the assumption that "spreads" between the prices for futures silver contracts in adjacent months will remain relatively constant. To the extent that the "spread" between the prices in adjacent months varies, the Commodity Trading Strategy may result in additional gain or loss.

## 4. *Other Transactions*

During the course of the Commodity Trading Strategy, a client may wish to engage in other transactions involving the open positions created as a result of the Commodity Trading Strategy. To the extent that such transactions are engaged in, additional margin deposits, fees and market risks are entailed.

*     *     *     *     *     *     *

Each prospective client is requested to date this statement of risk factors and verify that such client has not received and is not relying upon any other representations or warranties concerning the Commodity Trading Strategy. Therefore, PLEASE WRITE THE FOLLOWING SENTENCE IN YOUR OWN HANDWRITING:

"Except as set forth above, I have not received nor am I relying upon any representations or warranties concerning the potential risks or benefits of the Commodity Trading Strategy."

Dated: _____     _____

## TAX SPREADS

Our Trading Strategy turns ordinary income into long-term capital gains by using a unique application of the traditional commodity tax spread or straddle. Therefore, it would be appropriate to elaborate on the mechanics of spreads. In past years, the traditional tax spread has been

used only to defer capital gains taxes from year to year or to convert short-term capital gains into long-term capital gains.

When done properly, this method of investment minimizes the risks inherent in the market place because the tax-spreader always takes both sides of the market at the same time. That is, he simultaneously buys a long position (betting on the commodity investment to go up) and sells a short position (betting on the same commodity to go down). It is easily seen that it doesn't matter whether the commodity goes up or down, since always one side of the spread gains money while the other side loses an equivalent amount of money. The tax spread takes advantage of this by liquidating the loss side of the spread in the present tax year while holding and hedging the equivalent unrealized gain until the succeeding tax year. This allows the taxpayer to deduct these losses against gains in the present year and thus defer the taxes until the following year. Everything discussed so far is common knowledge and has been used successfully for many years, but only in the area of capital gains.

Our Trading Strategy is especially unique because of its ability to create ordinary losses in markets that heretofore only allowed for capital gains or losses. Recently the IRS ruled that any income or loss resulting from "closing transactions" from sales of put and call options to be classified as ordinary income or loss (see enclosed IRS letters and rulings). Our Trading Strategy always engages the sale or "writing" of put and call options where these transactions are liquidated by "buying back" the options in the future (closing transactions) and thus resulting in net ordinary losses.

Our strategy constructs spreads where one side of the spread is a set of silver futures contracts bought or sold for net capital gains while on the other side are equivalent put or call option sales against the underlying silver contracts for net ordinary losses (see enclosed flow chart). It is the combination of IRS rulings that permits organization of a series of these spread transactions which effectively convert ordinary income to long-term capital gains. For details on the mechanics of these transactions see enclosed example. As can be seen in the example, we create ordinary losses by selling put or call options at a lower price today than we buy them back for in the future. Whatever ordinary losses occur in these spreads, we automatically have equivalent capital gains since we are always hedged (i.e. on both sides of the market). Options are ideal with these transactions because of the limited down side movement in option premiums against an unlimited upside resulting in limited ordinary gains and unlimited ordinary losses (which are hedged) giving us exactly what we want in this type of tax spread.

It would be appropriate here to define an option. A "call" is an option to buy property such as real estate, securities or commodity future contracts. A "put" is the opposite, an option to sell. The most common example of a call option is the real estate option to buy property. All options contracts include, a span of time for which the offer is held open, an offering price for the property itself (called the striking price) and a cost for buying the option (called the option premium). For example, if

you owned a piece of real estate, you could write an option against the underlying property for say, $100,000 that is good for the next six months. Anyone desiring to tie up this property at $100,000 offering price for six months would buy this option from you for say $1,000 (the option premium).

One of three things can then happen to the option (a) The option is exercised if the option holder buys the property within six months for $100,000 (b) The option is not exercised within the six months and expires (c) Prior to the six month expiration, the option is sold to another party. In our transactions for taxes (a) and (b) never occur since the "sold" options are always bought back in a closing transaction prior to expiration or exercise.

The preceding example can similarly be applied in the securities and commodities markets. We have chosen the commodities markets on the London Bullion Markets for tax transactions because of the following reasons (a) Real estate does not work because of little liquidity, little market movement and no real "put" options available (b) The stock market options in the U.S. are not feasible because of no "put" options available, large fluctuations in spreads resulting in high risk, too little leverage available (i.e. it's ridiculous to buy $2,000,000 of IBM stock to create a $100,000 loss) and commission costs are exorbitantly high. (c) The U.S. commodities markets do not have puts and calls available which are what the IRS rulings are based on.

The only alternate is to use the largest foreign market exchange in the world, the London Bullion Market, because all the tools that are needed are available at minimum risk. Here the tax client is insured that all transactions made are registered (cleared) trades through the Bullion Market with detailed records checked monthly by the Bank of England. He is also quoted a firm but low price for effecting these trades (no more than 15%) [sic] of the amount to be converted).

---

OCT. 23, 1975

---

(A) Buy (Long) 23, June '76 Futures Contracts @ 222.70 [pence]

(B) Sell (Write) 23, Jan '76 Call Options against underlying silver from (A) @ 215.40 [pence] strike price & 20 [pence] Premium. Client's Acct. is credited with 680,000 × 20 [pence] = [£]136,000

(C) Sell (Short) 23, July '76 Futures Contracts @ 229.40 [pence]

(D) Sell (Write) 23, Feb '76 Put Options against underlying silver from (C) @ 213.80 [pence] strike price & 27 [pence] Premium. Client's Acct. is credited with 680,000 × 27 [pence] = [£] 183,600

OCT. 28, 1975 (Silver went down)

(E) Sell (Short) 28, June '76 Futures @ 220.30 [pence] to hedge in loss from (A) of 2.4 [pence] × 680,000 = [£]16,320

(F) Closing transaction of Calls from (B) by buying back @ 17.70 [pence] × 680,000 = [£]120,360 debit vs. [£] 136,000 credit (B) giving a gain of [£] 15,640

(G) Buy (Long) 28, July '76 Futures @ 220.35 [pence] to hedge in gain from (C) of 9.05 [pence] × 680,000 = [£] 61,540

(H) Closing transaction of Puts from (D) by buying back @ 35.95 [pence] × 680,000 = [£]244,460 debit vs. [£] 183,600 credit (D) giving a loss of [£] 60,860

---

Net hedged-in capital gain from transactions (E) & (G) are 61,540 − 16,320 = [£] 45,220 (or US $93,442) less clearing charges. These hedged-in capital gains are held for at least 6 months for long-term gains.

Net realized losses from options closing transactions (F) & (H) are 60,860 − 15,640 = [£] 45,220 (or US $93,442) plus clearing charges of [£] 3,630 (or US $7,501) for a total of $100,943 in losses.

*Note*: You are advised to check with your tax counsel on present IRS rulings regarding the treatment of options closing transaction losses.

## (B) *Representative Rothmetal Petitioner*

The parties agreed that the 1975-76 London options transaction entered into by Robert A. Meese (Meese), docket No. 12009-80, was representative of the option-hedge transactions executed by Rothmetal.

Rothmetal initiated Meese's London options transaction on October 9, 1975, by putting on two option-hedge straddles. On that date, Meese sold a call option for 102 lots of silver for delivery[104] on January 9, 1976, at a strike price of 216.4 pence per ounce. The option was sold for a premium of 21 pence per ounce, thus Rothmetal credited £214,200 to Meese's account.[105]The call option was hedged

---

[104]Due to an apparent computer programming error, the same declaration and delivery dates were contained on all Rothmetal option contracts.

[105]The amount credited is calculated as follows:

1,020,000 ounces × 21 pence per ounce premium = £214,200

by the purchase of a futures contract for 102 lots of silver for delivery on September 9, 1976. Rothmetal sold the futures contract to Meese at a price of 234.65 pence per ounce, and debited his account £2,393,430.[106]

The second straddle was executed by Meese's selling a put option for a premium of 14 pence per ounce for 102 lots of silver for delivery on December 9, 1975, at a strike price of 212.15 pence per ounce. The put option was hedged by the sale of a futures contract for 102 lots of silver for delivery on October 8, 1976, at a price of 238.05 pence per ounce. Rothmetal credited £142,800[107] and £2,428,110,[108] respectively, to Meese's account for the sale of the put option and futures contract.

The option positions were subsequently closed out 4 days later. The sold call option was offset by the purchase of an identical call option (102 lots of silver for delivery on January 9, 1976, at a strike price of 216.4 pence per ounce) at a premium of 20 pence per ounce, plus a commission charge of £1,428. The sold put option was similarly offset by the purchase of an identical option 102 lots of silver for delivery on December 9, 1975, at a strike price of 212.15 pence per ounce) at a premium of 17.1 pence per ounce, plus a commission of £1,428. Rothmetal debited £205,428[109] to Meese's account for the purchase of the call option and £175,848[110] for the purchase of the put option.

The call option leg of the straddle was replaced by the sale of a futures contract for 102 lots of silver for delivery on September 13, 1976, at a price of 234.65 pence per ounce. The put option leg of the second straddle was replaced by the purchase of a futures contract for 102 lots of silver for delivery on October 13, 1976, at a price of 235.95 pence per ounce. Rothmetal credited £2,393,430[111] to Meese's account

---

[106] The amount debited is calculated as follows:

1,020,000 ounces × 234.65 pence per ounce price = £2,393,430

[107] The amount credited is calculated as follows:

1,020,000 ounces × 14 pence per ounce premium = £142,800

[108] The amount credited is calculated as follows:

1,020,000 ounces × 238.05 pence per ounce price = £2,428,110

[109] The amount debited is calculated as follows:

1,020,000 ounces × 20 pence per ounce premium plus £1,428 commission = £205,428

[110] The amount debited is calculated as follows:

1,020,000 ounces × 17.1 pence per ounce premium plus £1,428 commission = £175,848

[111] The amount credited is calculated as follows:

1,020,000 ounces × 234.65 pence per ounce price = £2,393,430

for the sale and debited £2,406,690[112] to his account for the purchase.

As a result of closing out the sold options, Meese incurred a gain of £8,772[113] on the call option and a loss of £33,048[114] on the put option, after commissions. Thus, he incurred an overall net loss on sold options of £24,276 (£8,772 gain less £33,048 loss) for 1975. Meese reported an ordinary loss of $50,000 from the sold options on his 1975 Federal income tax return.

Rothmetal resumed trading for Meese on May 13, 1976. On that date, Meese purchased a futures contract for 15 lots of silver for delivery on August 13, 1976, at a price of 255.75 pence per ounce. The open position was closed out the following day by Meese's selling an identical offsetting contract at a price of 253.4 pence per ounce, less a commission of £36. Overall, Meese incurred a loss of £3,561 on the transaction.[115]

On May 17, 1976, Meese closed out the two futures straddles by purchasing offsetting contracts.[116] Overall, he incurred a gain of £24,990 on the straddles. Meese reported a long-term capital gain in the amount of $57,431.82 on his 1976 Federal income tax return.

Meese had made an initial margin deposit to Rothmetal in the amount of $6,000 (£2,912.62 on October 9, 1975. After his 1975-76 London options transaction was completed, Meese had £65.62 remaining in his account at Rothmetal.[117]

---

[112]The amount debited is calculated as follows:

1,020,000 × 235.95 pence per ounce price = £2,406,690

[113]The gain incurred on the call option is calculated as follows:

| | |
|---|---:|
| 10/09/75 Sale | £214,200 |
| 10/13/75 Offsetting purchase | 205,428 |
| Net gain | 8,772 |

[114]The loss incurred on the put option is calculated as follows:

| | |
|---|---:|
| 10/09/75 Sale | £142,800 |
| 10/13/75 Offsetting purchase | 175,848 |
| Net loss | 33,048 |

[115]The loss is calculated as follows:

| | |
|---|---:|
| 5/13/76 Purchase—15 lots at 255.75 pence per ounce | £383,625 |
| 5/14/76 Offsetting sale —15 lots at 253.4 pence per ounce, less £36 commission | 380,064 |
| Net loss | 3,561 |

[116]For convenience, we have omitted the details of the transactions.

[117]The net equity in Meese's account at the conclusion of his London options transaction is calculated as follows:

£2,912.62 initial margin -- £24,276 loss on sold options − £3,561 loss on unhedged futures trades + 24,990 gain on futures trades = £65.62

Meese's 1975-76 London options transaction is summarized as follows:

| Year | Description | Gain (loss) | Commissions | Net gain (loss) |
|------|-------------|-------------|-------------|-----------------|
| 1975 | Ordinary loss— granted options | (£21,420) | £2,856 | (£24,276) |
| 1976 | Long-term capital gain— futures trades | 24,990 | - - - | 24,990 |
| 1976 | Short-Term capital loss— unhedged futures trades | (3,525) | 36 | (3,561) |
|      | Totals | 45 | 2,892 | (2,847) |

## OPINION

When the trial of this case, the so-called London options case, commenced in 1983 it was said to be the largest single consolidation of cases in the history of the Tax Court.[118] Petitioners, numbering at one time over 1,400 (some of the petitioners have since settled their cases), claimed deductible losses from commodity straddle transactions in excess of $100 million on their respective returns for years from 1975 through 1980, resulting in deficiencies as determined by the Commissioner in excess of $61 million.

Petitioners begin their argument with the following statement (footnotes omitted):

On April 8, 1974, the Internal Revenue Service issued Private Letter Ruling 7404080200A (the so-called "Zinn Ruling") to the Chicago Board Options Exchange. The Zinn Ruling was the first of a series of private letter rulings that, taken together, illustrated the extraordinary attractiveness of hedged option trading as an investment vehicle for high bracket investors. *Zinn* and its progeny reaffirmed two principles. First, a person who bought an option held the underlying commodity as a capital asset. Accordingly, any loss or gain on a bought option would be treated as capital. Second, one who sold or granted an option did not own the underlying commodity. Any gain or loss on a sold option would therefore be treated as ordinary.

Notwithstanding the well-known position of the IRS that "No unpublished ruling or decision will be relied on, used, or cited, by any officer or employee of the Service as a precedent in the disposition of other cases" (sec. 601.601(d)(2)(v)(d), Statement of Procedural Rules), the private rulings received wide circulation and, as demonstrated

---

[118]Internal Revenue Service, 1983 Annual Report, Commissioner and Chief Counsel 36.

by this case, spawned an offshore cottage industry in commodity tax straddles of very substantial proportions. The private rulings were apparently derived in part, at least, from section 1234 as it read at the time of the rulings.[119]

Congress responded to these developments by amending section 1234(b) (relating to option grantors). Sec. 2136(a), Pub. L. 94-455, 90 Stat. 1929, applicable to options granted after September 1, 1976. The effect of the amendment was to "reverse the private ruling with respect to closing transactions by providing that gain or loss from a closing

---

[119]Prior to Sept. 2, 1976, sec. 1234 provided:

SEC. 1234. OPTIONS TO BUY OR SELL.

(a) TREATMENT OF GAIN OR LOSS.—Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

(b) SPECIAL RULE FOR LOSS ATTRIBUTABLE TO FAILURE TO EXERCISE OPTION.—For purposes of subsection (a), if loss is attributable to failure to exercise a privilege or option, the privilege or option shall be deemed to have been sold or exchanged on the day it expired.

(c) SPECIAL RULE FOR GRANTORS OF STRADDLES.—

(1) GAIN ON LAPSE.—In the case of gain on lapse of an option granted by the taxpayer as part of a straddle, the gain shall be deemed to be gain from the sale or exchange of a capital asset held for not more than 6 months on the day that the option expired.

(2) EXCEPTION.—This subsection shall not apply to any person who holds securities for sale to customers in the ordinary course of his trade or business.

(3) DEFINITIONS.—For purposes of this subsection—

(A) The term "straddle" means a simultaneously granted combination of an option to buy, and an option to sell, the same quantity of a security at the same price during the same period of time.

(B) The term "security" has the meaning assigned to such term by section 1236(c).

(d) NON-APPLICATION OF SECTION.—This section shall not apply to—

(1) a privilege or option which constitutes property described in paragraph (1) of section 1221;

(2) in the case of gain attributable to the sale or exchange of a privilege or option, any income derived in connection with such privilege or option which, without regard to this section, is treated as other than gain from the sale or exchange of a capital asset;

(3) a loss attributable to failure to exercise an option described in section 1233(c); or

(4) gain attributable to the sale or exchange of a privilege or option acquired by the taxpayer before March 1, 1954, if in the hands of the taxpayer such privilege or option is a capital asset.

Thus, sec. 1234(c)(1) as in effect prior to Sept. 2, 1976, only addressed the character of the gain realized on the *lapse* of an option which had been granted as part of a straddle. Sec. 1234 did not address the character of the gain or loss realized on a closing transaction entered into with respect to a granted option prior to the lapse of that option. Respondent therefore issued the so-called Zinn Ruling to specifically deal with this issue. In response to the Zinn Ruling, Congress subsequently amended sec. 1234(b), specifically providing that gain or loss from a closing transaction is to be treated as short-term capital gain or loss. (See discussion in text, *infra*).

transaction[120] is to be treated as short-term capital gain or loss," and also to provide "that income from the lapse of an option is to be treated as short-term capital gain."[121] H. Rept. 94-1192 (1976), 1976-3 C.B. (Vol. 3) 19, 21.

As indicated, the section 1234(b) amendment was only prospective in application. Furthermore, the amendment did not foreclose the potential for offsetting unrelated short-term or long-term capital gains with option-straddle short-term capital losses. The IRS thereafter issued Rev. Rul. 77-185, 1977-1 C.B. 48, wherein it was ruled that losses incurred in the first year of a straddle were but one step in a series of transactions which must be integrated and recognized, if at all, only upon conclusion of the scheme in a subsequent year. See *Smith v. Commissioner*, 78 T.C. 350, 385 (1982). This approach was rejected by this Court in the *Smith* case.

A typical London options transaction involved a 2-year (or more) series of commodity straddles and employed either an "option straddle" or "option hedge" trading strategy, the mechanics of which are fully described subsequently.

All London options transactions entered into by petitioners were conducted through 1 or more of 17 offshore broker/dealers operating on the basis of transactions on the London Metal Exchange (LME). Most of the transactions were conducted with the following 6 so-called "major" broker/dealers: Rudolf Wolff & Co., Ltd. (Rudolf Wolff), Competex, S.A. (Competex), Gardner Lohmann Ltd. (Gardner Lohmann), Amalgamated Metal Trading Ltd.

---

[120]A closing transaction occurs where the writer of the option terminates his obligation under that option by reacquiring it, or by making a payment equivalent to the value of an offsetting option. See H. Rept. 94-1192 (1976), 1976-3 C.B. (Vol. 3) 19, 22.

[121]Sec. 1234(b), as amended by sec. 2136(a), Pub. L. 94-455, 90 Stat. 1929, provides:

SEC. 1234(b). TREATMENT OF GRANATOR OF OPTION IN THE CASE OF STOCK, SECURITIES, OR COMMODITIES.—

(1) GENERAL RULE. In the case of the grantor of the option, gain or loss from any closing transaction with respect to, and gain on lapse of, an option in property shall be treated as a gain or loss from the sale or exchange of a capital asset held not more than 6 months.

(2) DEFINITION.—For purposes of this subsection—

(A) CLOSING TRANSACTION.—The term "closing transaction" means any termination of the taxpayer's obligation under an option in property other than through the exercise or lapse of the option.

(B) PROPERTY.—The term "property" means stocks and securities (including stocks and securities dealt with on a "when issued" basis), commodities, and commodity futures.

(3) NONAPPLICATION OF SUBSECTION.—This subsection shall not apply to any option granted in the ordinary course of the taxpayer's trade or business of granting options.

(Amalgamated), Rothmetal Trading Ltd. (Rothmetal), and Commodity Analysis Ltd. (Commodity Analysis). The trading strategies employed by each of the major broker/dealers are detailed in our findings of fact.

By agreement of the parties, evidence regarding the trading strategies of the remaining 11 broker/dealers was not presented at the trial of this case, pending a resolution of the issues presented herein. Evidence regarding the trading strategies of the 11 "minor" broker/dealers, involving less than 50 of the total number of petitioners, would have unduly extended the trial and greatly enlarged the already massive record.

As mentioned above and as outlined below, the evidence reveals that the trading strategies of all 6 of the major broker/dealers fall within one of two generic types of transactions, and it appears likely that the trading strategies of the minor broker/dealers will do likewise. Petitioners who transacted straddle business through the 11 minor broker/dealers not described in our findings of fact will be given the opportunity through responses to orders to show cause to demonstrate how, if at all, their transactions materially differ from one of the two types of the generic transactions hereinafter described.

Although the six major broker/dealers each devised a trading strategy of its own, these strategies were, in fact, simply variations on one of two themes. As stated, the transactions took the form either of an option straddle transaction or an option hedge transaction. The option straddle transaction was the more prevalent of the two. Both the option straddle transaction and the option hedge transaction involved the use of multiple offsetting positions combining options and futures contracts. The contracts were predominantly silver contracts, but in a significant number of instances copper wirebar contracts were also used.

The mechanics of the option straddle transaction were as follows:

Shortly after the option straddle was put on, the legs would be closed out through the purchase and sale of identical offsetting positions. The premium (purchase price) paid to buy an offsetting option which closed out the sold

(granted) option would exceed the premium that had been received on the sold option, resulting in an overall net loss on the sold option leg of the straddle. Conversely, the premium received on the sale of an offsetting option which closed out the purchased option would exceed the premium that had been paid for the purchased option, resulting in an overall net gain on the purchased option leg of the straddle. The net loss and gain, which were approximately equal, would be reported as an ordinary loss and short-term capital gain for year one. Since the expected tax result in year one was, prior to the amendment of section 1234, an ordinary loss, such loss could be used to offset ordinary income from unrelated sources.

Next, in a switch transaction, the so-called loss leg of the futures straddle would be closed out through the purchase (or sale) of an identical offsetting position and replaced by a new position with a different delivery date. (Because an inverse relationship exists between the legs of a futures straddle, one leg will have an unrealized loss while the other will have an unrealized gain.) The net loss on the closed leg of the futures straddle would be reported as a short-term capital loss in year one and would approximately equal the short-term capital gain incurred on closing out the purchased option position.

The final step of a typical option straddle transaction occurred in year two, although not earlier than 6 months after the switch. Both legs of the futures straddle would be closed out by offsetting trades, resulting in a gain approximately equal to the loss incurred on the switch transaction in year one. The gain incurred would be reported as either a short-term or long-term capital gain in year two. The net general objective was the realization of ordinary loss in year one, and the deferral of capital gain, short-term or long-term, to year two. While the tax losses anticipated were very substantial, the economic gains, if any, and losses were, by comparison, very small.

Option hedge transactions were utilized by Rudolf Wolff and Rothmetal, two of the major broker/dealers, for approximately 97 of petitioners herein. In this version of the commodity straddle strategy, the sale of a call or put option, or both, was hedged by the purchase of a futures

contract or the sale of a futures contract, or both. The option positions would then be closed out at a net loss through the purchase of identical offsetting options. Simultaneously, the initial futures contracts would be hedged with additional futures contracts, thus forming one or more futures straddles. In the following years, the futures straddles would be closed out at a gain equal in amount to the loss incurred on the sold options. The overall objective was the same as that of the option straddle transaction, namely, ordinary loss in year one and capital gain deferred to year two.

As pointed out in H. Rept. 94-1192, *supra* at 20-21, the decision as to entering into a closing transaction is within the discretion of the taxpayer. Consequently, certain characteristics of LME commodity trading take on special significance in the context of this case. For example, unlike its American counterparts (e.g., the New York Stock Exchange and the Chicago Board Options Exchange on which trading is regulated by the Commodity Futures Trading Commission), the LME does not operate as a clearinghouse for trades. Rather, all transactions on or subject to the rules of the LME are executed on a principal-to-principal basis.[122] Thus, the respective broker/dealers and petitioners were purchasing and selling options or futures contracts from and to each other, rather than petitioners purchasing and selling from and to unrelated third parties on the LME via the broker/dealers as agents.

Actual "Ring" trading is conducted on the LME between professional commodity traders on a net basis, and the closing ring prices reported in the London Financial Times serve as benchmarks for the off-ring inter-dealer market described in our findings of fact. Unlike the regulated commodity exchanges in the United States, there are no limits on price changes for metals traded under LME rules.

While it is true that the broker/dealers testified that they normally laid off their trades by entering into offsetting contracts with third parties, it is also true that all of petitioners' accounts were discretionary accounts, so that

---

[122]In a New York Times editorial entitled "Back from the Futures," May 2, 1986, the commodity investment product generated by principal-to-principal trading in the United States is called a "leverage contract" and is argued to "serve no redeeming function."

the broker/dealers had unlimited latitude in pricing the contracts into which they entered with petitioners.[123]

As a general rule, options are not traded on the ring or kerb (formalized trading by ring members after the close of ring sessions) because terms of individual option contracts have to be negotiated, but are traded on the inter-dealer market where buyers and sellers are afforded time to reach agreement on the various components of an option contract. This of course would afford ample opportunity to tailor-make contracts to achieve predetermined objectives.

The LME does not require or regulate the charging of commissions on options or futures contracts, and the amount of and manner in which commissions are charged vary significantly.

As manifested in our findings of fact, the broker/dealers exploited the foregoing possibilities in their promotional literature. For example, Gardner Lohmann invited its customers' attention to the potentials of its "Income Conversion Program" which was structured to exploit an apparent tax loophole. Similarly, Competex in its promotional literature described the "tax shelter" (Competex's words) as one having "write-offs * * * on an 8.3 to 1 ratio." While James Gourlay, Competex's manager, professed an intention to earn a net economic profit for petitioners dealing with Competex through changes in the spread, the Competex promotional material overwhelmingly emphasized the tax objectives and hardly mentioned the economic gain or loss potential.

On brief, respondent points to four factors which, it is argued, demonstrate the artificial and manipulative nature of the London options transaction. These factors are: artificial pricing, arbitrary fixing of commissions, artificial contangos,[124] and failure to require or maintain margin.

---

[123]Since the broker/dealers involved in this case were beyond the subpoena power of the Court, neither the Court nor respondent had access to the books and records of the broker/dealers. The testimony of the broker/dealer witnesses that they "normally" laid off trades, while not necessarily lacking credibility, remains unsubstantiated by objective evidence. No documentary evidence of laid-off trades was introduced. We note that sec. 982 ("Admissibility of Documents Maintained in Foreign Countries") was added by Pub. L. 97-248, 96 Stat. 629, the Tax Equity and Fiscal Responsibility Act of 1982, applicable with respect to formal document requests mailed after Sept. 3, 1982

[124]A contango is defined in Webster's Third New International Dictionary (1976) as the "premium or interest paid on a fixed day on the London Stock Exchange by a buyer to the seller to be allowed to defer payment until a future settlement." The parties stipulated the

Respondent's argument proceeds along the following lines:

1. *Pricing.*—Prices established by LME trading are fair, authoritative, stand as the daily world-wide benchmark, and are based upon ring trading. Prices struck in trading between ring sessions reflect the trend of prices prevailing during the formal sessions, and vary only slightly, if at all. Wide variations from the official daily price could only be caused by events outside the influence of the parties to the trade, such as an announced shortage of the metal, a currency devaluation, or a dramatic change in interest rates. None of those things occurred during the years in question. Nevertheless, the prices used by the broker/dealers and petitioners for the futures trades were frequently far afield from official prices, as evidenced by the use of non-market contangos. As a result, excess gains or losses resulted, and always in just the right amounts to bring the accounts to zero. But futures manipulation was the tail wagging the dog, for while such manipulations were necessary to bring the accounts to zero, it was the "plugged" option premiums which caused the ordinary losses which are the subject of this case.

Option premiums are negotiable, and there is no publication to which one can turn to determine a going market price. Instead of letting the market dictate premiums based on the underlying fair market strike prices,[125] the brokers kept the strike prices the same, and by doing so they were able to select the premiums needed to produce the amount of loss purchased by petitioners. Each petitioner paid more to buy an offsetting option than he received when he sold the countervailing option, even though time had elapsed and the option was closer to declaration.[126] Since time is one of the basic underpinnings of options and option pricing, one would expect under normal circumstances, and with all other things being equal, that with the lapse of time the grantor would pay less to buy back a closing transaction option than he received when initially selling the

---

following definition of "contango": "The difference of the future price over the cash or nearby prices when the future price is higher than the cash or nearby [price]."

[125]The parties stipulated that the term "strike price" means—"The agreed price at which the holder of an option may call or put."

[126]The parties stipulated that the term "declaration date" means—"The date on which the holder of an option must declare his intention to exercise his option."

countervailing option and thus realizing a profit. In this case, every petitioner had a net loss on granting options. The premiums therefore could not have been a fair market price.

2. *Commissions.*—The rates at which commissions were to be charged were not agreed upon in advance, commissions were determined by the broker/dealers without petitioners' knowledge or consent, commissions were charged at varying rates or not at all, depending upon the gain and loss objective sought, commissions were not routinely charged on each leg of straddles, as is customary in orthodox trading, and lump-sum commissions were sometimes charged in advance of trading without knowing in advance how much trading was to be done over a period of time and at what prices.

3. *Margins.*—In some cases trading was commenced before any initial margin was received, and in no case was maintenance margin required. In some cases no margin was ever required.

4. *Contangos.*—Under normal conditions, the cash price for immediate delivery will be less than the price for future delivery. The difference between these two prices is known as the contango, or spread differential. The major component of the contango is interest rates, i.e., the cost of financing for the period involved, while subsidiary components are the cost of insuring and storing the metal. Assuming constant interest rates, a contango widens in an arithmetic progression and is known as a linear contango. This means that the difference in price between any two adjacent dates would be the same. Yet the evidence in this case clearly demonstrates that contangos were adjusted by the brokers in order to arrive at a predetermined outcome.

In short, respondent is arguing that petitioners' London options transactions are factual shams. See *Brown v. Commissioner*, 85 T.C. 968 (1985). Petitioners argue that they "invested in discretionary commodity trading accounts because they had the potential for *significant* profit accompanied by *possible* favorable tax treatment." (Emphasis supplied.) In some instances there were times when significant profits "actually could have been taken."

Petitioners also argue, perhaps more cogently, that respondent's allegation that petitioners paid for a prearranged tax result is refuted in that tax consequences varied widely, were dependent on market movements, and were sometimes adverse to petitioners. For more than half of the petitioners, declining silver prices made it impossible to achieve long-term capital gain in the second year of their London option investment. For the overwhelming majority of such petitioners, the London option investment, as defined by respondent, resulted in adverse tax consequences. With reference to the term "as defined by respondent" petitioners state:

Respondent has taken the anomalous position that additional trading in the second and third year of the investment on behalf of Petitioners whose initial "series" failed to achieve long term gain is not at issue in this case. When the investment is so defined, the tax consequences were adverse for the majority of petitioners.

Even for those who successfully converted ordinary loss to long-term capital gain in the second year, the tax savings were often less than the amount invested. In short, petitioners argue that since they did not *always* get *all* of the tax benefits they bargained for, their commodity straddle strategies were legitimate.

Unfortunately, the charts derived by petitioners to demonstrate the correctness of the foregoing assertion[127] fail to account for rollovers into subsequent years, so that the economic effect of offsetting capital gains realized in year two, with the consequent tax postponement, cannot be independently determined.

It requires no lengthy or elaborate analysis of the facts to demonstrate that petitioners did not enter into these transactions primarily for economic profit, and that the transactions under scrutiny were not "a type of tax-motivated transaction which Congress intended to encourage." *Fox v. Commissioner*, 82 T.C. 1001, 1019 (1984); see also *Smith v. Commissioner, supra*. The expected tax benefits completely overwhelm any potential economic benefits that might have been expected from the straddles.

By means of the losses which petitioners intentionally incurred in year one through their commodity straddles,

---

[127]Appendices 1 and 2 to petitioners' brief are reproduced as Schedule 1 herein, pages 1179 - 1180.

they sought to shelter over $100 million of ordinary income or short-term capital gains which they postponed, or "moved," to subsequent years. In the process, they expected to convert this income to long-term capital gains (although admittedly they did not always succeed in the latter). Thus, petitioners hoped to obtain substantial interest-free loans from the Government and achieve more favorable tax rates. At the same time, the actual economic gains realized through straddling were either miniscule or nonexistent.

In a nutshell, the focal point of this case is the deductibility of the losses claimed by petitioners in year one of the London options transaction. Section 165(c)(2) permits individuals to deduct losses incurred in any transaction entered into for profit, though not connected with a trade or business. The statutory language is amplified by section 1.165-1(b), Income Tax Regs., as follows:

To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

In determining deductibility, we believe that substance-over-form precludes us from focusing solely upon the losses incurred by the closing of the sold options in year one of the London options strategy, to the exclusion of all that followed. For this reason we hold, as we have done before, that the relevant transaction was petitioners' entire commodity tax straddle scheme. In *Smith v. Commissioner*, 78 T.C. at 390-391, we stated:

We agree * * * that what petitioners invested in * * * were commodity tax straddles—i.e., a prearranged, planned sequence of trading * * * — not simple investments in butterfly straddles held solely for nontax profit objectives. For purposes of section 165(c)(2), then, we hold the relevant "transaction" to encompass petitioners' entire commodity tax straddle scheme. [Fn. ref. omitted.]

What petitioners invested in here with the respective broker/dealers was a prearranged sequence of trading calculated to achieve a tax-avoidance objective—not investments held for non-tax profit objectives.

In *Fox v. Commissioner, supra,* we held that the taxpayer did not enter into the tax straddle transactions there primarily for profit, nor were the transactions a type which Congress intended to encourage, and therefore that the taxpayer was not entitled to deduct his losses. The massive record in this case, which we have synthesized in as practical manner as possible in our findings of fact, overwhelmingly demonstrates that petitioners did not enter into these transactions primarily for economic profit. And had the transactions under scrutiny been of a type which Congress intended to encourage, surely it would not have been so quick to move to forestall them as it did by amending section 1234, discussed *supra.* We would therefore have little hesitancy in deciding this case on the authority of *Smith* and *Fox* were it not for the intervening enactment of section 108 of the Tax Reform Act of 1984 (Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630) ("section 108").

Before the 1986 amendment, section 108 provided:

SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.

(b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.

(c) NET LOSS ALLOWED WHETHER OR NOT TRANSACTION ENTERED INTO FOR PROFIT.—If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

(d) OTHER RULES.—Except as otherwise provided in subsections (a) and (c) and in sections 1233 and 1234 of such Code, the determination of

whether there is recognized gain or loss with respect to a position, and the amount and timing of such gain or loss, and the treatment of such gain or loss as long-term or short-term shall be made without regard to whether such position constitutes part of a straddle.

(e) STRADDLE.—For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day after the date of the enactment of the Economic Recovery Tax Act of 1981, and shall include a straddle all the positions of which are regulated futures contracts.

(f) COMMODITIES DEALER.—For purposes of this section, the term "commodities dealer" has the meaning given to such term by section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle).

(g) REGULATED FUTURES CONTRACTS.—For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1954 (as in effect before the date of enactment of this Act).

(h) SYNDICATES.—Subsection (b) shall not apply to any syndicate (as defined in section 1256(e)(3)(B) of the Internal Revenue Code of 1954).

[Sec. 108; 98 Stat. 494, 630.]

## Section 1808(d) of the Tax Reform Act of 1986 amended section 108 as follows:

(d) SECTION 108.—SECTION 108 OF THE TAX REFORM ACT OF 1984 IS AMENDED—

(1) by striking out "if such position is part of a transaction entered into for profit" and inserting in lieu thereof "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business",

(2) by striking out subsection (b) and inserting in lieu thereof the following:

"(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.",

(3) by striking out the heading for subsection (c) and inserting in lieu thereof the following: "(c) NET LOSS ALLOWED.—",

(4) by striking out subsection (f) and inserting in lieu thereof the following:

"(f) COMMODITIES DEALER.—For purposes of this section, the term 'commodities dealer' means any taxpayer who—

"(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), or

"(2) was a member of the family (within the meaning of section 704(e)(3) of such Code) of an individual described in paragraph (1) to the extent such member engaged in commodities trading through an organization the members of which consisted solely of—

"(A) 1 or more individuals described in paragraph (1), and

"(B) 1 or more members of the families (as so defined) of such individuals.", and

(4) by striking out subsection (h) and inserting in lieu thereof the following:

"(h) SYNDICATES.—For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue Code of 1954) shall not be considered to be a loss incurred in a trade or business."

[Sec. 1808(d), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817.]

It will be observed that the 1986 amendment accomplishes several things:

First, the concept of a "position" as part of a transaction entered into for profit is eliminated (second line of "flush" language at the conclusion of section 108(a)). The amended section 108(a) expressly distinguishes between a loss incurred by a commodities dealer in the trade or business of trading commodities and a loss incurred in a commodities transaction entered into for profit though not connected with a trade or business. Thus, the language of section 108(a) is now completely harmonized with that of section 165(c)(1), which allows losses incurred in a trade or business, and section 165(c)(2), which allows losses incurred in any transaction entered into for profit, though not connected with a trade or business.

Second, old section 108(b) is stricken and new material is substituted. Previously, section 108(b) provided a rebuttable presumption, applicable both to commodities dealers and some investors, that any position held by them was part of a transaction entered into for profit. New section 108(b) eliminates the rebuttable presumption and substitutes a per se rule that any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. Since the rebuttable presumption is totally eliminated, it is no longer available to investors. Cf. *Perlin v. Commissioner*, 86 T.C. 388 (1986).

Third, the definition of commodities dealers is expanded somewhat to include certain family members. It is worth noting, however, that the definition of "commodities dealer" remains "an individual described in section 1402(1)(2)(B)"; i.e., an individual who is actively engaged in trading "section 1256 contracts" and is registered with a domestic

board of trade. Sec. 1402(i)(2)(B).[128] Section 1256 contracts are four specified types of contracts, including regulated futures contracts, used in domestic straddle transactions on a domestic board of trade. See generally sec. 1256 and the definition contained in sec. 1256(b).[129]

Fourth, section 108(h) is amended to provide that losses incurred through a syndicate (defined in section 1256(e)(3)(B)), except by a commodities dealer, are not considered to be losses incurred in a trade or business.

In summary, then, amended section 108 traces the pattern of the loss provisions of section 165(c)(1) and (2), and makes it clear that losses incurred by commodities dealers trading in commodities are deductible under section 108 since they are losses incurred in a trade or business. Investors, on the other hand, must meet the test of loss incurred in a transaction entered into for profit. In the context of commodity straddle transactions, the investor language parallels the section 165(c)(2) language which we construed in *Smith* and *Fox*, and (except as to commodities dealers) we think the effect of amended section 108 is to revalidate our holdings in those cases. Cf. *Miller v. Commissioner*, 84 T.C. 827 (1985). The case before us does not involve commodities dealers.

---

[128]Sec. 1402(i) provides:

SEC. 1402(i). SPECIAL RULES FOR OPTIONS AND COMMODITIES DEALERS —

(1) IN GENERAL.—In determining the net earnings from self-employment of any options dealer or commodities dealer—

(A) notwithstanding subsection (a)(3)(A), there shall not be excluded any gain or loss (in the normal course of the taxpayer's activity of dealing in or trading section 1256 contracts) from section 1256 contracts or property related to such contracts, and

(B) the deduction provided by section 1202 shall not apply.

(2) DEFINITIONS.—For purposes of this subsection—

(A) OPTIONS DEALER.—The term "options dealer" has the meaning given such term by section 1256(g)(8)

(B) COMMODITIES DEALER.—The term "commodities dealer" means a person who is actively engaged in trading section 1256 contracts and is registered with a domestic board of trade which is designated as a contract market by the Commodities Futures Trading Commission.

(C) SECTION 1256 COONTRACTS.—The term "section 1256 contract" has the meaning given to such term by section 1256(b).

[129]Sec. 1256(b) provides:

SEC. 1256(b). SECTION 1256 CONTRACT DEFINED —For purposes of this section, the term "section 1256 contract" means—

(1) any regulated futures contract,

(2) any foreign currency contract,

(3) any nonequity option, and

(4) any dealer equity option.

For completeness, we now summarize the legislative history of amended section 108.

The section 108 amendment originated in the House and was adopted verbatim by the Conference Committee. The House report states that "It was not the intent of Congress in enacting section 108 to change the profit-motive standard of section 165(c)(2) or to enact a new profit motive standard." H. Rept. 99-426, at 911 (1985). The House report also states that "A taxpayer who does not satisfy indicia of trade or business status, such as the taxpayer in *Miller v. Commissioner* (84 T.C. 827 (1985)), would not be considered in the trade or business of trading commodities." H. Rept. 99-426, at 911 (1985). The Conference Committee statement of managers states that "The conference agreement follows the House bill," but makes no reference to any profit-motive standard. The statement of managers discusses various aspects of the concept of commodities dealers, but does not deal with investors. H. Rept. 99-841 (Conf.), at II-845 (1986).

At the time the Conference report was presented to the House for consideration, Mr. Rostenkowski, the floor manager in the House, made the following statement:

As chairman of the Committee on Ways and Means, I am often asked to participate in colloquies with other Members of the House of Representatives regarding the intent behind, or effect of, specific provisions in tax legislation. I take the responsibility to implement the decisions of the Committee on Ways and Means, and in this instance, the conference committee, very seriously. Consequently, I have limited the colloquies that I have agreed to participate in to those which do not attempt to modify the substantive agreement reached by the conferees on H.R. 3838. In addition, because we are discussing a conference agreement rather than a bill of merely one House of the Congress, for a colloquy to be considered as reflective of the conference agreement, it should be discussed in a substantially similar manner in both the House and the Senate. Otherwise, the views expressed can be considered only the views of one House and not necessarily reflective of the decisions made by the conferees. [132 Cong. Rec. H8360 (daily ed. Sept. 25, 1986).]

In a colloquy on the Senate floor between Senator Dole and Senator Packwood (floor manager of the bill in the Senate) following the Conference action, Senator Packwood concurred in a statement by Senator Dole that "I understand that the conference report does not amend the provisions of the 1984 act as they affect investors, and that

the conferees rejected any additional benefit for those investors." 132 Cong. Rec. S13956 (daily ed. Sept. 27, 1986).[130]

Senator Dole also stated that "I further understand that the statement of managers explaining the conference report did not include the language of the House report that discussed investors and that the conference report is the entire agreement of the Conferees." Senator Packwood's concurrence also included this statement.

In a floor statement on October 2, 1986, Mr. Rostenkowski reiterated that "As I indicated in my opening remarks to the House on September 25, 1986, I feel that a floor colloquy interpreting a provision of a conference report can only be considered valid by taxpayers and appropriate Government officials at the Treasury Department and IRS if it appears in substantially the same form in both the House and the Senate." Mr. Rostenkowski also said that Senator Dole's colloquy with Senator Packwood regarding the treatment of investors in pre-ERTA straddles, located on page S13956 of the Congressional Record of September 27, 1986, does not reflect the House's interpretation of the Conference agreement. 132 Cong. Rec. E3389, E3391 (daily ed. Oct. 2, 1986).

In deciding this case, we have used our best judgment in construing the statutory language actually enacted, giving full deference to the legislative history thus summarized.

Since the original enactment of section 108, and as of the date of this opinion, this Court has decided seven commodity straddle cases. Four of these: *Miller v. Commissioner, supra; Landreth v. Commissioner*, T.C. Memo. 1985-413; *Kurtz v. Commissioner*, T.C. Memo. 1985-410; and *Perlin v. Commissioner*, 86 T.C. 388 (1986), each hold that the taxpayers there involved had a reasonable prospect of some profit from the transactions and were entitled to apply former section 108. The remaining three cases, *Brown v. Commissioner, supra, Forseth v. Commissioner*, 85 T.C. 127 (1985), and *DeMartino v. Commissioner*, T.C. Memo. 1986-263, hold that the transactions there were shams.

---

[130]The first clause of this statement does not appear to be born out by the statutory language actually enacted, as above discussed.

All of the seven aforementioned cases were decided after the enactment of section 108 in 1984 and before its amendment in 1986. In *Miller*, the taxpayer, an individual with substantial commodity trading experience, incurred losses in the amount of $103,325 on a series of gold futures straddle trades executed during 1979. The Court, finding these trades to be part of a commodity tax straddle scheme designed to realize tax losses of approximately $100,000 in 1979, stated that "But for section 108, * * * we would be prepared to find against [taxpayer] since [taxpayer] lacked the requisite economic profit objective necessary to enable [him] to deduct [his] commodity tax straddle losses in [1979]." 84 T.C. at 835. We, however, construed the 1984 version of section 108 to require the allowance as deductions of taxpayer's gold straddle trading losses.

Both *Landreth* and *Kurtz* follow the rationale of *Miller*.

Subsequently, in *Forseth v. Commissioner, supra*, we held that the losses incurred by the taxpayers on certain gold and platinum forward straddle trades were not allowable, finding that the trades were factual shams. In *Forseth*, the taxpayers opened discretionary trading accounts with L.M.E. Commodities, Ltd. (LMEC), in London, authorizing the company to conduct discretionary trading in gold and platinum forward contracts on their behalf.[131] During 1980 and 1981, the taxpayers incurred large losses on the cancellation and offset of certain gold and platinum forward contracts executed by LMEC on their behalf. The taxpayers claimed these losses on their 1980 and 1981 Federal income tax returns.

In sustaining respondent's disallowance of the losses in *Forseth*, we found that the transactions "were factual shams, inspired, designed, and executed by [LMEC] * * * for the sole purpose of achieving for its investors capital and ordinary losses to offset their unrelated income in 1980 and 1981." 85 T.C. at 165. We relied on the following facts as indicia of sham: (1) The remarkable correlation between the tax needs of each taxpayer and the nature and amount of tax losses delivered by LMEC; (2) the remarkable correlation

---

[131]LMEC was owned by James Gourlay. In the instant case, Gourlay was employed as a manager for Competex and handled the option straddle transactions for the approximately 265 petitioners who opened discretionary trading accounts with Competex. He testified as a witness for petitioners.

between the amount of the projected losses and the amount of losses actually delivered for various levels of margin deposits; (3) the remarkable correlation between the amount of margin deposits paid to LMEC by the taxpayers at the beginning of trading and the amount of overall net losses realized by the taxpayers on their commodity trades; (4) LMEC's willingness to undertake trades in gold and platinum forward contracts on behalf of the taxpayers prior to receiving margin deposits from them; and (5) the lack of evidence corroborating testimony that LMEC established long or short positions with market-making brokers before such positions were laid off with the taxpayers.

Similarly, in Brown v. Commissioner, 85 T.C. 968 (1985), we disallowed losses incurred by the taxpayers on straddle trades involving forward contracts for the purchase and sale of Ginnie Maes and Freddie Macs, finding that the "disputed transactions constituted factual shams which were inspired, designed, and executed * * * for the sole purpose of attempting to achieve tax losses for [the taxpayers]." 85 T.C. at 1000. In Brown, the taxpayers opened discretionary trading accounts with Gregory Investment & Management, Inc. (GIM), which subsequently entered into forward contracts for the purchase and sale of Ginnie Maes and Freddie Macs with Gregory Government Securities, Inc. (GGS). The Court relied on the following facts in finding that these trades were not bona fide: (1) The forward contracts were bought and sold between the taxpayers and GGS; (2) the taxpayers executed powers of attorney authorizing GGS to perform any act on their behalf; and (3) GGS manipulated profits by foregoing a part of its fee or by utilizing its pricing formula.

In Perlin v. Commissioner, supra, we allowed deductions for certain commodity straddle trading losses incurred by taxpayers who were professional commodity dealers or persons regularly engaged in investing in regulated futures contracts. We found that these trades were in fact executed by competitive open-outcry bidding in accordance with the regulations of the Commodity Futures Trading Commission and therefore were bona fide rather than prearranged or fictitious transactions. We further found that respondent had failed to overcome the presumption applicable to

dealers and certain investors that the commodity straddles had been entered into for profit within the meaning of section 108(b).

*DeMartino v. Commissioner, supra,* found the straddles there involved to have been prearranged and therefore shams.

We think the critical inquiry in this case must be whether the losses putatively incurred under petitioners' tax straddle scheme, i.e., the London options transaction, are deductible as claimed, or whether the London options transaction lacked economic substance and was therefore a sham. See *Brown v. Commissioner, supra,* and *Forseth v. Commissioner, supra.* The one consistent thread which runs through all of the cases consolidated in this proceeding is that losses, either ordinary or capital, were intentionally incurred in year one, followed by countervailing gains in year two or in many instances later as a result of rollovers.[132] See *Smith v. Commissioner,* 78 T.C. at 390-391.

For purposes of the discussion which follows we assume, without deciding, that the commodity options and futures contracts which petitioners entered into were actual contracts. In thus postulating this assumption, we necessarily focus our attention not on whether petitioners have sufficiently authenticated their transactions (i.e., proved that there *were* actual transactions), but rather whether such transactions, even if actually proven, are nevertheless sufficient to accomplish the tax results which petitioners contemplated. Thus, we are here focusing our attention not on questions of fact but on a question of law. If section 1234 losses are unallowable under a paradigm set of facts as postulated by petitioners, then the question of whether petitioners have introduced enough evidence to prove that the transactions are authentic becomes moot. See Blum, *"Knetsch v. United States*: A Pronouncement on Tax Avoidance,"* 40 Taxes 296, 301 (April 1962). See *Knetsch v. United States,* 364 U.S. 361 (1960).

---

[132]The parties use the term "rollovers" to indicate the postponement of realized net gains to a year or years subsequent to year two by means of offsetting realized year two gains with losses in year two. To incur such losses in year two it was, of course, necessary under the London option transaction to incur a further offsetting gain, but one not intended to be realized until the next succeeding year.

Unless we accept the a priori premise upon which the commodity straddles in this case were marketed, namely, that formal compliance with the literal provisions of the Internal Revenue Code ends the discussion of loss deductibility, then there must be some profit objective in commodity straddling beyond "impressive tax savings." See Goldfein & Hochberg, "Use of Commodity Straddles Can Effect Impressive Tax Savings," 29 J. Tax. 342 (1968). That objective could only be that a taxpayer, such as any of petitioners herein, sought to profit from a "difference" gain in excess of commissions and other costs upon the completion of his commodity trading.[133] (A difference loss or gain is the net difference exclusive of commission and other costs between loss and gain when all of the positions have been closed out. See *Smith v. Commissioner*, 78 T.C. at 366.)

The tax rationale of commodity tax straddles is fully described in *Smith v. Commissioner*, 78 T.C. at 363-366. The option straddles and option hedges described in our findings of fact in this case are each a form of commodity tax straddle, the tax objective of each of which was to "move" income from year one of the straddle scheme to a subsequent year, and in the process convert it from ordinary income to long-term capital gain.[134]

In our findings of fact we have set out a representative overall London option transaction for each of the six major broker/dealers.[135] As reflected in the following table all six produced substantial ordinary losses in year one and insignificant overall gains or losses (difference gains or losses plus commissions) upon the conclusion of the strategy.[136] All money is stated in English pounds (£).

---

[133]It has been said that logically a commodity straddle would be held in the expectation of profiting from a change in the "spread" or "premium," the difference in price between two futures and/or options contracts. While the price movements of the two contracts will have some relationship to each other, as the prices will be affected by similar economic conditions, neither in theory nor in practice are the fluctuations identical. See Dailey, "Commodity Straddles in Retrospect: Federal Income Tax Considerations," 47 Brooklyn L. Rev. 321 (Winter 1981).

[134]Unlike the situation in *Smith*, in this case the income intended to be sheltered in year one, at least initially, was ordinary rather than capital. See amendment to sec. 1234 by sec. 2136(a), Pub. L. 94-455, applicable to options *granted* after Sept. 1, 1976

[135]"Transaction" in this sense refers to the entire series of transactions from the opening to the closing of an account.

[136]Since Gardner Lohmann and Amalgamated coordinated their efforts, their London options transaction was combined.

| Broker/dealer | Ordinary (loss) in year one | Difference gains (or loss) before commissions | Commissions debited |
|---|---|---|---|
| Competex | (56,240) | 40 | (6,816.08) |
| Rudolf Wolff | (48,000) | 24,900 | [137](22,695.00) |
| Gardner/Amalgamated | (27,315) | 3,290 | (6,725.76) |
| Commodity Analysis | (37,200) | 0 | (3,720.00) |
| Rothmetal | (21,420) | 45 | (2,892.00) |

There can be no real dispute that the tax centerpiece of the London options transaction was the closing of the sold option in year one with an ordinary loss objective and the moving of the offsetting capital gain to a subsequent year. The London option trades were consciously effected with this in mind. Petitioners no doubt realize that, given the complexity of trading in commodity options and futures and the relatively high cost of commissions, profiting from difference gains in amounts sizable enough to make the enterprise worthwhile is a difficult and hazardous undertaking at best. It follows logically, then, that the intentional skewing of the transactions to realize year one losses introduces an additional negative element which prohibitively stacks the deck against the chances of significant financial success.

Petitioners argue that under the London options transaction, there was a reasonable prospect for a profit. This argument conveniently overlooks the fact that in the critical year—the loss year—there was *no* prospect for *any* profit, for any other result would have destroyed the raison d'etre for entering into the London options transaction in the first place. We reemphasize at this point, however, that the focus of our attention is petitioners' entire tax straddle scheme, and not each separate straddle. It is the overall scheme which taints the deductibility of the year one losses. *Smith v. Commissioner*, 78 T.C. at 390-391; cf. *Miller v. Commissioner*, 84 T.C. at 843.

In *Landry v. Commissioner*, 86 T.C. 1284 (1986) (involving the deductibility of losses in the first year of a real estate venture), the Commissioner had stated on brief that he did not dispute that taxpayer's long-range goal was to realize a profit, but argued that no deductions were

---

[137]The disproportionate size of the Rudolf Wolff commission is unexplained by the size or number of transactions.

allowable because taxpayer lacked a primary good-faith intent to *"earn a profit during the taxable year* [emphasis in original] *in which the deductions were claimed* [emphasis added]." 86 T.C. at 1305. We rejected this argument, pointing out that many businesses are fraught with losses during their startup years. We stated that the statute there involved (sec. 183) mandates only that the activity be entered into or continued with an actual and honest ojective that it become profitable within a reasonable time. Since the taxpayers in the case before us had *no* perceptible profit objective and intentionally incurred losses in year one, their case is readily distinguishable from *Landry*.

Since there was no prospect of any profit in petitioners' loss year—year one—they are left with the argument that mere technical compliance with the provisions of the Code is sufficient. Petitioners do not effectively articulate this argument by keying elements of the straddles to specific Code sections, but for present purposes, we will assume that they have done so.[138]

Section 165 allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 1234 determines the character of gains and losses attributable to option transactions, including commodity options. New section 108(a) allows losses sustained by investors in straddle transactions if incurred in a transaction entered into for profit. But did the intentional closing transactions in year one of petitioners' tax straddle scheme fit within what sections 165 and 1234, and new section 108(a), intended? In the words of the Supreme Court, "The question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). We think, as applied to this case, the question can be answered by positing and answering another question: Could petitioners have profited from difference gains in commodity straddle transactions had they not *in every instance* entered into closing transactions

---

[138]The dissenting Justices in *Knetsch v. United States*, 364 U.S. 361 (1960), thought the interest deductions claimed by the taxpayer there should be allowed since the transactions leading to the interest charges were "real and legitimate," so that the formal requirements of sec. 163(a) (the interest deduction section) were met. The majority found the overall transaction to be a sham.

on sold options in year one of the straddle operation? Since the answer to this question must be "yes," it must follow that there was no business or profit-making purpose behind the sold option closing transactions above and beyond tax deductions. The intentionally realized losses in year one were not necessary or helpful in profiting from difference gains in petitioners' commodity straddle transactions. Put in this light, the London options strategy was "a mere device which put on the form of [commodity option and futures transactions] as a disguise for concealing its real character," the obtaining of unallowable loss deductions. As such, the London options transaction lacked economic substance and was a sham.[139]

In *Falsetti v. Commissioner*, 85 T.C. 332, 347 (1985), we defined "sham in substance" as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Stated another way, a sham in substance is simply a mislabeling of what actually occurred.[140] Petitioners here purported to be seeking profits from difference gains, but they were actually skewing the transactions for the sole purpose of obtaining expected tax benefits.

In *Forseth v. Commissioner*, 85 T.C. at 166, we held that section 108 is not available in commodity straddle cases involving factual shams, i.e., in those situations where the taxpayer does not establish the jural relationship he purports to create. See Professor Blum's article, *supra* at 310-311. We now hold that section 108 is likewise not available to permit loss deductions in the first year of commodity straddle transactions when, as here, the sham involves a series of transactions having no business or profit-making function apart from obtaining tax deductions. The losses intentionally incurred by petitioners in this case

---

[139]Judge Learned Hand characterized the transaction which led to the Supreme Court's famous substance-over-form holding in *Gregory v. Helvering* in the following manner: "All these steps were real, and their only defect was that they were not what the statute means by a [reorganization], because the transactions were not part of the conduct of the business of either or both companies; so viewed they were a sham, though all the proceedings had their usual effect." *Helvering v. Gregory*, 69 F.2d 809, 811 (2d Cir. 1934), affd. 293 U.S. 465 (1935).

[140]See Gideon, "Mrs. Gregory's Grandchildren: Judicial Restrictions of Tax Shelters," 5 Virginia Tax Rev. 825, 828 (Spring 1986).

were not intended by sections 165 and 1234 and amended section 108. *Gregory v. Helvering, supra.*

We do not believe that *Wehrly v. United States*, 792 F.2d 878 (9th Cir. 1986), requires a different result. The Ninth Circuit reversed and remanded the District Court judgment in favor of the Government following a jury verdict, holding that the retroactive "for profit" language of section 108 (before the 1986 amendment) requires the investor to have only a reasonable expectation of a profit. The Court held that profit must be a motive, but not necessarily (contrary to what the trial judge charged the jury) the primary motive for entering into a straddle transaction.

Thus, the *Wehrly* reversal turned on what the Circuit Court found to be an incorrect standard for determining profit motive. The absence of economic substance in the London option transaction negates the existence of any profit motive. Our holding that the London option transaction was a sham in substance is therefore not in conflict with *Wehrly.*

In conclusion, we hold that the London option transaction—petitioners' multiple and complex tax straddle scheme encompassing prearranged results—lacked economic substance and was a sham. Petitioners consequently may not deduct the losses claimed by them in year one of their straddle transactions. It follows, of course, that since the straddle transactions were a sham, gains reported by petitioners in year two and thereafter do not constitute taxable income to them, and we so hold. This holding is also consistent with section 108(c) which expressly allows net losses, if any, if losses are disallowed under section 108(a) and (b).

---

Except in docket Number 12833-81, respondent has advised the Court and petitioners that respondent no longer asserts the addition to tax for negligence under section 6653(a) insofar as the London options issue is concerned. We so hold. In docket Number 12833-81, respondent continues to assert the addition to tax for negligence under section 6653(a) on the basis of petitioner's failing to report offsetting gains in year two of his straddle transaction.

Since we have held that the London options strategy and the concomitant straddle transactions were a sham, there were no gains to report and the addition to tax for negligence for failure to report a fictitious gain may not be imposed.

This opinion involves only the London option issue. As to those petitioners whose cases involve solely this issue, decisions will be entered for respondent. As to those petitioners whose cases involve one or more unrelated issues which have been settled, decisions will be entered under Rule 155. As to those petitioners whose cases involve one or more as yet unresolved and unrelated issues, appropriate orders will be issued.

To reflect the foregoing,

> *Decisions will be entered for the respondent in those cases listed in Appendix B.*
>
> *Decisions will be entered under Rule 155 in those cases listed in Appendix C.*
>
> *Appropriate orders will be issued in those cases listed in Appendix D.*

Reviewed by the Court.

STERRETT, SIMPSON, GOFFE, CHABOT, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.*, agree with this opinion.

GERBER, *J.*, did not participate in the consideration of this case.

## SCHEDULE 1

## LONDON OPTIONS CASES
### Net Tax Savings [Cost] of Investment
### 1975 - 1976 Straddle

| | 1 Cash investment 1975 | 2 Tax savings from 1975 ord. loss | 3 Invested at 7.5% for 1 year | 4 Tax cost of 1976-76 LTCG | 5 Net tax savings [cost] 3 - 4 | 6 Col 1 invested at 7.5% for 2 years 1-155625 | 7 Net cash savings [cost] (5 - 6) | 8 Net tax savings per $1 (5/1) | 9 Net cash savings per $1 (7/1) |
|---|---|---|---|---|---|---|---|---|---|
| Anderson, Eddie | | | | N/A | | | | | |
| Bunning, John | | | | N/A | | | | | |
| Chadwick, James | | | | N/A | | | | | |
| Davison, Judson | | | | N/A | | | | | |
| Drewes, Kenneth | $8,400 | $31,611 | $33,982 | $16,941 | $17,041 | $9,707 | $7,334 | 2.03:1 | .87:1 |
| Emilson, Herbert | | | | N/A | | | | | |
| Garff, Gary | 7,500 | 45,421 | 48,828 | 15,169 | 33,659 | 8,667 | 24,992 | 4.49:1 | 3.33:1 |
| Hohnstein, Philip | 9,000 | 50,575 | 54,368 | 16,469 | 37,899 | 10,401 | 27,498 | 4.21:1 | 3.06:1 |
| Holmes, Eric | | | | N/A | | | | | |
| Kottinger, William | 7,000 | 12,860 | 13,825 | 9,961 | 3,864 | 8,089 | [4,225] | .55:1 | [.60]:1 |
| Meese, Robert | 6,000 | 15,771 | 16,954 | 12,354 | 4,600 | 6,934 | [2,334] | .77:1 | [.39]:1 |
| Miller, Robert | | | | N/A | | | | | |
| Neibaur, Darwin | | | | N/A | | | | | |
| Okies, Joseph | 3,000 | 9,235 | 9,928 | 1,360 | 8,568 | 3,467 | 5,101 | 2.86:1 | 1.70:1 |
| Schettler, Gordon | 10,000 | 56,656 | 60,905 | 27,937 | 32,968 | 11,556 | 21,412 | 3.30:1 | 2.14:1 |
| Schmidt, Robert | | | | N/A | | | | | |
| Sigman, Michael | | | | N/A | | | | | |
| Williams, Don | | | | N/A | | | | | |

## SCHEDULE 1
### (continued)

## LONDON OPTIONS CASES
### Net Tax Savings [Cost] of Investment
### 1976 - 1977 Straddle
### Recognition of Gain in 1977

| | 1 Cash investment 1976 | 2 Tax savings from 1976 ord. loss | 3 Invested at 7.2% for 1 year | 4 Tax cost of 1977 STCG or *LTCG | 5 Net tax savings [cost] 3 - 4 | 6 Col 1 invested at 7.2% for 2 years | 7 Net cash savings [cost] (5 - 6) | 8 Net tax savings [cost] per $1.00 | 9 Net cash savings [cost] per $1.00 |
|---|---|---|---|---|---|---|---|---|---|
| Anderson, Eddie | $6,000 | $24,730 | $26,511 | $34,110 | [$7,599] | $6,895 | [$14,494] | [1.26:1] | [2.42:1] |
| Bunning, John | Unable to obtain tax returns | | | | | | | | |
| Chadwick, James | 3,000 | 7,261 | 7,784 | *3,350 | *4,434 | 3,448 | 986 | 1.48:1 | .34:1 |
| Davison, Judson[1] | 12,000 | 53,196 | 57,026 | 33,398 | ¹23,628 | 13,790 | 9,838 | 1.97:1 | .82:1 |
| Drewes, Kenneth | 9,600 | 27,854 | 29,570 | 42,250 | [12,680] | 11,032 | [23,712] | [1.32]:1 | [2.47]:1 |
| Emilson, Herbert | 6,000 | 25,000 | 26,800 | 29,995 | [3,195] | 6,895 | [10,090] | [.53]:1 | [1.68]:1 |
| Garff, Gary | 7,750 | 15,398 | 16,507 | 44,678 | [28,171] | 8,906 | [37,077] | [3.637]:1 | [4.87]:1 |
| Hohnstein, Philip | | | N/A | | | | | | |
| Holmes, Eric | 3,250 | 7,456 | 7,993 | *3,832 | *4,161 | 3,735 | 426 | 1.28:1 | .13:1 |
| Kottinger, William | | | N/A | | | | | | |
| Meese, Robert | Unable to obtain tax returns | | | | | | | | |
| Miller, Robert[2] | 11,000 | 47,357 | 50,767 | 9,655 | ²41,122 | 12,641 | 28,471 | 3.74:1 | 2.59:1 |
| Neibaur, Darwin | 12,000 | 62,130 | 66,603 | *80,937 | [14,334] | 13,790 | [28,124] | [1.19]:1 | [2.34]:1 |
| Okies, Joseph | 3,000 | 10,755 | 11,529 | *12,495 | [966] | 3,448 | [4,414] | [.32]:1 | [1.47]:1 |
| Schettler, Gordon | 8,000 | 53,850 | 57,727 | 86,465 | [28,738] | 9,193 | [37,931] | [3.59]:1 | [4.74]:1 |
| Schmidt, Robert | 3,000 | 13,846 | 14,843 | 17,776 | [2,933] | 3,448 | [6,381] | [.98]:1 | [2.13]:1 |
| Sigman, Michael | 3,750 | 7,486 | 8,025 | *16,630 | [8,605] | 4,309 | [12,914] | [2.29]:1 | [3.44]:1 |
| Williams, Don | 7,200 | 20,894 | 22,398 | *8,650 | *13,748 | 8,274 | 5,474 | 1.91:1 | .76:1 |

*Amount of '77 STCG estimated to equal '76 ordinary loss—not enough detail on tax return.

¹49,467 of STCG 104,976 absorbed by '77 LTCL c/o, effectively giving STCG, LTCG treatment.

²$STCG of $106,078 sheltered by STCG c/o of $13,381 + LTCG c/o of 73,443. Only 19,254 picked up in income.

## APPENDIX A

Brenton and Sandra Hughes, docket No. 4054-79; Troy F. Ray and Mattie B. Ray, docket No. 5544-79; John D. Taylor and Marilyn F. Taylor, docket No. 5649-79; Arthur J. Grote and Delta J. Grote, docket No. 7605-79; Robert W. Gibbs and Ramona P. Gibbs, docket No. 7692-79; Calvin E. Carman, docket No. 8146-79; Leonard L. Telford and Leona M. Telford, docket No. 8147-79; Roy M. Kizerian and Ora Lee Kizerian, docket No. 8148-79; Scott B. Smith and Venita Smith, docket No. 8150-79; Paul S. Rogers and Susan M. Rogers, docket No. 8151-79; Warren J. Latey and Margaret F. Latey, docket No. 8152-79; Earl W. Sampson and Ler Lynn Sampson, Marilyn Stevens, docket No. 8153-79; William R. Clyde and Hazel S. Clyde, docket No. 8156-79; Robert H. Burgener and Diane Burgener, docket No. 8157-79; Steven R. Vareen and Karen F. Vareen, docket No. 8158-79; Richard F. Bennett and Darlene Bennett, Ronald D. Wightman and Ilse S. Wightman, docket No. 8160-79; David H. White, Mariano Martin and Dolores Martin, Reed Fietkau and Bessie Fietkau, Warren B. Davis and Marjorie W. Davis, Tats Masuda and Hatsue Masuda, Ben E. Lewis and Barbara W. Lewis, Andrew F. Wenta and Lorna A. Wenta, Clark L. Tolton and Asenatha A. Tolton, Don J. Hobby and Rowena C. Hobby, docket No. 8161-79; Norman C. Kirby and Josie B. Kirby, Grant C. Mills and Georgia H. Mills, Asael S. Jones and Rossine W. Jones, Spencer G. Beck and June Beck, docket No. 8163-79, Thomas and Susanne Minas, docket No. 8668-79; George K. Riches and Shirley C. Riches, docket No. 8720-79; Michael L. Jones and Beverly H. Jones, docket No. 9118-79; John M. McKain and Barbara A. McKain, docket No. 9453-79; J. Gordon Brookover and Barbara J. Brookover, docket No. 9454-79; Al H. Kuykendall and Carolyn T. Kuykendall, docket No. 9455-79; Michael P. Naeve and Kaye Y. Naeve, docket No. 9456-79; Clarence William Pack and Pat F. Pack, docket No. 9457-79; George T. Davis and Jane W. Davis, docket No. 9458-79; Dale D. Jones and Leah B. Jones, docket No. 9459-79; Donald L. Pape and Darlyne Pape, docket No. 9460-79; Rjay Lloyd and Sara A. Lloyd, docket No. 9461-79; Richard S. Bowers and Jeannine M. Bowers, docket No. 9580-79; Dean H. Affleck and Zella M. Affleck, docket No. 9587-79; William McDougall and Marselle E. McDougall, docket No. 9588-79; Gene L. Glenn and Ruth Glenn, docket No. 9589-79; Ace S. Raymond and Marjorie K. Raymond, docket No. 9590-79; Richard S. McLelland, Jr., and Susan M. McLelland, docket No. 9591-79; James W. Williams and Carol Williams, docket No. 9698-79; Neal C. Capel and Lucy Capel, docket No. 9699-79; Gordon O. Schettler and Dorothy Schettler, docket No. 9700-79; John L. Kallmeyer and Magda A. Kallmeyer, Burton E. Becker and Phyllis W. Becker, William Becker and Joyce G. Becker, Robert J. Oliver and Mary E. Oliver, docket No. 9830-79; John H. Affleck and Lynn I. Affleck, docket No. 9908-79; Terry Payne and Patricia Payne, docket No. 9993-79; Robert L. Bothwell and Margareth J. Bothwell, docket No. 10466-79; Robert J. Ostwinkle and Carol A. Ostwinkle, docket No. 11819-79; Paul N. Christensen and Winifred L. Christensen, docket No. 11822-79; Albert M. Carollo and

Leona Carollo, docket No. 12157-79; J. Jerome Wildgen and Jacqueline Wildgen, docket No. 12427-79; Terry Payne and Patricia Payne, docket No. 12803-79; James Tisdale and Brenda S. Tisdale, docket No. 13009-79; Robert G. Tate and Lois J. Tate, docket No. 13580-79; Joseph A. Ivey, Jr., and Arline M. Ivey, docket No. 13586-79; Alvin B. Meyer, docket No. 13835-79; J. Harley Quint and Patricia E. Quint, docket No. 14469-79; Darwin Neibaur and June Neibaur, docket No. 14502-79; R. M. Hobson, Inc., docket No. 14656-79; William B. Kottinger III and Dian Kottinger, docket No. 14944-79; James M. Bledsoe and Donallorene Bledsoe, docket No. 14947-79; Kay J. Smallwood and Virginia M. Smallwood, docket No. 15119-79; James P. Giangobbe and Patricia A. Giangobbe, docket No. 15144-79; Lawrence Graff and Dolores Graff, docket No. 15145-79; Roger E. Hildahl and Glenda (Hildahl) Allen, docket No. 15232-79; Jack Douglass, Josephine Douglass, Leon Nightingale, Jacqueline Nightingale and Steven R. Nightingale, docket No. 15238-79; Leslie L. Mitchell and Colleen Mitchell, docket No. 15259-79; Paul J. Villano, Jr., and Shirley N. Villano, docket No. 15260-79; Richard E. Kremp and Carole L. Kremp, docket No. 15286-79; James R. Barnard and Ann B. Barnard, docket No. 15340-79; John B. Crooks and Rita S. Crooks, docket No. 15591-79; Paul G. Rees, docket No. 16151-79; Lester B. Madsen and Patricia A. Madsen, docket No. 16319-79; Marvin Lipschultz and Beverlee Lipschultz, docket No. 16358-79; Robert A. Seaborn and Linda R. Seaborn, docket No. 16823-79; Allen Nobel Farms, Inc., docket No. 17421-79; Donald L. Lucas and Sally S. Lucas, docket No. 17539-79; Terry W. Blankinship and Nora R. Blankinship, docket No. 321-80; Freddie C. Leguillon and Margo Leguillon, Joseph Sanfilippo and Marian R. Sanfilippo, Michael L. Sanfilippo and Judy L. Sanfilippo, docket No. 673-80; John P. Lee and Patricia Lee, docket No. 798-80; Robert E. Lee and Elizabeth I. Lee, docket No. 868-80; Otto L. Tiede and Helen Tiede, docket No. 956-80; Reed N. and Pauline Christensen, docket No. 957-80; Joseph D. Becker and Karen M. Becker, docket No. 958-80; Cornelius and Catherine Mahoney, docket No. 959-80; Gary L. and Linda J. Bringhurst, docket No. 960-80; Ira Neibaur & Sons, Inc., docket No. 961-80; Gustav E. Rosenheim and Alyce Rosenheim, docket No. 962-80; Frank L. and Lois K. Harms, docket No. 963-80; Lavell B. and Elma Winn, docket No. 964-80; Henry G. and Paula West, docket No. 965-80; Edward Bohrer and Gwenyth Bohrer, docket No. 966-80; Glen and Joaquina Sheppard, docket No. 967-80; Glenn H. Weyhrich and Carol J. Weyhrich, docket No. 1130-80; Robert W. Clark and Cynthia L. Clark, docket No. 1131-80; Judson A. Davison and Betty D. Davison, docket No. 1132-80; Phil Hohnstein and Dorothy Hohnstein, docket No. 1133-80; Marion G. Peterson and Bonnie H. Peterson, docket No. 1134-80; Estate of Robert O. Barber, Deceased, Mary O. Barber, Personal Representative, and Mary O. Barber, Surviving Spouse, docket No. 1135-80; Dean T. Watkins and Janine Watkins, docket No. 1136-80; Kenneth E. Drewes and Lois Drewes, docket No. 1137-80; Robert F. Meger, docket No. 1138-80; Alvin L. Stratton and Jane A. Stratton, docket No. 1139-80; Harry L. Switzer and Ann H. Switzer, docket No. 1140-80; Levi D. Kuhn and Rose M. Kuhn, docket No. 1141-80; Edwin L. Madsen and Grace G. Madsen,

docket No. 1142-80; Ed A. Butterfield and Barbara Butterfield, docket No. 1243-80; Jerry L. Butterfield and Karen P. Butterfield, docket No. 1339-80; Earl Kramer and Janet R. Kramer, docket No. 1627-80; Benjamin Kopf, Jr., and Marian M. Kopf, docket No. 2502-80; Lee Roy, docket No. 2569-80; Joe R. Wilmetti and Karen Wilmetti, docket No. 2872-80; Don V. Cook and Lynn S. Cook, docket No. 2875-80; J. Keith Ormond and Bonnie J. Ormond, docket No. 3205-80; Carvel R. Shaffer and Bonnie J. Shaffer, docket No. 3279-80; James M. Pahl and Freida J. Pahl, docket No. 3332-80; Glee Michaelson and Dorothy A. Michaelson, docket No. 3333-80; Sherman L. Ruff and Betty Ruff, docket No. 3334-80; Fred Tiede and Irene Tiede, docket No. 3335-80; R. Michael Shaw and Beverly L. Shaw, docket No. 3336-80; Jerome Singer and Zenia Singer, docket No. 3565-80; Donald Thal and Eleanor Thal, docket No. 3566-80; Irving Rosengard and Sophie Rosengard, docket No. 3568-80; Nick C. Scholzen and Erroleen Scholzen, docket No. 3705-80; Lowell T. Niebaum and Karen D. Niebaum, docket No. 3999-80; Robert Bunning and Mary D. Bunning, docket No. 4000-80; John Bunning, Jr., and Esther Bunning, docket No. 4036-80; Michael G. Harris and Nancy S. Harris, docket No. 4174-80; Michael A. Davis and Lynn C. Davis, docket No. 4363-80; Harvey J. Widroe and Margery Widroe, docket No. 4457-80; Carl H. Church and Lynne H. Church, docket No. 4567-80; Garth H. and Margaret A. Wilson, docket No. 4665-80; Maurice J. Niebaum, docket No. 5055-80; Robert B. Bragg and Marcia G. Bragg, docket No. 5333-80; Hannah M. Bragg, docket No. 5334-80; Joe B. Hollingsworth and Billie S. Hollingsworth, docket No. 5395-80; Comer R. Youmans, Jr., and Margaret A. Youmans, docket No. 5396-80; William A. Jackson and Gloria C. Jackson, docket No. 5397-80; Charles T. Austin and Pat M. Austin, docket No. 5398-80; Charles J. Delancey and Eleanor M. Delancey, docket No. 5399-80; George F. Elsenbrock and Margaret K. Elsenbrock, docket No. 5400-80; Raymond Killingsworth and Patsy Killingsworth, docket No. 5401-80; Keith L. Wedin and Sharon L. Wedin, docket No. 5465-80; Vernon J. Johnson and Jeanne P. Johnson, docket No. 5466-80; Eugene M. Higgins and Elaine H. Higgins, docket No. 5467-80; Paul M. White and Janice Lori White, docket No. 5468-80; Ernest W. Chalekson, docket No. 5469-80; Robert S. Feldman and Joan Feldman, docket No. 5470-80; Morgan W. Walker, docket No. 6315-80; John G. McGregor, Jr., and Jean R. McGregor, docket No. 6589-80; Estate of Barbara Silverman, Deceased, Jay I. Silverman, Personal Representative, and Jay I. Silverman, Surviving Spouse, docket No. 6590-80; Morris H. Fine and Beverly S. Fine, docket No. 6591-80; Naresh C. Jain, docket No. 6702-80; Robert W. Stenger and Kathie Stenger, docket No. 6840-80; Morton Edelstein, docket No. 6906-80; Paul Copperman, docket No. 7204-80; John R. Kinker and Betsy Kinker, docket No. 7829-80; Donald L. Lucas and Sally S. Lucas, docket No. 7836-80; Allen Dale Dykman and Marian Dykman, docket No. 8151-80; Ira Larsen and Helen J. Larsen, docket No. 8536-80; Dean R. Ackley and Sandra Ackley, docket No. 8583-80; Wayne E. Taysom and Patricia R. Taysom, docket No. 8584-80; Ira A. Haskell and Donna Haskell, docket No. 8585-80; James E. Crowell and Lois C. Crowell, docket No. 8586-80; Calvin D.

Nelson and Judith Nelson, docket No. 8587-80; Bernard I. Rabinovitz and Sylvia Rabinovitz, docket No. 8588-80; Stanley J. Greenfield and Betty J. Greenfield, docket No. 8589-80; Kenneth J. Gilson, docket No. 8711-80; Donald K. Richards and Iva Lu Richards, docket No. 8905-80; Robert M. and Berenice M. Healy, docket No. 9060-80; Daniel J. O'Connor and Irene G. O'Connor, docket No. 9076-80; Don G. Williams and Elaine I. Williams, docket No. 9084-80; Don L. Christensen and Lora Christensen, docket No. 9325-80; Joseph P. Klein and Kathy E. Klein, docket No. 9329-80; Larry W. Casey and Suanne Casey, docket No. 9330-80; Benjamin Feldman and Evelyn Feldman, docket No. 9331-80; Margaret Cole, Formerly Margaret Boleky, docket No. 9332-80; Edward J. Boleky III, docket No. 9333-80; John H. Payne and Dorothy Payne, docket No. 9418-80; Edward C. Hall and Stephanie M. Hall, docket No. 9423-80; Grant M. Christensen, docket No. 9443-80; William H. Geisler, docket No. 9590-80; Daniel J. and Janice Breinin, docket No. 9746-80; Jerome and Rita Rosenbloom, docket No. 9747-80; Norman C. and Barbara B. Charles, docket No. 9748-80; Kenneth and Ana M. Young, docket No. 9763-80; Donald W. Geis and Joan E. Geis, docket No. 10188-80; Charles M. Shumate and Lillian Shumate, docket No. 10226-80; Ronald Pellerito and Estate of Sharon Pellerito, Deceased, Ronald Pellerito, Executor, docket No. 10252-80; Robert G. Condra and Helen I. Condra, docket No. 10269-80; James G. Glasper and Francine Y. Glasper, docket No. 10270-80; Herbert M. Elliott and Bonnie J. Elliott, docket No. 10525-80; Kenneth G. Frazee and Elva E. Frazee Barraclough, docket No. 10597-80; Harold W. and Dorothy H. Finley, docket No. 10604-80; Boyd R. Burkhardt and Judith C. Burkhardt, docket No. 10605-80; Brad Lipschultz Trust, by David Kardoff, Trustee, docket No. 10642-80; Allied Ventures, Inc., docket No. 10643-80; Stanley L. and Geraldine M. Heiner, docket No. 10660-80; Billimac C. Bradley and Mable G. Bradley, docket No. 10721-80; Leo M. Knudson and Betty L. Knudson, docket No. 10722-80; Hyrum J. Christiansen and Lou Etta Christiansen, docket No. 10723-80; Robert W. and Ramona P. Gibbs, docket No. 10724-80; David K. Ricks and Janet L. Ricks, docket No. 10725-80; Stanley Snyder and Renee Snyder, docket No. 10902-80; Bert M. Rettner, docket No. 10922-80; Michael C. Romney and Dora P. Romney, docket No. 10929-80; John E. Biegger and Shirley A. Biegger, docket No. 10986-80; Ralph N. Creer and Jairene V. Creer, docket No. 11017-80; Pascal Dellegrazie and Doris Dellegrazie, docket No. 11067-80; Marvin Lipschultz and Beverlee Lipschultz, docket No. 11068-80; Vernon L. Watkins and Marilyn Watkins, docket No. 11096-80; Gary S. Vandeweghe and Barbara M. Vandeweghe, docket No. 11097-80; Alexander T.S. Healy and Mary Healy, docket No. 11140-80; Stanley R. Kielmar and Carol J. Kielmar, docket No. 11173-80; William M. Preskar and Angelina Preskar, docket No. 11174-80; John C. Sullivan, docket No. 11175-80; Lawrence Glick and Nancy Glick, docket No. 11176-80; Hubert C. Swartout and Helen R. Swartout, docket No. 11177-80; Louis Buddy Yosha and Janet Yosha, docket No. 11195-80; Brad, Mark and Jason Lipschultz Trust, by David Kardoff, Trustee, docket No. 11205-80; Jason Lipschultz Trust, by David Kardoff, Trustee, docket No. 11206-80; Mark Lipschultz Trust, by David

Kardoff, Trustee, docket No. 11207-80; John Healy and Charlotte M. Healy, docket No. 11208-80; Donald S. Sloane and Nora J. Sloane, docket No. 11212-80; John E. Kalsbeck and Jacqueline Kalsbeck, docket No. 11216-80; Holmes Hally Industries, docket No. 11282-80; Robert J. Dunn and Peggy A. Dunn, docket No. 11402-80; Benn Jacobson and Tiziana Jacobson, docket No. 11495-80; Paul R. and Louise I. Greenberg, docket No. 11496-80; Edward O. Breunig and Mary E. Breunig, docket No. 11574-80; Henry C. Ryder and Velma D. Ryder, docket No. 11605-80; William E. Casselman and Lucy B. Casselman, docket No. 11640-80; Lloyd S. Epstein and Bernice A. Epstein, docket No. 11689-80; R.D. Wightman and Ilse S. Wightman, docket No. 11737-80; Leonard L. Telford and Leona M. Telford, docket No. 11739-80; Robert D. Duffin and June S. Duffin, and Dean F. Johnson, docket No. 11745-80; Delbert Lambert and Karel Lambert, docket No. 11748-80; Frank P. Vantrepotte and Margaret T. Vantrepotte, docket No. 11755-80; Robert G. Kilburg and Margaret A. Kilburg, docket No. 11756-80; Howard Zuker and Linda Zuker, docket No. 11757-80; Harold L. Melsheimer and Sabrina Melsheimer, docket No. 11780-80; Douglas C. Stewart and Mary L. Stewart, docket No. 11781-80; Clarence Wm. Pack and Pat F. Pack, docket No. 11782-80; Lee I. Bromiley and Dianna C. Bromiley, docket No. 11783-80; Wayne L. Taylor and Sandra H. Taylor, docket No. 11811-80; Manny and Sally Karbelnig, docket No. 11823-80; Jasper O. McCollough, Jr., and Joan H. McCollough, docket No. 11894-80; John L. Knight and Judith H. Knight, docket No. 11952-80; Ronald A. Nielsen, docket No. 12006-80; Robert A. and Vivian K. Meese, docket No. 12009-80; Robert F. Miller, docket No. 12027-80; William M. and Sybil A. Regitz, docket No. 12028-80; Warren and Rena Noland, docket No. 12029-80; Weldon and Judy Noland, docket No. 12030-80; Louis M. Niven and Dolores R. Niven, docket No. 12067-80; W. Paul Mahan and Sandra L. Mahan, docket No. 12122-80; Bernard Zwerling and Lillian Zwerling, docket No. 12144-80; David A. Tallant and Ruth A. Tallant, docket No. 12164-80; Ross E. Siddoway and Imogene Y. Siddoway, docket No. 12197-80; Neils P. Neilson and Irma S. Neilson, docket No. 12198-80; Calvin E. Carman, docket No. 12199-80; Richard F. Bennett and Darlene Bennett, docket No. 12203-80; Glorus R. Rowley, docket No. 12204-80; Paul S. Rogers and Susan R. Rogers, docket No. 12207-80; Frank Naccarato and Joyce Naccarato, docket No. 12213-80; Roland L. Raetz and Gwendolyn S. Raetz, docket No. 12214-80; Wendell E. McDermaid and Fern McDermaid, docket No. 12216-80; Myron L. Brady and Ivie P. Brady, docket No. 12218-80; A. Grant Watson and Stella Watson, docket No. 12219-80; Max Hambelton, docket No. 12221-80; Delos G. Fotheringham and Genevieve C. Fotheringham, Robert B. Johanson and Elizabeth Johanson, Max A. Newren and Coy M. Newren, Richard N. Paul and Edith D. Paul, L. Jay Waldron and Larue Waldron, docket No. 12224-80; Chris S. Lloyd and Carole H. Lloyd, docket No. 12225-80; Leslie K. Feil and Dianne Feil, docket No. 12226-80; Paul I. Nixon, Jr., and Sheri L. Nixon, docket No. 12229-80; Cloyd R. Russell and Janice L. Russell, docket No. 12232-80; Vernon Cavill and Marjorie F. Cavill, docket No. 12233-80; O. Verl Reed and Fern Reed, docket No. 12236-80;

Ralph W. Bleazard and June Bleazard, docket No. 12237-80; James T. Bruce and Janet Bruce, George A. Dean and Jacqueline M. Dean, Martin C. Lindem, Jr., and Margaret M. Lindem, docket No. 12238-80; Estate of Mary R. Gardner, Brenda Ruth Lister, and Ivan Leonard Gardner, Co-Personal Representatives, docket No. 12241-80; Ralph Bleazard and June Bleazard, docket No. 12246-80; Edwin G. Knight and Connie M. Knight, docket No. 12247-80; Heinz F. Rahde and Gisela Rahde, docket No. 12249-80; William P. Werrett and Delrean Werrett, docket No. 12250-80; Harry C. Davis and Darlene I. Davis, docket No. 12252-80; Estate of Mary R. Gardner, Brenda Ruth Lister, and Ivan Leonard Gardner, Co-Personal Representative, docket No. 12253-80; Marv R. Bell and Gladys M. Bell, docket No. 12254-80; D. Creed Brimhall and Elinor B. Brimhall, docket No. 12255-80; William A. Edginton and Lucia B. Edginton, docket No. 12261-80; Warren B. Davis and Marjorie W. Davis, docket No. 12262-80; Roger C. Bare and Blanche M. Bare, J. Blaine Bingham and Darlene R. Bingham, Leonard E. Bluhm and Barbara B. Bluhm, Verda Davis, George M. Fitz and Angeline M. Fitz, Louis B. Freeman and Jayne H. Freeman, Ray C. Gaines and Dorothy J. Gaines, Robert S. Lawson and Betty Lou Lawson, Estate of Donald H. Main, Sr., and Genevieve J. Main, Personal Representative, Levay J. Maestas and Lucy T. Maestas, Doyle E. McInelly and Naida M. McInelly, Richard L. Pulsipher and Kathleen Pulsipher, Boyd L. Peterson and Linda Peterson, A. Eugene Powell and Donna Powell, Ruth P. Prather, Arnold E. Rothermich and Patricia Rothermich, Stuart H. Sorensen, Jack Stephensen and Laura Stephensen, Clyde B. Taylor and Jacqueline Taylor, Harold W. Wack and Patricia Wack, Lavar J. Wilkinson and Marian J. Wilkinson and John D. Richards, Jr., and Dianne A. Richards, docket No. 12263-80; George W. Irwin and Ivonda J. Irwin, docket No. 12264-80; Angela A. Arriz, docket No. 12265-80; Kearn G. Kendall and Vicki R. Kendall, Carl J. Larsen and Shirlee A. Larsen, docket No. 12266-80; Grant Mills and Georgia Mills, docket No. 12267-80; Estate of Leroy Wagstaff, Carol Buhler, Personal Representative and Leah M. Wagstaff, docket No. 12268-80; Glen S. Gold and Virginia Gold, docket No. 12269-80; Edward J. Arriz, Helen M. Evans, Robert H. Hout and Elaine T. Hout, Robert Pecharich and Nancy Pecharich, docket No. 12270-80; Mariano Martin and Delores Martin, docket No. 12273-80; John A. Paskett and Elaine P. Paskett, docket No. 12274-80; David B. Bartell and Santa M. Bartell, docket No. 12343-80; Albert H. Landry and Bonnie M. Landry, docket No. 12344-80; James V. Decker and Patricia P. Decker, docket No. 12345-80; Louis Steven Long and Esther R. Long, docket No. 12410-80; Joseph C. Sapala and Barbara J. Sapala, docket No. 12417-80; Gerald R. Alderson and Roberta G. Alderson, docket No. 12491-80; Shirley Mae Cassidy, docket No. 12608-80; Thomas D. Rice and Winifred E. Rice, docket No. 12609-80; Richard C. Jensen and Valeen Jensen, docket No. 12610-80; Jon R. Young and Lillian G. Young, docket No. 12611-80; Edward L. Gelbach and Sandra L. Gelbach, docket No. 12612-80; Marcia K. Wallace, docket No. 12613-80; Michael Bell, docket No. 12614-80; Thomas P. Sheils and Helen K. Sheils, docket No. 12615-80; Geoffrey B. Edwards and Suzanne W. Edwards, docket No.

12616-80; Howard M. Borris and Jill B. Borris, docket No. 12617-80; Erwin L. Hoffman and Arlene R. Hoffman, docket No. 12618-80; David K. Miller and Linda C. Miller, docket No. 12619-80; Jay A. Redack and Teri H. Redack, docket No. 12620-80; Kenneth Fertig and Claire Gordon, docket No. 12621-80; Howard L. Thaler and Deike Thaler, docket No. 12622-80; Robert W. Bell and Geraldine Bell, docket No. 12623-80; Jack E. Rowe and Patricia S. Rowe, docket No. 12624-80; Gene R. and Rose Mary Hedin, docket No. 12625-80; Benjamin T. Richards and Mary Maureen Richards, docket No. 12721-80; Michael J. Gertner and Judy Gertner, docket No. 12767-80; George E. Van Auken and Ruby I. Van Auken, docket No. 12774-80; Don Stanisich and Shirley Stanisich, docket No. 12793-80; Ralph M. and Molly Wolveck, docket No. 12834-80; Ronald A. Melanson and Florence T. Melanson, docket No. 12864-80; Benn Jacobson, docket No. 12884-80; T.B. Hudson and Dorothy Hudson, docket No. 12901-80; Max W. and Jo Elsie Deason, docket No. 12928-80; Herbert J. Cropper and Patsy R. Cropper, docket No. 12970-80; John J. Dilli, docket No. 12976-80; Robert Franklin and Ann Franklin, docket No. 12987-80; James Toskas and Dale Toskas, docket No. 13049-80; Charles A. Ware and Opal L. Ware, docket No. 13066-80; Phillip Ariew and Jennell Ariew, docket No. 13067-80; Dennis L. Tank and Ann G. Tank, Deceased, by Dennis L. Tank, Surviving Spouse, docket No. 13068-80; John L. Taylor and Martha E. Taylor, docket No. 13069-80; Coleman L. McVea and Eleanor L. McVea, docket No. 13125-80; Dent Dustin and Betty Dustin, docket No. 13126-80; Nelson D. Sirlin and Kathleen A. Sirlin, docket No. 13142-80; Wendell B. Whitacre and Pierrette J. Whitacre, docket No. 13155-80; David A. Scholzen and Judy Scholzen, docket No. 13162-80; Stephen R. Landau, docket No. 13192-80; Keith V. Scholzen and Shelly B. Scholzen, docket No. 13199-80; Lester M. Kaufmann and June B. Kaufmann, docket No. 13223-80; Ronald E. Baker and Judith R. Baker, docket No. 13383-80; James M. Saunders and Pauline B. Saunders, docket No. 13452-80; Mary Lu Scholzen, docket No. 13540-80; Richard E. Spaulding, docket No. 13604-80; Daniel Olonoff and Charlotte Olonoff, docket No. 13616-80; Robert L. Clement and Maurilia Clement, docket No. 13765-80; Laurence B. Torin and Phyllis A. Torin, docket No. 14448-80; Joseph L. Browning, docket No. 14757-80; Jennifer Moore Bailey, Formerly Jennifer Claire Klungvedt and Jennifer Claire Moore, docket No. 15144-80; Donald R. Metz and Cathryn S. Metz, docket No. 15592-80; James S. and Nancy T. Froelich, docket No. 15770-80; Reading Coca-Cola Bottling Works, Inc., docket No. 15771-80; Vincent R. Ruocco and Loyce M. Ruocco, docket No. 15811-80; Charles S. Eytel and Mary Ann Eytel, docket No. 15899-80; R. Clyde Ashworth and Shirley Ashworth, docket No. 16204-80; Harold H. Halford and Janet E. Halford, docket No. 16319-80; Scott D. Gordon and Jacquelin Gordon, docket No. 16483-80; Richard N. Smith and Alice O. Smith, docket No. 16556-80; James B. Kennard and Eleanor K. Kennard, docket No. 16557-80; Charles T. Koval and Joan Koval, docket No. 16558-80; Melvin I. Masterson and Mildred I. Masterson, docket No. 16559-80; Norman D. Nelson and Janet H. Nelson, docket No. 16560-80; Henry S. Pachoe, docket No. 16561-80; Sherwin Nelson, docket No. 16562-80; Richard S.

McLelland, Jr., and Susan M. McLelland, docket No. 16563-80; Vivian J. Stone, docket No. 16656-80; Joseph B. Olson and Betty J. Olson, docket No. 16680-80; Wayne R. Viehweg and Mary Jane Viehweg, docket No. 16681-80; Visut Kanchanapoom and Meechai Kanchanapoom, docket No. 16856-80; Robert W. Bell and Geraldine Bell, docket No. 16857-80; Edward R. Ritvo and Jean K. Ritvo, docket No. 16858-80; Snethen P. Harris, Jr., and Olga W. Harris, docket No. 17069-80; Herbert H. Blankinship and V. Elizabeth Blankinship, docket No. 17117-80; Edward A. Lewis, docket No. 17147-80; Kim K. Collins and Carol R. Collins, docket No. 17148-80; Stephen N. Engberg and Marlene J. Engberg, docket No. 17336-80; John E. and Dorothy M. Keane, docket No. 17351-80; Estate of Leona C. Bryant, Deceased, Marvin D. Bryant, Executor, and Marvin D. Bryant, Surviving Spouse, docket No. 17457-80; Francis J. and Nancy E. Baron, docket No. 17644-80; Ace Spencer Raymond and Melanie P. Raymond, docket No. 18137-80; Jack V. Labbee and Lorraine Labbee, docket No. 18654-80; Arnold S. Hiatt and Anne W. Hiatt, docket No. 18692-80; Karl F. and Julia C. Kundert, docket No. 19091-80; Estate of Jack Sarver, Deceased, Irene Sarver, Personal Representative and Irene Sarver, Surviving Spouse, docket No. 19247-80; Kenneth P. Kirchman and Budagail S. Kirchman, docket No. 19248-80; J.M. Hess Construction Co., Inc., docket No. 19382-80; Roscoe E. Abney and Ruby L. Abney, Marshall R. Craig and Ruth H. Craig, Harold A. Dalebout and Louise G. Dalebout, M. Carl Gibson and Irma B. Gibson, Werner Haack and Helen E. Haack, Robert E. Hall and Joyce Hall, Rex G. Hutchinson and Nina G. Hutchinson, Forrest Kleinman and Mary I. Kleinman, Charles B. Morton and Jean G. Morton, James R. Olsen and Lorna S. Olsen, Elbert Stoker and Caroline Stoker, A. Harper Wallace and Ellen W. Wallace, docket No. 19395-80; Douglas M. Adams and Vera H. Adams, Kenneth L. Allred and Ruth H. Allred, Jack H. Alston and Meade L. Alston, Gloria B. Barraclough, Clarence R. Bennion and Ione Bennion, George L. Boyce and Katherine S. Boyce, Gilbert L. Bradshaw and Beth N. Bradshaw, Barney Brooks and Alice Brooks, Anna H. Brown, Sharon Lee Brown, Helen C. Bullock, Denzil M. Cazier and Arlie A. Cazier, Jane T. Chabries, Edward L. Christensen and Margaret P. Christensen, Robert A. Christensen and Kay M. Christensen, David B. Cook and Sharon P. Cook, George V. Coon and Beth J. Coon, Leroy J. Darling and Janice R. Darling, Joseph K. Davis and Leona B. Davis, Thurmis M. Engle and Joy Engle, Stephen W. Farr, Roger Ferguson and Gay Lou Ferguson, Paul W. Flandro and Marian B. Flandro, Allen A. Francis and Margaret A. Francis, Herold L. Gregory and Mary E. Gregory, Don A. Hansen and Rose L. Hansen, Lynn M. Hansen and Elizabeth Hansen, Wilford H. Hansen and Esther J. Hansen, Ralph E. Hardy and Marian S. Hardy, Dee O. Howell and Barbara W. Howell, James M. Hunter and Mildred M. Hunter, Marvin D. Jensen and Leone R. Jensen, Noal W. Jensen and Renee S. Jensen, William A. Llewelyn and Jaunita O. Llewelyn, Norman Lowe and Verla Lowe, Eleanor Lyon, Burt W. Match and Betty Match, Thomas J. May and Norma May, Robert W. McBride and Audrey J. McBride, Paul W. McCullough, Douglas D. Mellen and Penny Mellen, Robert S. Miyake and Akiko

Miyake, Jean R. Morton and Thelma Morton, Richard K. Obyn and Maria A. Obyn, Glade Owen and Jean Owen, I. Reed Payne and D. Ruth Payne, Thomas B. Petersen and Colleen Petersen, Donald R. Roberts and Beth R. Roberts, G. Raymond Robinson and Dorthey M. Robinson, Bill J. Rosenhan and Gloria D. Rosenhan, Edward D. Snow and Anne G. Snow, Leland S. Standifird and Ruth Standifird, Wesley O. Swenson and Virginia Swenson, Max N. Tassainer and Mary E. Tassainer, Harry G. Taylor and Alice D. Taylor, Wayne D. Taylor and Fawn J. Taylor, Stuart E. Temple and Christine Temple, Deloy A. Thorpe and Marlene A. Thorpe, Zelda E. Tidwell, Owen J. Traynor, Jr., and Jacqueline M. Traynor, James D. Turner and Leatha M. Turner, Ross O. Van Orden and Della R. Van Orden, John A. Vincent and Kay N. Vincent, David L. Woody and Shirley D. Woody, Harold Adams and Cora M. Adams, Hobart Barbour, Jr., and Dama J. Barbour, Thomas J. Bender, Jr., and Ruth W. Bender, Eleanor O. Blonquist, Richard L. Billings and Una G. Billings, George D. Burgess and Afton D. Burgess, Ranald H. Devey and Rose A. Devey, Beverly N. Frederikson, Lawrence A. Hood and Margaret Hood, Val B. Jennings and Sarepta P. Jennings, Warren J. Latey, Jr., and Margaret F. Latey, Dale W. Lewis and Jean W. Lewis, Curtis B. McGurie and Eileen W. McGurie, George H. Pratt and Vivian J. Pratt, Carol S. Rayburn, Clifford D. Roper and Charlene Roper, Orlando L. Sanchez and Lucy I. Sanchez, Maurine Edna Haltiner, Betty G. Johnson, Calvin N. Paxton and June M. Paxton, John R. Rork and Anneliese B. Rork, Leo J. Zanelli and Wilma L. Zanelli, docket No. 19396-80; Wilbert Washington and Lyvonne Washington, docket No. 19419-80; Carlos E. Velasco and Barbara E. Velasco, docket No. 19492-80; Don S. Milligan and Myrna I. Milligan, J. Eugene Seaich and Dorothy Seaich, Tats Masuda and Hatsue Masuda, L. Ione Curtis Senn, J.H. Swasey and Elizabeth C. Swasey, Morris D. Young and Lorraine P. Young, June F. Copp, Stanley M. Follett and Colleen B. Follett, Dently T. Mellen and Dee Mellen, docket No. 19664-80; Glenn J. Bethers and Tella M. Bethers, Tom Green, Melvin W. Blake and Norma L. Blake, Henry I. Elswood and Fay B. Elswood, Wells J. Iverson and Anna B. Iverson, docket No. 19665-80; Bud M. Compton and Marie B. Compton, William R. Farris and Gloria M. Farris, Rulon P. Madsen and Ramona H. Madsen, Hilding M. Marlowe and Mary W. Marlowe, Carl Molyneux and Helen J. Molyneux, Marvin J. Peterson and Geneva C. Peterson, Olean Petersen and Margaret H. Petersen, Michael H. Thurman, Michael H. Thurman and Joyce S. Thurman, Ralph H. Harrison and La Vaun E. Harrison, docket No. 19666-80; Richard J. Bradford and Helen Bradford, George E. Buck and Stella B. Buck, Dean A. Clark and Marion B. Clark, Stanley L. Cross and Cora Jean Cross, Julie A. Hurst, George K. Imaizumi and Mary S. Imaizumi, Paul I. Nixon, Jr., and Sheri L. Nixon, Lyman K. Porter and B. Bernice Porter, docket No. 19669-80; Leland V. Child and Barbara Child, docket No. 19670-80; Champlain Oil Co., Inc., docket No. 19750-80; CBCS, Inc., docket No. 19751-80; Mitchell T. Curtis and Louise F. Curtis, docket No. 19752-80; C. Herbert Emilson and Pauline V. Emilson, docket No. 19753-80; Alexis DeAzevedo and Linda DeAzevedo, docket No. 19754-80; Theodore Osman and Helene B. Osman, docket No.

19897-80; Stephen C. Osman and Harle S. Osman, docket No. 19898-80; Cloid L. Hinckley and LaVon S. Hinckley, docket No. 20078-80; Glenn E. Bray and Mildred H. Bray, Ewing J. Hunt and Ona A. Hunt, Hattie S. Kippen, Gene M. Richards and Ann H. Richards, Thaola H. Tucker, Wallace E. Wahlen and Lucille Wahlen, Rex M. Bradford and Luella B. Bradford, docket No. 20079-80; James R. Clark, docket No. 20138-80; Warren R. Adair and Patricia Adair, docket No. 20292-80; Clyde Benton and Majoria Benton, Garth J. Swallow and Carma C. Swallow, docket No. 20293-80; Frank L. Sagendorf and Roxie A. Sagendorf, docket No. 20295-80; Roland L. Raetz and Gwendolyn S. Raetz, Jennie B. Vandrimmelen, Donald D. Drake, and Marceil Drake, docket No. 20296-80; Glorus R. Rowley, docket No. 20297-80; Shirl D. Kemp and Barbara Kemp, Francelle E. Larsen, docket No. 20298-80; O. Verl Reed and Fern Reed, docket No. 20299-80; Floyd L. Tarbet and Karen L. Tarbet, docket No. 20362-80; Laurence E. Drivon and Rosemarie Drivon, docket No. 20436-80; Dick Fouts and Betty Fouts, docket No. 20521-80; Byron H. Bowman and Avonell G. Bowman, docket No. 20522-80; David D. Leiter and Judith A. Leiter, docket No. 20531-80; Eddie H. Anderson, docket No. 20543-80; R. James Rigney and Jean C. Rigney, docket No. 20574-80; Richard G. Scott and Jeanene W. Scott, docket No. 20697-80; Dean W. McDonald and A. Jeanne McDonald, docket No. 20699-80; Morgan Thomas and Joyce Thomas, docket No. 20700-80; Robert C. Rider and Marie E. Rider, docket No. 20701-80; Carl E. Dudley and Ethel Dudley, docket No. 20703-80; Thomas J. and Mary F. Kenney, docket No. 20768-80; Laurence W. Bell and Emma L. Bell, docket No. 20770-80; R. Max Rogers and Florence F. Rogers, docket No. 20771-80; Fae Z. Hacker, docket No. 20847-80; Gilbert L. Robbins and Merlyn A. Robbins, docket No. 21035-80; Dix H. McMullin and Renae McMullin, docket No. 21036-80; Lowell R. Simpson and Sandra S. Simpson, docket No. 21037-80; Joseph C. Jacobs and Emily L. Jacobs, William G. Poulsen and Barbara A. Poulsen, Lorin K. Smith and Cleone C. Smith, docket No. 21039-80; Ken Garff Co., Inc., docket No. 21126-80; Ken Garff Foreign Cars, Inc., docket No. 21127-80; Estate of Marjorie H. Garff, Deceased, Kendall Day Garff, Executor, and Kendall Day Garff, Surviving Husband, docket No. 21128-80; Robert H. Garff and Kathi Garff, docket No. 21129- '0; Gary Garff and Linda Garff, docket No. 21130-80; Arthur J. Dellinger, docket No. 21179-80; Dorothy R. Dellinger, docket No. 21180-80; Robert M. Ryan and Helen R. Ryan, docket No. 21188-80; Leonard M. Shlain and Carole Shlain, docket No. 21282-80; George P. Dorsey and Marie L. Dorsey, docket No. 21817-80; John S. Pennish and Evelyn W. Pennish, docket No. 22035-80; Marvin C. Friedman and Frances J. Friedman, docket No. 22085-80; W. Robert Hightower and Alice C. Hightower, docket No. 22195-80; Donald W. Frei and Susan S. Frei, docket No. 22511-80; John L. Johnson and Penney Johnson, docket No. 22512-80; Allen T. Noble and Billie D. Noble, docket No. 22867-80; Ben W. Walters and Carol L. Walters, docket No. 22981-80; Albert Starr and Marcia D. Starr, docket No. 277-81; Gail B. Horne and Miriam C. Horne, docket No. 278-81; James A. Wood and O. Joann Wood, docket No. 279-81; Paul W. Lowden, docket No. 387-81; David R. Michelson and

Kathleen M. Michelson, docket No. 388-81; Robert E. Wolfer and Marie J. Wolfer, docket No. 389-81; Edward A. Johnson and Janice M. Johnson, docket No. 390-81; Charles M. Parrish and Gloria F. Parrish, docket No. 391-81; Richard D. Chapman and Marlys K. Chapman, docket No. 392-81; James D. Barger, docket No. 463-81; Kurt G. Schroeder and Marlies Schroeder, docket No. 537-81; Raymond C. Stubbs and Jacqueline Stubbs, docket No. 538-81; Mark R. Cram and Melba N. Cram, docket No. 666-81; Robert V. Johnson and Dorothy D. Johnson, docket No. 667-81; Walter W. Schnekenburg and Velda Schnekenburg, docket No. 668-81; Cloyd E. Russell and Geneve Russell, Richard F. North and Betty Jane North, docket No. 669-81; Kent Andreason and Joy Andreason, Darryl P. Dong, docket No. 670-81; Ronald Singer and Shelley Singer, docket No. 705-81; Robert B. Steele and Avis J. Steele, docket No. 910-81; Jesse A. Henriques and Mary Q. Henriques, docket No. 911-81; Raymond C. Avansino, Jr., and Kristen A. Avansino, docket No. 927-81; Kimball C. Kaufman and Faye T. Kaufman, docket No. 940-81; Leonard A. Zell, docket No. 998-81; Dale E. Shirley and Patti Shirley, docket No. 1000-81; Stanley M. Higashino and Betty Y. Higashino, docket No. 1009-81; Philip N. Leavitt and Barbara Leavitt, docket No. 1051-81; Maurice Engleman and Shirley Engleman, docket No. 1109-81; Estate of Harry X. Bergman, Deceased, Shirley Engleman, Heir At Law, docket No. 1110-81; Alfred R. Barca, docket No. 1232-81; Ralph E. Springer and Beverly Springer, docket No. 1233-81; William Schaan Co., Formerly Baker Livestock Auction, Inc., docket No. 1240-81; Harold V. Feeney, Jr., and Mary A. Feeney, docket No. 1241-81; Richard H. Lussier and Suzanne D. Lussier, docket No. 1242-81; Joel W. Renbaum and Barbara P. Renbaum, docket No. 1403-81; Ruth E. Kreiss, docket No. 1404-81; Starling E. Kay and Beatrice Kay, docket No. 1405-81; John Varni and Lena M. Varni, docket No. 1501-81; Stephen P. Miller, docket No. 1539-81; A. Edward Warren and Alvarene A. Warren, docket No. 1563-81; Robert E. Nordyke, docket No. 1802-81; Ira Sankey and Edna Sankey, docket No. 1871-81; William R. McCurtain and Mamie McCurtain, docket No. 2029-81; John C. Nelson and Mazel P. Nelson, docket No. 2030-81; W. Roy Brown and Evelyn Brown, docket No. 2078-81; Kenneth Lemings and Carolyn Lemings, docket No. 2373-81; Myron and Lynda Finkelstein, docket No. 2398-81; Lawrence Ernest Weisheit and Elizabeth Anne Weisheit, docket No. 2459-81; Jerry M. Hess and Joan E. Hess, docket No. 2579-81; Julian O. Standen and Elizabeth G. Leavy, docket No. 2658-81; Rex H. Crockett and Jeanne M. Crockett, docket No. 3001-81; Alan du Bois and Marjorie du Bois, docket No. 3002-81; Calvin D. Nelson and Judith Nelson, docket No. 3003-81; Kenneth J. Huber and Emma C. Huber, docket No. 3004-81; James A. Brinton and Lorraine H. Brinton, docket No. 3066-81; Edward M. Geritz and Marjorie J. Geritz, docket No. 3185-81; Lesly H. and Doris M. Meyer, docket No. 3269-81; Philip N. Leavitt and Dawn Leavitt, docket No. 3286-81; Walter W. Klosterman and Nancy M. Klosterman, docket No. 3337-81; Manuel P. Perez and Mary Jo Perez, docket No. 3544-81; Jack A. Scaman and Florence A. Scaman, docket No. 3545-81; Richard G. Rowland and Sandra A. Rowland, docket No. 3546-81; William J.

Gammie, docket No. 3547-81; Louis S. Cole and Ursula A. Cole, docket
No. 3561-81; Robert A. Paisley and Phyllis R. Paisley, docket No.
3583-81; Thomas J. Miklautsch and Helen B. Miklautsch, docket No.
3618-81; John Gunderson and Carol J. Gunderson, docket No. 3802-81;
John L. and Barbara Mortensen, docket No. 4135-81; Frank W. Paulin,
docket No. 4270-81; Leon Kaufman and Judy P. Kaufman, docket No.
4348-81; Robert L. Roth and Alberta Roth, docket No. 4419-81; Donald J.
Doot and Emily H. Doot, docket No. 4467-81; Stanley Antonio and Eva
Antonio, docket No. 4468-81; Otto L. Bendheim and Ronnie K.
Bendheim, docket No. 4496-81; Garabed Messrobian and Anne Messrob-
ian, docket No. 4785-81; Robert Bishop and Simone C. Bishop, docket
No. 4786-81; George and Irma C. Anderl, docket No. 4827-81; Robert S.
Leventhal, docket No. 4841-81; Winthrop H. Hall and Susan H. Hall,
docket No. 4894-81; Charles E. Andre and Bartis N. Andre, docket No.
4909-81; John R. Flynn and Florence M. Flynn, docket No. 4910-81;
Estate of Jack J. Sarver, Deceased, and Irene Sarver, Personal Represen-
tative, and Irene Sarver, docket No. 4911-81; Paul W. Berezny, Jr., and
Louise M. Berezny, docket No. 4987-81; Michael S. Musulin and Wanda
L. Musulin, docket No. 5083-81; Joseph E. Giovanini and Clarice J.
Giovanini, docket No. 5123-81; Leonard H. Lubich and Marion Lubich,
docket No. 5194-81; Raymond E. Prouhet and June L. Prouhet, docket
No. 5237-81; Donald F. Williams and Barbara J. Williams, docket No.
5458-81; Manning J. Post and Florence S. Post, docket No. 5539-81;
Joseph K. Brown and Sara L. Brown, docket No. 5540-81; Dale D. Jones
and Leah B. Jones, docket No. 5541-81; Raymond C. Nann and Barbara
M. Nann, docket No. 5618-81; Max Tonn and Gladys Grace Tonn, docket
No. 5621-81; Richard A. Leland and Virginia C. Leland, docket No.
5669-81; Matt M. Musulin and Mary A. Musulin, docket No. 5787-81;
Stanley D. Harmon and Bette G. Harmon, docket No. 5812-81; Irvin G.
Lane and Rosemarie Lane, docket No. 5813-81; Marvin C. and Dorothea
Bonine, docket No. 6114-81; Scott H. Gaidano and Susan Jane Doelger,
docket No. 6115-81; Benjamin F. Davis, Formerly Benjamin F. Dick,
docket No. 6145-81; Estate of Ruth Ann Peterson, Deceased, Edward W.
Peterson, Executor, and Edward W. Peterson, docket No. 6146-81;
Abraham and Geryll Lee Joffe, docket No. 6147-81; Howard H. Goldberg
and Jessa K. Goldberg, docket No. 6377-81; Melvin L. Meyerowitz and
Betty Meyerowitz, docket No. 6500-81; Edward H. Margolin and Bonnie
Margolin, docket No. 6556-81; Robert L. Riddle, docket No. 6583-81;
Jafar Shah-Mirany and Carol Shah-Mirany, docket No. 6762-81; Carl E.
Nauta and Anita L. Nauta, docket No. 6763-81; James M. Finneran and
Jo Anne Finneran, docket No. 6764-81; Charles Epstein and Ruth L.
Epstein, docket No. 6929-81; Julian R. Goldberg and Barbara Goldberg,
docket No. 7113-81; Howard Ratliff and Gloria Ratliff, docket No.
7213-81; Joseph R. Grund and Josephine M. Grund, docket No. 7214-81;
O. Melvin and Letitia A. Phillips, docket No. 7372-81; Myron H. Center
and Eleanor R. Center, docket No. 7389-81; Arnold Brown and Phyllis
Brown, docket No. 7698-81; Marvin Lustbader and Marilyn Lustbader,
docket No. 7851-81; Robert B. Lipschultz, docket No. 7852-81; Stuart
Hack and Ellen Hack, docket No. 8020-81; Robert B. Lipschultz and Sari

Lipschultz, docket No. 8431-81; Bar-B-Que Industries, Inc., docket No. 8432-81; Fred J. Krone and Audrey L. Krone, docket No. 8434-81; Frank A. DiJohn and Nancy DiJohn, docket No. 8545-81; Jacob D. Hornstein and Betty S. Hornstein, docket No. 8573-81; Morton H. Perry and Dorothy G. Perry, docket No. 8586-81; Richard and Mary Juanita Bukey, docket No. 8589-81; Marvin J. Kahn and Helene R. Kahn, Deceased, docket No. 9395-81; George F. Baumann and Marcella Baumann, docket No. 9501-81; Lawrence G. Soderholm, Jr., and Dora M. Soderholm, docket No. 9635-81; S.A. Nathan, Jr., docket No. 9705-81; Richard and Jeannine Sebastian, docket No. 9716-81; O. Brent Black and Sally N. Black, docket No. 9845-81; Thomas C. and Frances Cotter, docket No. 9917-81; Clemon J. and Ivy C. Herrington, docket No. 9926-81; Dennis B. Iverson and Deborah S. Iverson, docket No. 9940-81; Glen T. Gardner and Dina Mori Gardner, docket No. 10003-81; Ellis H. Goodman and Louise K. Goodman, docket No. 10196-81; William E. Callighen, Shirley M. Callighen, Anthony L. Llewellyn, Sandra L. Llewellyn, Wilson Darell Murphy, and Linda S. Murphy, docket No. 10939-81; Sheldon E. Friedman and Debby B. Friedman, docket No. 11621-81; Robert Glenn and Yvonne Glenn, docket No. 11717-81; Robert Glenn, docket No. 11718-81; New State Lands, Inc., docket No. 11797-81; Eugene Stoller and Doris Stoller, docket No. 11820-81; Zell C. and Myrna Hurwitz, docket No. 11846-81; Franklin Goldstein and Frances Goldstein, docket No. 11892-81; Howard Levinton and Peggy J. Levinton, docket No. 11929-81; John B. Cook and Mary W. Cook, Barry E. Fitzgerald and Cheryl K. Fitzgerald, Donald W. Hurta and Marian Hurta, David C. Johnson and Kaye Johnson, docket No. 12219-81; Herbert Fisher and Rosalind Fisher, docket No. 12324-81; Raymond G. Berggreen and Phyllis P. Berggreen, docket No. 12352-81; James D. Wyatt and Donna S. Howard, Formerly Donna S. Wyatt, docket No. 12525-81; Stanley Safier and Kitty Safier, docket No. 12742-81; Paul B. Baker and Barbara Baker, docket No. 12806-81; Don L. Christensen and Marva Christensen, docket No. 12827-81; James L. Spindler and Jacqueline Spindler, docket No. 12828-81; Harold M. Moore and Anastasia Moore, docket No. 12829-81; Erwin Hoffman and Arlene Hoffman, docket No. 12830-81; Theodore Makower and Frances Makower, docket No. 12831-81; Jon A. Masterson and Marguerite A. Masterson, docket No. 12832-81; Larry W. Casey and Suanne Casey, docket No. 12833-81; Howard L. Thaler and Deike Thaler, docket No. 12834-81; John C. Brown and Mary M. Brown, docket No. 12835-81; Michael D. McGee and Priscilla A. McGee, docket No. 12836-81; Sidney T. Lubin and Deborah Lubin, docket No. 12837-81; Clarence Wm. Pack and Pat F. Pack, docket No. 12838-81; Lucela C. Lowry, docket No. 12839-81; Walter Wall and Karen Wall, docket No. 12840; Robert C. Noren and Willie M. Noren, docket No. 12841-81; Marcia Wallace, docket No. 12842-81; Glenn H. Weyrich and Carol J. Weyrich, docket No. 12843-81; Dean T. Watkins and Lillian Watkins, docket No. 12844-81; John F. Patzman and Ruth A. Patzman, docket No. 12845-81; Cecilia Tallichet, docket No. 12846-81; Bernina Sewing Machine Co., Inc., docket No. 12847-81; Joseph E. Okies and Bonnie L. Okies, docket No. 12848-81; Homer S. Satterfield and Marguerite Satterfield,

docket No. 12849-81; Norman D. Nuttall and Sandra Nuttall, docket No. 12850-81; American Electric Contracting Corp., docket No. 12863-81; Gabriel H. Schwartz and Jody Schwartz, docket No. 12878-81; Alvin Akman and Marion Akman, docket No. 13026-81; Salvatore P. Giambra and Katherine W. Giambra, docket No. 13064-81; Karl M. Johnson, docket No. 13132-81; Theodore Wanderer and Bonnie L. Cannon, docket No. 13133-81; Marvin Lipschultz and Beverlee Lipschultz, docket No. 13276-81; Leonard Gilmor and Sandra Gilmor, docket No. 13664-81; Gennaro Licosati and Margaret Licosati, docket No. 13707-81; Seymour Holtzman and Evelyn Holtzman, docket No. 13809-81; Frank P. Cuscela and Mary Lee Cuscela, docket No. 13810-81; Edward Ozzie and Mary Ann Ozzie, docket No. 13898-81; John C. Sullivan, Jr., and Kathleen Sullivan, docket No. 13913-81; Philip S. and Jane B. York, docket No. 13938-81; Jack E. Cweiber and Elaine H. Cweiber, docket No. 14058-81; Siegfried and Corina M. Jachmann, docket No. 14134-81; Robert E. Lee and Elizabeth I. Lee, docket No. 14353-81; Lettie B. Pierce, docket No. 14441-81; Harvey J. Widroe and Margery Widroe, docket No. 14446-81; James S. Jones, docket No. 14608-81; John A. and Barbara J. Artukovich, docket No. 14670-81; Herbert M. Greenbaum and Gay Greenbaum, docket No. 14776-81; Craig M. Berge and Nancy Berge, docket No. 15327-81; Jack Olshansky and Shirley Olshansky, docket No. 15328-81; Richard L. Miner and Rhea R. Miner, docket No. 15329-81; Clayton A. Neilson and Betty Joan Neilson, docket No. 15332-81; Thomas D. Armour and Darlene Armour, docket No. 15333-81; Salvatore E. Tomaso and Virginia Tomaso, docket No. 15334-81; La Grand Neilson and Yvonne Neilson, docket No. 15335-81; Franklin D. Transtrum and Dianne Transtrum, docket No. 15336-81; Richard E. and Joyce Maddalena, docket No. 15389-81; James F. Zahner and Eva J. Zahner, docket No. 15507-81; Wayne E. Taysom and Patricia R. Taysom, docket No. 15536-81; Gustav E. Rosenheim and Alyce M. Rosenheim, docket No. 15537-81; Leo P. Ayotte and Nancy C. Ayotte, docket No. 15538-81; Vinyl Products Manufacturing, Inc., docket No. 15540-81; Richard Fraige, docket No. 15541-81; Fred Kayne and Lenore E. Kayne, docket No. 15675-81; Arthur O. Silver, docket No. 15875-81; George S. Kurata and Eleanor T. Kurata, docket No. 15930-81; La Donna Reichardt, docket No. 15934-81; Herbert J. Cropper and Mariann C. Cropper, docket No. 15967-81; Donald N. Van Hees and Patricia C. Van Hees, docket No. 15987-81; Gerald G. Dolgash and Marianne J. Dolgash, docket No. 16015-81; A. Douglas Hulen and Helen M. Hulen, docket No. 16288-81; D. Max Hodel and Joanne S. Hodel, docket No. 16388-81; Michael P. Haines and Gail K. Haines, docket No. 16398-81; Kermit L. Lilja and Lillian M. Lilja, docket No. 16469-81; James D. Medema and Millie M. Medema, docket No. 16481-81; Dennis L. Tank and Elaine K. Tank, docket No. 16517-81; James J. Koehler and Alice Koehler, docket No. 16702-81; George Robertson and Dorothy Robertson, docket No. 16770-81; Wendell W. Mason and Renee S. Mason, docket No. 16890-81; Robert B. Franklin and Anne W. Franklin, docket No. 16963-81; Isaac and Loraine D. Baranowicz, docket No. 17033-81; Larry J. Hale and Alixe M. Hale, docket No. 17108-81; Cole L. MacPherson and Virginia S.

MacPherson, docket No. 17187-81; Montague Guild, Jr., and Andrea C. Guild, docket No. 17394-81; Kent R. Swallow and Peggy Lou Swallow, docket No. 17452-81; Keith G. LeCheminant and Virginia LeCheminant, docket No. 17453-81; Kenneth Dennis and George Ann Dennis, docket No. 17524-81; David R. Michelson and Kathleen M. Michelson, docket No. 17525-81; James V. Decker and Patricia P. Decker, docket No. 17528-81; Gale R. Livingston and Florence Livingston, docket No. 17529-81; Murray W. Hall and Wendy J. Hall, docket No. 17532-81; Dwight W. Ripley and Ramona Ripley, docket No. 17603-81; Irwin Winston and Sharon Winston, docket No. 17665-81; Barry S. Neidorf and Carol Neidorf Biener, docket No. 17682-81; Jack Pelzer and Jeanne Pelzer, docket No. 17762-81 Richard A. Hoiekvam and Sharon G. Hoiekvam, docket No. 17810-81; Melvin J. Masterson and Mildred J. Masterson, docket No. 17828-81; Alvin D. Blumberg and Amelia Blumberg, docket No. 17829-81; James D. and Debera McElmury, docket No. 17838-81; Paul W. Bennett and Janet L. Bennett, docket No. 17924-81; Alan H. Sands and Gloria Sands, docket No. 17932-81; Ronald S. Sands and Hedy Sands, docket No. 17933-81; Robert Chartoff and Vanessa Chartoff, docket No. 17935-81; Alexis K. DeAzevedo and Linda C. DeAzevedo, docket No. 17996-81; Frank and Marla Raper, docket No. 18041-81; Milford J. Seby and Ann M. Seby, docket No. 18217-81; James A. Neilson and Donna J. Neilson, docket No. 18264-81; Chester Chin and Lily Chin, docket No. 18337-81; David Perrin and Beverly Perrin, docket No. 18416-81; Leon Siegal, docket No. 18428-81; Brad A. Perrin and Barbara L. Perrin, docket No. 18573-81; Peter F. Shish, Deceased, docket No. 18671-81; Edward W. and Sharon G. Taylor, docket No. 18747-81; Richard C. and Suzanne A. Kurtz, docket No. 18929-81; Jerome B. Morgan, docket No. 18939-81; Gordon and Claire A. LaBossiere, docket No. 19013-81; John J. Bardet, docket No. 19080-81; Robert L. Bothwell and Margaret H. Bothwell, docket No. 19103-81; Harvey and Marcella B. Karp, docket No. 19108-81; Frederick B. and Beverly J. Poneman, docket No. 19173-81; John L. Vogelstein and Jacqueline W. Vogelstein, docket No. 19181-81; Herbert M. Kristal and Evelyn S. Kristal, docket No. 19331-81; Gerald L. Moore and Bette Jo Moore, docket No. 19336-81; Stuart Bandman and Myrna Bandman, docket No. 19758-81; Sheldon J. Davis, docket No. 19912-81; Morris Shub and Sadie Shub, docket No. 20338-81; Richard C. Cavanaugh and Doris J. Cavanaugh, docket No. 20492-81; John W. McElhatton and Judith McElhatton, docket No. 20514-81; Sidney Elston and Dorothy Elston, docket No. 20627-81; Jerome M. Paros and Linda L. Paros, docket No. 20641-81; Robert F. Kuhne and Sylvia W. Kuhne (1975), Robert F. Kuhne and Roberta Kuhne (1976), docket No. 20689-81; William M. Lee and Louise D. Lee, docket No. 20933-81; Gail C. Goodrich and Frances A. Goodrich, docket No. 21155-81; Steve Musulin and Joyce Musulin, docket No. 21170-81; Richard Lewis and Gladys Lewis, docket No. 21641-81; Ben Jacobson, docket No. 21896-81; James R. Clark and Kathleen Clark, docket No. 21906-81; David N. Kuhn and Elizabeth T. Kuhn, docket No. 22192-81; William D. Rippy, docket No. 22244-81; Robert E. Longman and Carolyn A. Longman, docket No. 22359-81; Lincoln C. White and Jean White,

docket No. 22409-81; Lincoln C. White and Aline White, docket No. 22412-81; Manning Post and Florence S. Post, docket No. 22413-81; Farouk A. Habra and Mary L. Habra, docket No. 22414-81; John A. Habra and Carol M. Habra, docket No. 22415-81; Robert Schmidt and Sandra C. Schmidt, docket No. 22417-81; Stephen D. Harlan, Jr., and M. Joan Harlan, docket No. 22418-81; James L. Herrell, docket No. 22419-81; William W. Taylor and Barbara C. Taylor, docket No. 22420-81; Frank Peppiatt and Valerie Peppiatt, docket No. 22436-81; James R. Compton and Marjorie L. Compton, docket No. 22450-81; James A. Heath and Roberta B. Heath, docket No. 22498-81; Samuel A. Megeath III, docket No. 22522-81; O. Seaburn Eaton and Kingsley B. Eaton, docket No. 22548-81; Mary Irene Gallio, as Special Administrator of the Estate of Mike Gallio, Deceased, and Mary Irene Gallio, Individually, docket No. 22644-81; Joseph E. Giovanini and Clarice J. Giovanini, docket No. 22904-81; John G. McGregor, Jr., and Jean R. McGregor, docket No. 22966-81; Allen Fujimoto, docket No. 23122-81; Richard N. Smith and Alice O. Smith, docket No. 23123-81; James B. Kennard and Eleanor K. Kennard, docket No. 23124-81; Robert R. Heikes and Annie E. Heikes, docket No. 23321-81; Edwin L. Madsen and Grace G. Madsen, docket No. 23322-81; Guilford C. Babcock and Gwendolyn G. Babcock, docket No. 23323-81; Kenneth E. Pickens and Barbara M. Pickens, docket No. 23324-81; Charles E. Westenburg and Donna L. Westenburg, docket No. 23376-81; Stanton G. Schwartz and Helene G. Schwartz, docket No. 23445-81; Joseph C. Magliolo and Pauline Magliolo, docket No. 23475-81; Roy O. Martin, Jr., and Barbara Martin, docket No. 23544-81; Mel Brooks and Anne B. Brooks, docket No. 23591-81; Thomas R. Moore and Margaret K. Moore, docket No. 24091-81; Jack A. Garfield and Bertha I. Garfield, Alma V. Nicol and Olga A. Nicol, docket No. 24207-81; Scott C. Evans and Joyce M. Evans, docket No. 24208-81; David B. and Margaret L. Beardslee, docket No. 24272-81; Stephen M. Stone and Linda L. Stone, docket No. 24461-81; Roger Stinard and Rebecca D. Stinard,[1] docket No. 24519-81; Andrew J. Werner and Elaine A. Werner, docket No. 24604-81; James W. Freston and Margie S. Freston, docket No. 24755-81; A. Edward Warren and Alvarene A. Warren, docket No. 25047-81; Hugh C. Thompson III and Paula S. Thompson, docket No. 25089-81; Charles H. Willingham and Nancy P. Willingham, docket No. 25090-81; Frederick P. Dooley and Lois P. Dooley, docket No. 25091-81; Z. James and Lois Mae Ponczak, docket No. 25257-81; Hugh L. Clearman and Dorothy Clearman, docket No. 25348-81; Hugh L. Clearman and Dorothy Clearman, docket No. 25349-81; Earl Taylor, docket No. 25538-81; Richard H. Kolb and Silvia R. Kolb, docket No. 25639-81; Arturo G. Torres and Janice I. Torres, docket No. 25877-81; Walter E. La Borde and Ila D. La Borde, docket No. 25879-81; George E. Middleton and Emma L. Middleton, docket No. 25880-81; Al H. Kuykendall and Carolyn T. Kuykendall, docket No.

---

[1]On Nov. 29, 1983, the Court granted petitioner's motion in docket No. 24519-81 to substitute Rebecca D. Stinard, as surviving spouse and heir of Roger D. Stinard, deceased, for decedent Roger Stinard.

25994-81; Harry McCool and Leota McCool, docket No. 26011-81; Franklin D. Transtrum and Dianne Transtrum, docket No. 26122-81; Melvin J. Fischer and Jane E. Fischer, docket No. 26203-81; Clyde A. Herr and Genevieve L. Herr, docket No. 26271-81; William H. Moseley and Martha T. Moseley, docket No. 26290-81; Harold Engelson and Louise Engelson, docket No. 26700-81; Michael J. and Sandra Grafe, docket No. 26768-81; Michael S. Fabricant, docket No. 26925-81; Dennis Michael Romano and Carol A. Romano, docket No. 26999-81; Malcolm M. Berenson and Claudia K. Berenson, docket No. 27176-81; Dave E. Theurer and Gayle M. Theurer, docket No. 27177-81; Roy M. Kizerian and Ora L. Kizerian, docket No. 27223-81; John L. Jackson and Yvonne L. Jackson, docket No. 27224-81; Robert H. Burgener and Diane Burgener, docket No. 27225-81; Gordon D. Bozarth and Amy (Bozarth) Candray, docket No. 27237-81; Fortune Pope and Catherine Pope, docket No. 27400-81; James W. Salley and Mildred S. Salley, docket No. 27633-81; James W. Salley, Inc., docket No. 27634-81; Melvin M. Kazdin and Phyllis R. Kazdin, docket No. 27719-81; Robert P. Warmington and Loring P. Warmington, docket No. 27932-81; Richard C. Bruno, docket No. 28076-81; George A. Miller and Maurine C. Miller, docket No. 28431-81; James A. Morgan and Suzanne N. Morgan, docket No. 28492-81; Missile Alloy Metal Cutting, a.k.a. Supreme Industries, docket No. 28493-81; William H. Clark and Mildred V. Clark, docket No. 28495-81; Charles T. Koval and Joan Koval, docket No. 28496-81; Thomas T. Anderson and Myrna Anderson, docket No. 28730-81; William E. McGlashan and Christney C. McGlashan, docket No. 28731-81; Chester U. Mortensen and Janet U. Mortensen, docket No. 29252-81; James Lerman and Simone D. Lerman, docket No. 29331-81; Stanton Joseph and Susan C. Joseph, docket No. 29417-81; David D. Leiter and Judith A. Leiter, docket No. 29423-81; Wayne R. Viehweg and Mary Jane Viehweg, docket No. 29646-81; Edward M. O'Reilly and Sarah E. O'Reilly, docket No. 30042-81; John B. Park and Judith E. Park, docket No. 30045-81; Cecil Finegold and Ruth Finegold, docket No. 30434-81; Raymond Finegold and Jessie J. Finegold, docket No. 30435-81; Leon H. Glaser and Betty J. Glaser, docket No. 30546-81; James L. Herrell, docket No. 30618-81; Paul R. Yedinak and Nancy V. Yedinak, docket No. 30640-81; Terry J. Happel and Joan L. Happel, docket No. 30641-81; James S. Jones, docket No. 30708-81; Donald J. Hayden and Carol Hayden, docket No. 30709-81; Arnold L. Brink and Patricia A. Brink, docket No. 30920-81; Estate of Reuben Tucker and Josephine Tucker, docket No. 30974-81; Rulon D. Robison and Joan H. Robison, docket No. 31139-81; Howard C. Sharp and Marjorie Sharp, docket No. 31178-81; Irving J. Beers and Marcia B. Beers, docket No. 31186-81; Marvin L. Sears, docket No. 31188-81; T.O. Richardson, Inc., docket No. 31190-81; Raymond A. Davis and Ruth M. Davis, docket No. 31191-81; Robert N. Langerman and Goldythe B. Langerman, docket No. 31192-81; Norton and Adrienne Sperling, docket No. 31262-81; Seymour Resnick and Marian Resnick, docket No. 31278-81; Laurence E. Drivon and Rosemarie Drivon, docket No. 31288-81; Leslie Bokor and Estate of Magda Bokor, Deceased, Leslie Boker, Executor, docket No. 31299-81; Stephen Robert

and Eileen L. Robert, docket No. 31327-81; Harry H. Ennis and Virginia Ennis, docket No. 31348-81; James H. Pingree and Janice B. Pingree, docket No. 31349-81; Dennis E. Bale and Dorothy G. Bale, docket No. 31350-81; Kenneth A. Koorndyk, Sr., and Johanna M. Koorndyk, docket No. 31536-81; Harold H. Kay and Lorraine E. Kay, docket No. 31589-81; Carl Morton and Sharon C. Morton, docket No. 31614-81; Halco Spring & Manufacturing Co., Inc., docket No. 183-82; Angelo Pantele and Patricia Pantele, docket No. 678-82; Samuel F. Hutchinson and Judith A. Hutchinson, docket No. 706-82; Joseph J. Askin and Gloria Askin, docket No. 776-82; Jose A. Rodriguez and Lora E. Rodriguez, docket No. 784-82; Howard E. Kay and Cheryle D. Kay, docket No. 849-82; Oral T. Dalton and Bonnie B. Dalton, docket No. 890-82; Melvyn A. Horwitt, docket No. 993-82; Alex Milstein, docket No. 1199-82; Michael Sigman and Diane Sigman, docket No. 1235-82; Edward H.L. Mason and Margaret M. Mason, docket No. 1295-82; William J. and Veronica Tiedemann, docket No. 1347-82; Elizabeth P. Hazen, docket No. 1353-82; Benjamin F. Johnson and Sylvia G. Johnson, docket No. 1496-82; Lowell E. Hoskins and Betty E. Hoskins, docket No. 1536-82; Maynard H. Frudden and Dorothy N. Frudden, docket No. 1568-82; Richard A. Baniszewski and Nancy J. Baniszewski, docket No. 1775-82; Franklin O. Barnes and Roberta Barnes, docket No. 1790-82; Hillel Sharlin and Diane Sharlin, docket No. 1813-82; George E. and Linda K. Deeb, docket No. 1834-82; Richard P. Singer and Nancy K. Singer, docket No. 1841-82; Jack and Betty Rubinstein, docket No. 1982-82; Jules Salit and Edith Salit, docket No. 2018-82; Lewis and Ada Burrows, docket No. 2080-82; Larry J. Dermody and Barbara Dermody, docket No. 2283-82; Robert L. Sutter and Janet K. Sutter, docket No. 2284-82; Michael M. Gibson and Carla C. Gibson, docket No. 2285-82; Frederick L. Krueger and Patricia Krueger, docket No. 2286-82; Michael D. Kowitz, docket No. 2287-82; Ralph A. Dahlstrom, Jr., docket No. 2293-82; Gerald B. Lee and Marilyn M. Lee, docket No. 2299-82; Arben K. Andersen and Peggy R. Andersen, docket No. 2300-82; William B. Moore and Dawn O. Moore, docket No. 2308-82; Howard E. Lemon and Carolina Lemon, docket No. 2334-82; Velvet O'Donnell Corp., docket No. 2475-82; Renee R. McGuinn, docket No. 2648-82; Barry K. Saltzman and Marietta Saltzman, docket No. 2776-82; Warren E. Drew, docket No. 2782-82; Gene and Carol Watts and Gene Watts, docket No. 2844-82; Nona L. Drew, docket No. 2881-82; Jerry M. Hess and Joan E. Hess, docket No. 2906-82; David Cook, docket No. 3122-82; Robert J. McKay and Elizabeth G. McKay, docket No. 3280-82; John A. McGuinn, docket No. 3406-82; Marilyn Cook, docket No. 3408-82; Allen Rubin and Noreen Rubin, docket No. 3432-82; Ralph K. Duffin and Patricia A. Duffin, docket No. 3519-82; Kenneth and De Etta Green and Kenneth Green, docket No. 3534-82; James and Jane Chadwick, docket No. 3535-82; Michael and Phyllis Manning, docket No. 3537-82; Raymond and Bonnie Spore, docket No. 3538-82; Harold L. Canada and Dorothy F. Canada, docket No. 3627-82; Donald E. and Marilyn L. White, docket No. 3685-82; Patrick J. Gilmartin and Geraldine M. Gilmartin, docket No. 3770-82; Alfred L. Friedlander and Paula Friedlander, docket No. 3794-82; David E. Farkas and Pamela

Farkas, docket No. 3864-82; Jules Klein and Shirley M. Klein and Jules Klein, docket No. 3874-82; Alan B. Andrews, docket No. 3968-82; Robert S. Feldman and Joan Feldman, docket No. 3999-82; Edward L. Gelbach and Sandra L. Gelbach, docket No. 4000-82; Janet L. Stennett, docket No. 4001-82; Shelby E. Ross and Charlotte Ross, docket No. 4002-82; Robert L. Amstadter and Barbara Amstadter, docket No. 4003-82; Matthew H. Steinberg and Joyce S. Steinberg, docket No. 4004-82; Seymour C. Morrow and Donelda Morrow, docket No. 4005-82; Phillip A. Wiedrick and Veeva J. Wiedrick, docket No. 4006-82; John L. Stennett, docket No. 4007-82; Louis Zipperman and Sylvia Zipperman, docket No. 4008-82; Julius L. Gray and Sharon C. Gray, docket No. 4009-82; Henry Jaffe and Florence Jaffe, docket No. 4010-82; Raul A. Vernal and Susan B. Vernal, docket No. 4011-82; Richard V. Vosburgh and Barbara E. Vosburgh, docket No. 4017-82; Dean M. Lloyd and Marchey A. Lloyd, docket No. 4160-82; James O. Johnston and Joan S. Johnston, docket No. 4509-82; Rene I. Marasigan and Ramona Marasigan, docket No. 4518-82; Daniel S. Garcia and Yolanda Garcia, docket No. 4629-82; Robert A. Lassalle and Catherine Lassalle, docket No. 4630-82; Victor S. Sands and Charlene L. Sands, docket No. 4631-82; Leonard W. Glass and Catherine R. Glass, docket No. 4763-82; Leonard W. Glass and Catherine R. Glass, docket No. 4764-82; Now Designs, Inc., docket No. 4821-82; Jay J. Eller and Helene P. Eller, docket No. 4907-82; Peter Gray, a.k.a. Peter Grazis and Ellen B. Gray, a.k.a. Ellen B. Grazis, docket No. 4993-82; Arnold L. Stanley, docket No. 5070-82; Alex Morales and Novella Morales, docket No. 5072-82; Wayne A. and Sharyn Rutledge, docket No. 5074-82; Bill J. Hawthorne and Danette S. Hawthorne, docket No. 5228-82; David M. Snow and Barbara J. Snow, docket No. 5229-82; Estate of Paul M. Magnuson, Deceased,. Bank of California N.A., Executor, and Evelyn P. Magnuson, docket No. 5337-82; Joseph Lewinbuk and Aliza Lewinbuk, docket No. 5442-82; Robert S. and Jane S. Flowers, docket No. 5529-82; Estate of Gary P. Glance, Deceased, Donald R. Price, Executor, docket No. 5661-82; Michael P. Naeve and Kaye Y. Naeve, docket No. 5868-82; Reed N. Christensen and Pauline L. Christensen, docket No. 5869-82; J. Ramon Yorgason and Marilyn Yorgason, docket No. 5870-82; James A. Jacobson and Deborah B. Jacobson, docket No. 5871-82; Henry G. West and Paula West, docket No. 5872-82; J. Gordon Brookover and Barbara J. Brookover, docket No. 5873-82; Jerome S. Glazer, docket No. 5907-82; Estate of Louis A. Glazer, Deceased, Lillian L. Glazer, Executrix, and Lillian L. Glazer, docket No. 5908-82; Gerald J. Gonda and Beverly J. Gonda, docket No. 5915-82; James P. Riley and Pamela J. Riley, docket No. 5924-82; James W. Fox and Edra Y. Fox, docket No. 5936-82; Bernard Katz and Lee Katz, docket No. 5957-82; Kenneth J. Johnson and Doris T. Johnson, docket No. 6063-82; William L. Boddie and Sybil A. Boddie, docket No. 6116-82; Frank Chadwick and Jo Ann Chadwick, docket No. 6139-82; John T. and Jeannette M. Kelsey, docket No. 6200-82; Gerald and Charneth Belanger, docket No. 6365-82; James C. Truman and Suzanne A. Truman, docket No. 6382-82; Daniel A. Farkas, docket No. 6395-82; Roger S. Carlson and Barbara W. Carlson, docket No. 6557-82; Daniel Melnick, docket No.

6828-82; William A. Mallet and Jeanne Mallet, docket No. 6837-82; Monroe L. Mallet and Helga Mallet, docket No. 6838-82; Eugene W. Dach and Virginia Dach, docket No. 6839-82; Gerald W. Noga and Donna C. Noga, docket No. 6841-82; William G. Stich and Helma S. Stich, docket No. 6850-82; Jack M. Gravelle and Donna J. Gravelle, docket No. 6857-82; Hal and Ruth Dauernheim, docket No. 6870-82; Ki Dong Kang and Soonho Kang, docket No. 7045-82; James L. Johnston and Joanne F. Johnston, docket No. 7121-82; Keith E. and Adrienne G. Mullenger, docket No. 7128-82; Michael C. Monozon and Judith A. Monozon, docket No. 7310-82; Edward C. Maddocks and LaFern Maddocks, docket No. 7786-82; James H. Benson and Catherine E. Benson, docket No. 7808-82; Sidney A. Blubaugh and Irene A. Blubaugh, docket No. 7977-82; Edward E. Lee, Jr., and Betty J. Lee, docket No. 8074-82; Maurice J. Niebaum, docket No. 8413-82; Emory M. Wright, Jr., and Marguerite C. Wright, docket No. 8415-82; Morris H. Fine and Beverly S. Fine, docket No. 8580-82; Brent C. Berge and Deborah Berge, docket No. 8739-82; Donald R. Levin and Eleanore Levin, docket No. 10129-82; Harvey Klein and Phyllis Klein, docket No. 10287-82; John W. Lattimore and Virginia Lattimore, docket No. 10444-82; Daniel B. Artmann and Karen Artmann, docket No. 10622-82; Gerald J. Schmidt and Mary A. Schmidt, docket No. 10623-82; Robert J. Foreman and Elizabeth Foreman, docket No. 11087-82; John McKain and Barbara A. McKain, docket No. 11810-82; Roderick Silveira and Mary Ann Silveira, docket No. 11811-82; Donald King and Sandra R. King, docket No. 12000-82; John G. McGregor, Jr., docket No. 12809-82; H. Thomas and Marilyn J. Hood, docket No. 12926-82; Vincent L. Gillis and Nadine L. Gillis, docket No. 13062-82; Ted A. Pierce and Marilyn R. Pierce, docket No. 13241-82; Estate of Theodore R. Pierce, Deceased, Theodore A. Pierce, Personal Representative, docket No. 13242-82; Richard V. and Evangeline L. Escobar, docket No. 13285-82; Edward A. Johnson and Janice M. Johnson, docket No. 13320-82; Leander and Helen Katsidhe, docket No. 13415-82; Raymond G. Maynard and Grace A. Maynard, docket No. 13617-82; Henry Rabinowitz and Marcia Rabinowitz, docket No. 13667-82; M. Ervin Wahnish and Jacqueline A. Wahnish, docket No. 13689-82; Frank H. Carson and Devora M. Carson, docket No. 13998-82; Alexander S. Rados and Sandra S. Rados, docket No. 14197-82; Gordon I. Segal and Carole B. Segal, docket No. 14309-82; Estate of Elfriede H. Levan, Deceased, and Arthur B. Levan, Surviving Husband, docket No. 14310-82; Kenneth J. Fitzgerald and Mary Fitzgerald, docket No. 14311-82; Irving Gerson and Ann Gerson, docket No. 14312-82; Samuel H. Levinson and Florence Levinson, docket No. 14313-82; Charles W. Samet and Sara K. Samet, docket No. 14314-82; Martin M. Wales and Carolyn Wales, docket No. 14315-82; George C. Pingree and Anne C. Pingree, docket No. 14470-82; Lee P. Sperling and Babette K. Sperling, docket No. 14712-82; Irving M. Ringel and Lois E. Ringel, docket No. 14731-82; Frank J. Soltes and Ann A. Soltes, docket No. 14732-82; Andrew L. Heard and Barbara A. Heard, docket No. 14733-82; Eugene Malitz and Judith Malitz, docket No. 14803-82; Ronald W. Strahan and Patricia J. Strahan, docket No. 14856-82; John Gamble, Jr., and Delores D. Gamble, docket No.

14949-82; Robert Sharfstein and Lillian Sharfstein, docket No. 14959-82; Estate of John Paul Jacobs, Deceased, and Eileen A. Jacobs, Surviving Spouse, docket No. 14960-82; Louis Kamerlink and Emma Kamerlink, docket No. 14961-82; David Dewees and Anne Dewees, docket No. 14968-82; Alvin I. Smith and Bernice Smith, docket No. 14969-82; Ronald W. Spindler and Diane M. Spindler, docket No. 15002-82; S. Arthur Gregerson and Montess Gregerson, docket No. 15007-82; John W. Pfuhl and Maren C. Pfuhl, docket No. 15018-82; Carl H. Schwerdtfeger and Lucille T. Schwerdtfeger, docket No. 15058-82; Norbert J. Mann and Barbara M. Mann, docket No. 15073-82; William J. Cohen and Eileen M. Cohen, docket No. 15094-82; Clair Chadwick and Evelyn Chadwick, docket No. 15097-82; Charles Haines and Lucille Haines, docket No. 15260-82; George T. Davis and Jane W. Davis, docket No. 15646-82; Darrell B. Edwards and Marceline J. Edwards, docket No. 15704-82; W. Grant Evans and Helen B. Evans, docket No. 15788-82; Arthur B. Camp and Denise K. Camp, docket No. 15844-82; William Blau and Meredith Blau, docket No. 15914-82; Herbert Radley and Charlene Radley, docket No. 16284-82; Estate of James E. Grisham, Deceased, and Mary F. Grisham, Surviving Spouse, docket No. 16285-82; Thornton B. Stearns and Diane C. Stearns, docket No. 16350-82; Fred H. Landeen and Elizabeth Rae Landeen, docket No. 16419-82; Joel M. Cohen, docket No. 16629-82; Harry Berger and Paulette Berger, docket No. 16630-82; Joseph Interlandi and Grace Howell, Formerly Grace Interlandi, docket No. 16631-82; Jerome Richard and Sue S. Richard, docket No. 16632-82; Burton H. Greenberg and Ann M. Greenberg, docket No. 16753-82; Carl E. Vogelsang and Martha J. Vogelsang, docket No. 17308-82; Abbey J. Grunewald, docket No. 17311-82; Adolphe Bitterman and Pearl E. Bitterman, docket No. 17452-82; Frank P. Hesser, docket No. 17453-82; Robert M. Turf and Barbara A. Turf, docket No. 17460-82; Harold Q. Vander Kley and Norma I. Vander Kley, docket No. 17463-82; Reuben C. Tullis and Nancy F. Tullis, docket No. 17853-82; John Vancza, Jr., and Georgia F. Vancza, docket No. 17917-82; Robert D. Exel, docket No. 18399-82; Donald J. Martinson and Norma Martinson, docket No. 18400-82; Leo M. Knudson and Betty L. Knudson, docket No. 18401-82; L. Rodney Larsen, docket No. 19184-82; L. Rodney Larsen and Anita R. Larsen/Craig, docket No. 19185-82; Mitchell Halopoff and Patricia A. Halopoff, docket No. 19318-82; Kenneth R. Weitzman, docket No. 19488-82; Jack Mendelsohn, docket No. 20138-82; Adrian Finkelstein and Parvaneh Finkelstein, docket No. 20423-82; Thomas Klein and Linda Klein, docket No. 20983-82; H. Allan Collier and Patricia Collier, docket No. 21016-82; John C. and Rebecca R. Kunzman, docket No. 21282-82; William D. Rippy, docket No. 22277-82; John Perry, docket No. 22783-82; Allen Beallo and C. Ruby Beallo, docket No. 24028-82; Stephen W. Solomon and Carole A. Solomon, docket No. 24371-82; Harry J. Noznesky, Deceased, and Serena Noznesky, docket No. 25066-82; Peter H. Noznesky and Sally A. Noznesky, docket No. 25070-82; Philip A. Noznesky and Sheila Noznesky, docket No. 25174-82; Otto S. Shill, Jr., and Betty R. Shill, docket No. 25411-82; H. Glenn Holland and Carolyn

Holland, docket No. 25506-82; and Louis E. Carabini and Anna Carabini, docket No. 26314-82.

## APPENDIX B

| | | | | | |
|---|---|---|---|---|---|
| 9454-79, | 9456-79, | 9458-79, | 9461-79, | 9580-79, | 9587-79, |
| 9588-79, | 9589-79, | 9590-79, | 9830-79, | 9908-79, | 9993-79, |
| 11819-79, | 11822-79, | 12427-79, | 12803-79, | 13009-79, | 13580-79, |
| 13586-79, | 15259-79, | 15260-79, | 16151-79, | 16319-79, | 17421-79, |
| 956-80, | 957-80, | 958-80, | 960-80, | 961-80, | 962-80, |
| 963-80, | 964-80, | 965-80, | 966-80, | 967-80, | 1130-80, |
| 1131-80, | 1132-80, | 1135-80, | 1136-80, | 1137-80, | 1139-80, |
| 2502-80, | 3332-80, | 3333-80, | 3334-80, | 3568-80, | 3705-80, |
| 4174-80, | 4363-80, | 5333-80, | 5334-80, | 5399-80, | 5400-80, |
| 5401-80, | 5465-80, | 5467-80, | 5468-80, | 5469-80, | 6315-80, |
| 6590-80, | 6591-80, | 7204-80, | 8151-80, | 8584-80, | 8587-80, |
| 8589-80, | 8711-80, | 9325-80, | 9329-80, | 9332-80, | 9333-80, |
| 9423-80, | 9443-80, | 9746-80, | 9747-80, | 9748-80, | 10270-80, |
| 10597-80, | 10643-80, | 10660-80, | 10721-80, | 10722-80, | 10902-80, |
| 11017-80, | 11140-80, | 11173-80, | 11174-80, | 11175-80, | 11176-80, |
| 11195-80, | 11205-80, | 11206-80, | 11207-80, | 11208-80, | 11212-80, |
| 11402-80, | 11496-80, | 11574-80, | 11605-80, | 11780-80, | 11781-80, |
| 11782-80, | 11783-80, | 12067-80, | 12164-80, | 12344-80, | 12417-80, |
| 12491-80, | 12608-80, | 12612-80, | 12613-80, | 12614-80, | 12615-80, |
| 12616-80, | 12617-80, | 12618-80, | 12619-80, | 12620-80, | 12621-80, |
| 12622-80, | 12721-80, | 12774-80, | 12901-80, | 12970-80, | 12987-80, |
| 13068-80, | 13126-80, | 13142-80, | 13162-80, | 13192-80, | 13452-80, |
| 13604-80, | 13616-80, | 15592-80, | 15899-80, | 16319-80, | 16559-80, |
| 16560-80, | 16561-80, | 16563-80, | 16656-80, | 16680-80, | 17117-80, |
| 17148-80, | 17351-80, | 17644-80, | 18137-80, | 18654-80, | 19091-80, |
| 19248-80, | 19382-80, | 19492-80, | 19751-80, | 19897-80, | 19898-80, |
| 20543-80, | 20574-80, | 21126-80, | 21127-80, | 21179-80, | 21180-80, |
| 21188-80, | 22085-80, | 277-81, | 278-81, | 279-81, | 389-81, |
| 392-81, | 911-81, | 1232-81, | 1233-81, | 1240-81, | 1563-81, |
| 2029-81, | 2030-81, | 2398-81, | 2459-81, | 2579-81, | 3001-81, |
| 3002-81, | 3003-81, | 3066-81, | 3286-81, | 3337-81, | 3544-81, |
| 3545-81, | 3802-81, | 4467-81, | 4827-81, | 4987-81, | 5083-81, |
| 5123-81, | 5237-81, | 5787-81, | 5812-81, | 6145-81, | 6377-81, |
| 6500-81, | 6762-81, | 6764-81, | 6929-81, | 7113-81, | 7372-81, |
| 7698-81, | 7852-81, | 8020-81, | 8573-81, | 8586-81, | 8589-81, |
| 9395-81, | 9705-81, | 9845-81, | 9917-81, | 9926-81, | 10196-81, |
| 11621-81, | 11797-81, | 11846-81, | 11892-81, | 11929-81, | 12525-81, |
| 12742-81, | 12828-81, | 12830-81, | 12834-81, | 12836-81, | 12840-81, |
| 12842-81, | 12848-81, | 12863-81, | 13026-81, | 13133-81, | 13664-81, |
| 14776-81, | 15327-81, | 15328-81, | 15389-81, | 15507-81, | 15538-81, |
| 15675-81, | 15930-81, | 15934-81, | 16702-81, | 17394-81, | 17603-81, |
| 17665-81, | 17682-81, | 17762-81, | 17924-81, | 17932-81, | 17933-81, |

17935-81, 18428-81, 18929-81, 18939-81, 19108-80, 19331-81,
20338-81, 22359-81, 22412-81, 22417-81, 22522-81, 23324-81,
23445-81, 23544-81, 24604-81, 25089-81, 25090-81, 25091-81,
25257-81, 25348-81, 26290-81, 27237-81, 27400-81, 28431-81,
29252-81, 29417-81, 30709-81, 30920-81, 31589-81, 784-82,
849-82, 993-82, 1347-82, 1353-82, 1496-82, 1813-82,
1982-82, 2283-82, 2286-82, 2287-82, 2782-82, 2881-82,
3864-82, 3968-82, 3999-82, 4004-82, 4007-82, 4008-82,
4010-82, 4509-82, 4518-82, 4629-82, 4630-82, 4763-82,
4764-82, 5072-82, 5337-82, 5661-82, 6063-82, 6395-82,
6837-82, 6839-82, 7121-82, 7786-82, 8074-82, 10129-82,
11811-82, 12000-82, 12926-82, 13062-82, 13617-82, 14803-82,
14968-82, 14969-82, 15018-82, 16284-82, 17308-82, 19318-82,
19488-82, 20138-82, 22783-82, 25174-82, 25506-82.

## APPENDIX C

13278-78, 5544-79, 5649-79, 8720-79, 9453-79, 9455-79,
9460-79, 14944-79, 15144-79, 321-80, 2569-80, 4000-80,
5466-80, 5470-80, 6589-80, 6906-80, 8585-80, 8586-80,
8588-80, 9084-80, 9330-80, 9331-80, 10226-80, 10269-80,
10605-80, 10723-80, 10986-80, 11097-80, 11755-80, 11757-80,
11811-80, 11823-80, 11894-80, 12122-80, 12345-80, 12609-80,
12610-80, 12611-80, 12928-80, 13049-80, 13066-80, 13067-80,
13069-80, 14448-80, 16556-80, 16557-80, 16562-80, 16856-80,
17069-80, 19750-80, 19752-80, 19753-80, 19754-80, 20138-80,
22867-80, 22981-80, 387-81, 390-81, 391-81, 463-81,
538-81, 910-81, 927-81, 998-81, 1109-81, 1110-81,
1241-81, 1242-81, 1405-81, 1539-81, 1871-81, 2658-81,
3004-81, 4348-81, 4785-81, 4786-81, 4909-81, 5669-81,
6115-81, 12831-81, 12833-81, 12835-81, 12837-81, 12841-81,
12847-81, 13064-81, 14353-81, 15332-81, 15334-81, 15336-81,
15536-81, 15987-81, 16890-81, 16963-81, 20933-81, 22409-81,
22498-81, 23122-81, 23123-81, 23322-81, 25047-81, 25639-81,
26122-81, 26271-81, 26925-81, 27176-81, 27634-81, 30042-81,
30045-81, 30435-81, 30974-81, 31262-81, 31299-81, 31348-81,
31349-81, 31350-81, 890-82, 1295-82, 1536-82, 1568-82,
2284-82, 2285-82, 2308-82, 2334-82, 2475-82, 2648-82,
2776-82, 3627-82, 3794-82, 4003-82, 4006-82, 4017-82,
4160-82, 4631-82, 5070-82, 5529-82, 6116-82, 6841-82,
7808-82, 10623-82, 13285-82, 13320-82, 13415-82, 14856-82,
15007-82, 16350-82, 18400-82, 21282-82, 25066-82, 25070-82.

## APPENDIX D

4054-79, 7605-79, 7692-79, 8146-79, 8147-79, 8148-79,
8150-79, 8151-79, 8152-79, 8153-79, 8156-79, 8157-79,
8158-79, 8160-79, 8161-79, 8163-79, 8668-79, 9118-79,
9457-79, 9459-79, 9591-79, 9698-79, 9699-79, 9700-79,
10466-79, 12157-79, 13835-79, 14469-79, 14502-79, 14656-79,

| | | | | | |
|---|---|---|---|---|---|
| 14947-79, | 15119-79, | 15145-79, | 15232-79, | 15238-79, | 15286-79, |
| 15340-79, | 15591-79, | 16358-79, | 16823-79, | 17539-79, | 673-80, |
| 798-80, | 868-80, | 959-80, | 1133-80, | 1134-80, | 1138-80, |
| 1140-80, | 1141-80, | 1142-80, | 1243-80, | 1339-80, | 1627-80, |
| 2872-80, | 2875-80, | 3205-80, | 3279-80, | 3335-80, | 3336-80, |
| 3565-80, | 3566-80, | 3999-80, | 4036-80, | 4457-80, | 4567-80, |
| 4665-80, | 5055-80, | 5395-80, | 5396-80, | 5397-80, | 5398-80, |
| 6840-80, | 7829-80, | 7836-80, | 8536-80, | 8583-80, | 8905-80, |
| 9060-80, | 9076-80, | 9418-80, | 9590-80, | 9763-80, | 10252-80, |
| 10525-80, | 10604-80, | 10642-80, | 10724-80, | 10725-80, | 10922-80, |
| 10929-80, | 11067-80, | 11068-80, | 11096-80, | 11177-80, | 11216-80, |
| 11282-80, | 11495-80, | 11640-80, | 11689-80, | 11737-80, | 11739-80, |
| 11745-80, | 11748-80, | 11756-80, | 11952-80, | 12006-80, | 12009-80, |
| 12027-80, | 12028-80, | 12029-80, | 12030-80, | 12144-80, | 12197-80, |
| 12198-80, | 12199-80, | 12203-80, | 12204-80, | 12207-80, | 12213-80, |
| 12214-80, | 12216-80, | 12218-80, | 12219-80, | 12221-80, | 12224-80, |
| 12225-80, | 12226-80, | 12229-80, | 12232-80, | 12233-80, | 12236-80, |
| 12237-80, | 12238-80, | 12241-80, | 12246-80, | 12247-80, | 12249-80, |
| 12250-80, | 12252-80, | 12253-80, | 12254-80, | 12255-80, | 12261-80, |
| 12262-80, | 12263-80, | 12264-80, | 12265-80, | 12266-80, | 12267-80, |
| 12268-80, | 12269-80, | 12270-80, | 12273-80, | 12274-80, | 12343-80, |
| 12410-80, | 12623-80, | 12624-80, | 12625-80, | 12767-80, | 12793-80, |
| 12834-80, | 12864-80, | 12884-80, | 12976-80, | 13125-80, | 13155-80, |
| 13199-80, | 13223-80, | 13383-80, | 13540-80, | 13765-80, | 14757-80, |
| 15144-80, | 15770-80, | 15771-80, | 15811-80, | 16204-80, | 16483-80, |
| 16558-80, | 16681-80, | 16857-80, | 16858-80, | 17147-80, | 17336-80, |
| 17457-80, | 18692-80, | 19247-80, | 19395-80, | 19396-80, | 19419-80, |
| 19664-80, | 19665-80, | 19666-80, | 19669-80, | 19670-80, | 20078-80, |
| 20079-80, | 20292-80, | 20293-80, | 20295-80, | 20296-80, | 20297-80, |
| 20298-80, | 20299-80, | 20362-80, | 20436-80, | 20521-80, | 20522-80, |
| 20531-80, | 20697-80, | 20699-80, | 20700-80, | 20701-80, | 20703-80, |
| 20768-80, | 20770-80, | 20771-80, | 20847-80, | 21035-80, | 21036-80, |
| 21037-80, | 21039-80, | 21128-80, | 21129-80, | 21130-80, | 21282-80, |
| 21817-80, | 22035-80, | 22195-80, | 22511-80, | 22512-80, | 388-81, |
| 537-81, | 666-81, | 667-81, | 668-81, | 669-81, | 670-81, |
| 705-81, | 940-81, | 1000-81, | 1009-81, | 1051-81, | 1403-81, |
| 1404-81, | 1501-81, | 1802-81, | 2078-81, | 2373-81, | 3185-81, |
| 3269-81, | 3546-81, | 3547-81, | 3561-81, | 3583-81, | 3618-81, |
| 4135-81, | 4270-81, | 4419-81, | 4468-81, | 4496-81, | 4841-81, |
| 4894-81, | 4910-81, | 4911-81, | 5194-81, | 5458-81, | 5539-81, |
| 5540-81, | 5541-81, | 5618-81, | 5621-81, | 5813-81, | 6114-81, |
| 6146-81, | 6147-81, | 6556-81, | 6583-81, | 6763-81, | 7213-81, |
| 7214-81, | 7389-81, | 7851-81, | 8431-81, | 8432-81, | 8434-81, |
| 8545-81, | 9501-81, | 9716-81, | 9940-81, | 10003-81, | 10939-81, |
| 11717-81, | 11718-81, | 11820-81, | 12219-81, | 12324-81, | 12352-81, |
| 12806-81, | 12827-81, | 12829-81, | 12832-81, | 12838-81, | 12839-81, |
| 12843-81, | 12844-81, | 12845-81, | 12846-81, | 12849-81, | 12850-81, |
| 12878-81, | 13132-81, | 13276-81, | 13707-81, | 13809-81, | 13810-81, |
| 13898-81, | 13913-81, | 13938-81, | 14058-81, | 14134-81, | 14441-81, |

14446-81, 14608-81, 15329-81, 15333-81, 15335-81, 15537-81,
15540-81, 15541-81, 15875-81, 15967-81, 16015-81, 16288-81,
16388-81, 16398-81, 16469-81, 16481-81, 16517-81, 16770-81,
17033-81, 17108-81, 17187-81, 17452-81, 17453-81, 17524-81,
17525-81, 17528-81, 17529-81, 17532-81, 17810-81, 17828-81,
17829-81, 17838-81, 17996-81, 18041-81, 18217-81, 18264-81,
18337-81, 18416-81, 18573-81, 18671-81, 18747-81, 19013-81,
19080-81, 19103-81, 19173-81, 19181-81, 19336-81, 19758-81,
19912-81, 20492-81, 20514-81, 20627-81, 20641-81, 20689-81,
21155-81, 21170-81, 21641-81, 21896-81, 21906-81, 22192-81,
22244-81, 22413-81, 22414-81, 22415-81, 22418-81, 22419-81,
22420-81, 22436-81, 22450-81, 22548-81, 22644-81, 22904-81,
22966-81, 23124-81, 23321-81, 23323-81, 23376-81, 23475-81,
23591-81, 24091-81, 24207-81, 24208-81, 24272-81, 24461-81,
24519-81, 24755-81, 25349-81, 25538-81, 25877-81, 25879-81,
25880-81, 25994-81, 26011-81, 26203-81, 26700-81, 26768-81,
26999-81, 27177-81, 27223-81, 27224-81, 27225-81, 27633-81,
27719-81, 27932-81, 28076-81, 28492-81, 28493-81, 28495-81,
28496-81, 28730-81, 28731-81, 29331-81, 29423-81, 29646-81,
30434-81, 30546-81, 30618-81, 30640-81, 30641-81, 30708-81,
31139-81, 31178-81, 31186-81, 31188-81, 31190-81, 31191-81,
31192-81, 31278-81, 31288-81, 31327-81, 31536-81, 31614-81,
183-82, 678-82, 706-82, 776-82, 1199-82, 1235-82,
1775-82, 1790-82, 1834-82, 1841-82, 2018-82, 2080-82,
2293-82, 2299-82, 2300-82, 2844-82, 2906-82, 3122-82,
3280-82, 3406-82, 3408-82, 3432-82, 3519-82, 3534-82,
3535-82, 3537-82, 3538-82, 3685-82, 3770-82, 3874-82,
4000-82, 4001-82, 4002-81, 4005-82, 4009-82, 4011-82,
4821-82, 4907-82, 4993-82, 5074-82, 5228-82, 5229-82,
5442-82, 5868-82, 5869-82, 5870-82, 5871-82, 5872-82,
5873-82, 5907-82, 5908-82, 5915-82, 5924-82, 5936-82,
5957-82, 6139-82, 6200-82, 6365-82, 6382-82, 6557-82,
6828-82, 6838-82, 6850-82, 6857-82, 6870-82, 7045-82,
7128-82, 7310-82, 7977-82, 8413-82, 8415-82, 8580-82,
8739-82, 10287-82, 10444-82, 10622-82, 11087-82, 11810-82,
12809-82, 13241-82, 13242-82, 13667-82, 13689-82, 13998-82,
14197-82, 14309-82, 14310-82, 14311-82, 14312-82, 14313-82,
14314-82, 14315-82, 14470-82, 14712-82, 14731-82, 14732-82,
14733-82, 14949-82, 14959-82, 14960-82, 14961-82, 15002-82,
15058-82, 15073-82, 15094-82, 15097-82, 15260-82, 15646-82,
15704-82, 15788-82, 15844-82, 15914-82, 16285-82, 16419-82,
16629-82, 16630-82, 16631-82, 16632-82, 16753-82, 17311-82,
17452-82, 17453-82, 17460-82, 17463-82, 17853-82, 17917-82,
18399-82, 18401-82, 19184-82, 19185-82, 20423-82, 20983-82,
21016-82, 22277-82, 24028-82, 24371-82, 25411-82, 26314-82.